THOMAS E. MONTGOMERY, County Counsel (State Bar No. 109654)
County of San Diego
By MELISSA M. HOLMES, Senior Deputy (State Bar No. 220961)
    ROBERT A. ORTIZ, Senior Deputy (State Bar No. 246849)
1600 Pacific Highway, Room 355
San Diego, California 92101-2469
Telephone: (619) 531-5836; Fax: (619) 531-6005
E-mail: melissa.holmes@sdcounty.ca.gov

Attorneys for Defendants County of San Diego, William Gore, Armin Vianzon and
Jeffrey Perine

# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Estate of Mark Roshawn Adkins, by and through his successor-in-interest Collette Adkins; Collette Adkins individually and in her capacity as successor-in-interest, <br><br> Plaintiffs, <br><br> v. <br><br> County of San Diego; William Gore, individually and in his official capacity; SDCSD Corporal Armin Vianzon, individually and in his official capacity; SDCSD Deputy Jeffrey Perine, individually and in his official capacity; and Does 1-20 individually and in their official capacities, inclusive, <br><br> Defendants. | No. 18-cv-00371-H-MDD <br><br> NOTICE OF LODGMENT IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT <br><br> Date: June 3, 2019 <br> Time: 10:30 a.m. <br> Courtroom: 15A <br> Judge: Honorable Marilyn L. Huff <br><br> NO ORAL ARGUMENT REQUESTED |

Defendants County of San Diego, William Gore, Armin Vianzon and Jeffrey Perine lodge the following exhibits in support of their motion for summary judgment:

Exhibit A – Excerpts from Defendant Deputy Jeffrey Perine's Deposition, referenced passages have been highlighted;

1  Exhibit B – Excerpts from Defendant Corporal Armin Vianzon's Deposition, referenced
2                passages have been highlighted;
3  Exhibit C – CD containing Cropped Video of Incident, cropping prepared by Jeffrey
4                Martin;
5  Exhibit D – CD containing Video of Incident, edited by Shawn Choi;
6  Exhibit E – Corporal Vianzon's Taser download report CSD000138;
7  Exhibit F – Excerpts of Deputy Patrick O'Connor's Deposition, referenced passages have
8                been highlighted;
9  Exhibit G – County of San Diego Medical Examiner's Department Autopsy and
10               Toxicology Reports, Bates Nos. CSD000123 – CSD000135;
11 Exhibit H – Excerpts of Plaintiff's Use of Force Expert, Roger Clark's Deposition,
12               referenced passages have been highlighted;
13 Exhibit I –  Addendum F, the County's Use of Force policy in effect at the time of the
14               incident;
15 Exhibit J - Excerpts of County's 30(b)(6) witness on use of force policy and procedure,
16               Lieutenant Christopher Cross' Deposition, referenced passages have been
17               highlighted;
18 Exhibit K – Excerpts of County's 30(b)(6) witness on Taser training, Joseph Jarujua's
19 Deposition, referenced passages have been highlighted;
20 Exhibit L - Excerpts of County's 30(b)(6) witness on Taser qualifications, Sergeant
21 James Golembiewski's Deposition, referenced passages have been highlighted;
22 Exhibit M – Portions of Spring 2017 Weapons Qualifications marked as Exhibit 24 to
23 Golembiewski's Deposition (CSD003197 & CSD003202).

24 DATED: May 6, 2019                 THOMAS E. MONTGOMERY, County Counsel

25
26                                     By: s/MELISSA M. HOLMES, Senior Deputy
                                       Attorneys for Defendants County of San Diego,
27                                     William Gore, Armin Vianzon and Jeffrey Perine
                                       E-mail: melissa.holmes@sdcounty.ca.gov
28

# Exhibit A

Atkinson-Baker, Inc.
www.depo.com

```
 1              UNITED STATES DISTRICT COURT

 2             SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   ESTATE OF  MARK ROSHAWN ADKINS,    )
     ET AL.,                            )
 5                                      )        CERTIFIED COPY
                         PLAINTIFFS,    )
 6                                      )
         vs.                            )Case No. 18cv0371
 7                                      )         H-JMA
     COUNTY OF SAN DIEGO, ET AL.,       )
 8                                      )
                         DEFENDANTS.    )
 9   _____)

10

11

12

13

14       VIDEOTAPED DEPOSITION OF DEPUTY JEFFREY PERINE

15                 SAN DIEGO, CALIFORNIA

16                  NOVEMBER 8, 2018

17

18

19   ATKINSON-BAKER, INC.
     800.288.3376
20   www.depo.com

21   REPORTED BY:  LORENA BARRÓN, CSR NO. 12058

22

23   JOB.:  AC0B693

24

25
```

Atkinson-Baker, Inc.
www.depo.com

```
 1   BY MR. SCOTT:                                          10:38:12

 2       Q    If you've already deployed both cartridges, so

 3   four barbs have been expelled from the Taser, if you

 4   continue to pull the trigger after that, does that send

 5   electric current through the wire similar to pushing the  10:38:31

 6   ARC button?

 7            MS. HOLMES:  Objection.  Vague.  Incomplete

 8   hypothetical.

 9            THE WITNESS:  Yes.  It -- it would -- it would

10   basically do the same thing as the ARC button.            10:38:41

11   BY MR. SCOTT:

12       Q    You -- you started as a deputy sheriff in

13   2014?

14            Do I have that right?

15       A    Yes.                                              10:39:00

16       Q    Do you remember the first time that you had to

17   use a Taser in a non-training setting, you know, against

18   the suspect in the field?

19            MS. HOLMES:  Objection.  Vague.

20            THE WITNESS:  Yes.  It was -- the incident was   10:39:13

21   Mr. Adkins.

22   BY MR. SCOTT:

23       Q    So prior to the incident with Mr. Adkins, you

24   had never, in your career as a deputy sheriff, used a

25   Taser against a -- you know, a live human being in the    10:39:34
```

                                                                    33

Atkinson-Baker, Inc.
www.depo.com

1    field?                                                    10:39:39

2              MS. HOLMES:  Objection.  Asked and answered.

3              THE WITNESS:  That's correct.

4    BY MR. SCOTT:

5         Q    Have you ever used a Taser in the field in a   10:39:43

6    non-training setting since the Adkins incident?

7         A    No.

8         Q    Now, I assume, but please correct me if I'm

9    wrong, that you have deployed the Taser device in a

10   training setting before the Adkins incident; is that     10:40:09

11   true?

12        A    Yes.

13        Q    All right.  I think we've said our next

14   exhibit in order is Exhibit 6.

15             Does that sound right?                          10:40:33

16                  (Exhibit 6 was marked.)

17   BY MR. SCOTT:

18        Q    Do you recognize Exhibit 6, sir?

19        A    Is No. 6 in regards to the Use of Force

20   report?                                                  10:41:04

21             MS. HOLMES:  No, he's asking for the exhibit

22   in general.

23             THE WITNESS:  Oh.

24             MS. HOLMES:  Not No. 6.  So take your time.

25   Read through the entire thing.  Any time he asks you     10:41:09

34

Deputy Jeffrey Perine
November 8, 2018
EXHIBIT A

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | evidence.  Vague.  Calls for speculation. | 01:54:14 |
| 2 | THE WITNESS:  I was aware that whenever we | |
| 3 | unholster our Taser, it -- it needs to be necessary and | |
| 4 | justified.  And if you're going to arm the Taser, then | |
| 5 | there's a chance that you are going to use it. | 01:54:29 |
| 6 | Um, so at the time that a Taser is unholstered, | |
| 7 | there needs to be some sort of, um, display or actions | |
| 8 | that, you know, would -- would force you to do so. | |
| 9 | BY MR. SCOTT: | |
| 10 | Q    My -- my question is a little bit different. | 01:54:45 |
| 11 | Prior to the Adkins incident, were you aware | |
| 12 | that -- of a risk of potentially accidentally deploying | |
| 13 | a Taser against a suspect, based on the sensitive | |
| 14 | trigger that's described in the training bulletin? | |
| 15 | MS. HOLMES:  Objection.  Incomplete | 01:55:03 |
| 16 | hypothetical.  Vague. | |
| 17 | THE WITNESS:  I recall a sensitive trigger, | |
| 18 | but it -- it -- I don't recall specifics of accidentally | |
| 19 | deploying it.  And I -- in my time, I'd never seen | |
| 20 | anything like that or heard anything. | 01:55:16 |
| 21 | BY MR. SCOTT: | |
| 22 | Q    Prior to the Adkins incident, were you aware | |
| 23 | that, um, a deputy needed to be careful not to | |
| 24 | accidentally deploy a second cartridge when using a | |
| 25 | Taser? | 01:55:31 |

124

Atkinson-Baker, Inc.
www.depo.com

```
 1            MS. HOLMES:  Objection.  Vague.  Incomplete      01:55:32
 2    hypothetical.
 3            THE WITNESS:  I -- I don't recall that
 4    specifically, um, but like with any device we use where
 5    a trigger is pulled, you know, caution should be taken.    01:55:46
 6    And I don't know exactly what the trigger or the
 7    sensitivity level is, um, so I couldn't a hundred
 8    percent tell you that.
 9    BY MR. SCOTT:
10       Q    Did you ever accidentally employ your Taser       01:56:02
11    against Mr. Adkins specifically?
12       A    Accidentally?
13            MS. HOLMES:  Objection.  Vague.
14            THE WITNESS:  I -- I don't believe so, because
15    I don't believe my Taser, um, when deployed, made         01:56:17
16    connection with him.
17    BY MR. SCOTT:
18       Q    Did you ever accidentally ARC the Taser that
19    you used during the Adkins incident?
20            MS. HOLMES:  Same objection.                      01:56:32
21            THE WITNESS:  Not intentionally.
22    BY MR. SCOTT:
23       Q    Well, my question was specifically to your
24    knowledge.  Um, did you ever accidentally cause your
25    Taser to ARC when using it against Mr. Adkins?            01:56:43
```

Deputy Jeffrey Perine
November 8, 2018
EXHIBIT A

Atkinson-Baker, Inc.
www.depo.com

```
 1              MS. HOLMES:  Same objection.  Asked and        01:56:47
 2      answered.
 3              THE WITNESS:  It -- not intentionally.  I
 4      mean, I -- I don't know what you're trying to get at.
 5      Not that I recall.                                    01:56:56
 6              MS. HOLMES:  Do you understand what he's
 7      asking you?
 8              THE WITNESS:  Yes, if I intentionally was
 9      ARC'ing my Taser.
10              MS. HOLMES:  That's not what he asked you.     01:57:04
11          It seems like he's confused, that's why I'm
12      stepping in.  So maybe have the reporter read it back or
13      say it a different way, but he's not following you.
14              THE WITNESS:  Sorry.
15      BY MR. SCOTT:                                          01:57:14
16          Q   At some point you've reviewed the Taser
17      download report --
18          A   Yes.
19          Q   -- from the Adkins incident, correct?
20          A   Yes.                                           01:57:22
21          Q   Did -- and do you remember seeing, um, several
22      different lines suggesting that the Taser was ARC'd that
23      morning?
24          A   Yes.
25          Q   Now, based on your memory of the incident      01:57:34
```

126

Atkinson-Baker, Inc.
www.depo.com

```
 1   itself and your review of the documents, was each of        01:57:36

 2   those ARCs something that you did on purpose or -- or

 3   were any of them an accident, to the best of your

 4   knowledge?

 5           MS. HOLMES:  Objection.  Compound.                   01:57:46

 6           THE WITNESS:  To the best of my knowledge,

 7   they were an accident or unintentional.  And a lot of it

 8   I was trying to re-holster it.  And, you know, I

 9   don't -- I can't recall why there were additional, you

10   know, one second, where it says ARCs on the printout.        01:58:02

11   BY MR. SCOTT:

12       Q    Okay.  So we'll look at the document here in a

13   few minutes.  But based -- I want to make sure I

14   understand what you're saying.

15           How many times do you recall deliberately            01:58:13

16   employing electrical current against Mr. Adkins?

17           MS. HOLMES:  Objection.  Vague.  Asked and

18   answered.

19           THE WITNESS:  I -- at no point was any

20   electrical current delivered from my Taser, because it       01:58:27

21   never had any type of effect.

22   BY MR. SCOTT:

23       Q    Okay.  Let me ask the question a little bit

24   different way.

25           Um, based on your memory, how many times did         01:58:39
```

127

Atkinson-Baker, Inc.
www.depo.com

```
1    you deliberately attempt to employ the Taser against        01:58:41

2    Mr. Adkins?

3          A    Deploy?

4          Q    Okay.  Well, I -- I guess, in your mind deploy

5    means shooting the barbs in the first instance, right?      01:58:52

6          A    Yes.

7          Q    Okay.  How many times did you intentionally

8    shoot barbs from your Taser at Mr. Adkins?

9          A    Two separate times.

10         Q    Was there any time after that that you then      01:59:03

11   deliberately ARC'd the Taser against Mr. Adkins?

12         A    Not that I recall.

13         Q    To the best of your memory, you never pushed

14   the -- the ARC button after you deployed the Taser?

15         A    I don't recall whether I did or not.  I think    01:59:21

16   a lot of it was just a struggle.

17         Q    What do you mean?

18         A    Well, trying to gain compliance, there are

19   barbs, you know, everywhere.  And trying to get to a

20   safe spot.                                                   01:59:36

21         Q    After you shot the two sets of barbs, do you

22   remember pulling the trigger again?

23         A    I don't recall that.

24         Q    Now, does that mean you don't think you pulled

25   the trigger again or does it -- does it mean you just        01:59:49
```

128

Atkinson-Baker, Inc.
www.depo.com

```
 1   don't remember it one way or the other?          01:59:52

 2       A    I -- honestly, I'm not sure.

 3       Q    So you're not saying you didn't.  You're just

 4   saying "I don't remember"?

 5            MS. HOLMES:  Objection.  Misstates prior     02:00:05

 6   testimony.

 7            THE WITNESS:  No, I don't -- I don't remember

 8   doing it at all.

 9   BY MR. SCOTT:

10       Q    Okay.  So I got to back up one question, then.  02:00:13

11       A    Okay.

12       Q    Does that mean that you -- you remember.  And

13   the way you remember it is that you did not pull the

14   pull the trigger again?

15            MS. HOLMES:  Objection.  Vague.              02:00:22

16   Unintelligible.

17            THE WITNESS:  From my recollection, it -- I

18   never made contact.  So from my recollection, it

19   wouldn't have done any good to -- to do that.  And I --

20   I don't know why I would have.  And I don't recall doing  02:00:38

21   it.

22   BY MR. SCOTT:

23       Q    Okay.  So let's set aside whether you think it

24   made contact or not.

25       A    Okay.                                        02:00:47
```

Deputy Jeffrey Perine
November 8, 2018
EXHIBIT A

Atkinson-Baker, Inc.
www.depo.com

```
 1        Q     I'm just asking about the act of pulling the      02:00:47
 2   trigger.
 3              Did you pull the trigger a third time after
 4   deploying both cartridges?
 5              MS. HOLMES:  Objection.  Asked and answered.      02:00:53
 6              THE WITNESS:  I -- I don't recall.
 7   BY MR. SCOTT:
 8        Q     Did you push the ARC button after deploying
 9   the two cartridges against Mr. Adkins?
10        A     I don't recall whether I pushed it.               02:01:08
11              I recall trying to, um, figure a way to -- to
12   get the cartridges out, um, because the -- the barbs
13   were everywhere, and I didn't want to put my Taser down
14   and have, you know, someone else grab it.
15              So a lot of it was trying to -- I was trying      02:01:30
16   to get the cartridges out and holster it, but the barbs
17   were just kind of everywhere.
18        Q     When did you try to holster it?
19              MS. HOLMES:  Objection.  Vague.
20              THE WITNESS:  From my recollection, after I       02:01:46
21   deployed the second -- the second cartridge.
22   BY MR. SCOTT:
23        Q     All right.  Let's now go to the March 2017
24   bulletin that's also part of Exhibit 10.
25        A     Okay.                                             02:02:22
```

130

Atkinson-Baker, Inc.
www.depo.com

```
 1            MS. HOLMES:  How are you doing?              02:02:29

 2            Do you need a break?

 3            THE WITNESS:  No, I'm good.  I'm just thirsty.

 4    BY MR. SCOTT:

 5       Q    Did you receive this March 2017 training      02:02:34

 6    bulletin?

 7       A    I -- I don't recall reading this exact one.  I

 8    may have.

 9       Q    The italicized sentence at the bottom of the

10    first paragraph says, This training bulletin supersedes  02:02:55

11    any previous instructions or warnings regarding the use

12    of Taser slash CEW.  Deputies shall follow all of these

13    guidelines.

14            Do you see where it says that?

15       A    Yes.                                         02:03:10

16       Q    All right.  Um, what does that sentence that I

17    just read to you mean to you?

18            How do you interpret that?

19       A    That this bulletin is now the letter of the

20    law.  You know, we're going by this.                 02:03:22

21       Q    But you don't remember ever reading this

22    bulletin?

23            MS. HOLMES:  Objection.  Misstates prior

24    testimony.

25            THE WITNESS:  I don't recall specifically     02:03:31
```

Deputy Jeffrey Perine
November 8, 2018
EXHIBIT A

Atkinson-Baker, Inc.
www.depo.com

```
 1    reading it.  Um, if it was a bulletin that was sent via      02:03:33

 2    email, then I did read it, because I read all of them.

 3            And so with -- with policies, we have so many,

 4    whether it's Taser or some other -- whether it's a force

 5    option or just a policy in general, we get a lot, you know,   02:03:49

 6    sent through email.

 7    BY MR. SCOTT:

 8        Q    The first bullet point where it says, Use the

 9    shortest objectively reasonable duration of CEW exposure

10    to accomplish lawful objectives, do you see that there?      02:04:02

11        A    Yes.

12        Q    What does that mean to you?

13        A    That we're going to try to -- if the Taser is

14    used, to get them in a safe position, handcuffed, so

15    that we don't have to ARC, use -- deploy Taser anymore.      02:04:23

16    And it's kind of like that with most forces, use of

17    force.

18            We want to limit any type of -- you know,

19    whether it be strikes or blows or Taser, just make --

20    make it safe as quick as possible.                           02:04:37

21        Q    So all things being equal, the minimum amount

22    of force is what you should use if you can do that

23    safely.

24            Is that a true statement?

25            MS. HOLMES:  Objection.  Vague.  Calls for           02:04:48
```

132

Deputy Jeffrey Perine
November 8, 2018
**EXHIBIT A**

Atkinson-Baker, Inc.
www.depo.com

```
 1   at 2:27 p.m.                                          02:27:56

 2   BY MR. SCOTT:

 3        Q    Good afternoon, sir.

 4             We were just starting to talk about when we

 5   broke, the -- what we've been referring to this       02:28:09

 6   afternoon as -- is the Adkins incident.

 7             Um, can you tell me what you remember about

 8   sort of the -- the beginning of that encounter?

 9             Or how did you first hear that there was an

10   incident that you needed to respond to?              02:28:26

11        A    It was a radio call that was sent to me and my

12   partner.

13        Q    And -- and what was the nature of the radio

14   call?

15        A    It initially came out as a 602 call, which is 02:28:36

16   a trespassing call.  Um, I don't remember the exact

17   address, but it was on Lemon Grove Way.  Um, and then I

18   remember responding, saying I'll -- I'll be en route.

19             And the call, as I was driving to the call, it

20   continued to get updated information.  Second person   02:28:58

21   called in, um, I remember the subject was scaling walls,

22   was sweating profusely, specifically mentioned the --

23   the subject, um, I don't remember the exact verbiage,

24   but I believe he was on PCP, which is odd in a radio

25   call.  And then as I approached the area, I was flagged 02:29:26
```

Deputy Jeffrey Perine
November 8, 2018
EXHIBIT A

1    down by a couple different citizens who appeared to be        02:29:31

2    frightened and pointed me in the direction of the

3    subject.

4        Q    So let me unpack that a little bit.

5             You said that it was initially reported as a        02:29:45

6    602 call, right?

7        A    Yes.

8        Q    Meaning, the initial report was that there was

9    a -- a trespassing-type suspected crime; is that right?

10            MS. HOLMES:  Objection.  Vague.        02:30:01

11            THE WITNESS:  From what I recall, that's what

12   the initial dispatch call was.

13   BY MR. SCOTT:

14       Q    Okay.  Um, in -- in terms of the -- the nature

15   of the suspected offense, did that ever change?        02:30:10

16            I mean, did you ever get an update suggesting

17   that a different crime was afoot?

18       A    Yes.

19       Q    And what was that different crime?

20       A    They mentioned that the subject was pulling on        02:30:20

21   door handles.  Um, so my fear was some sort of

22   residential burglary, 459.  Um, so that -- that was also

23   in my mind.  And then the mention of PCP, it would be

24   11550, someone possibly under the influence.  11550 H&S.

25       Q    So in -- in terms of kind of what you were        02:30:45

Deputy Jeffrey Perine
November 8, 2018
EXHIBIT A

1    thinking of is potential, um, crimes under the penal        02:30:47

2    code, so far you've mentioned initially 602 trespass,

3    right, so far?

4         A    Yes.

5         Q    And then because of a report that apparently       02:30:58

6    the person was trying to enter a home that didn't belong

7    to him, potentially a 459, which is a burglary, right?

8         A    Yes.

9         Q    And then the fact that he may have been under

10   the influence would be an 11550 under the penal code,       02:31:11

11   right?

12             Oh, that's actually under the --

13        A    Health and safety.

14        Q    -- health and safety code, right?

15        A    Yes.                                                02:31:17

16        Q    Based on the information you had before you

17   got to the scene, were there any other crimes that were

18   suspected, to your knowledge?

19        A    To my knowledge, it -- it -- it was somewhat

20   unknown, because I don't know why they're trying to go      02:31:30

21   into the houses or what's happening or what their intent

22   is.  I hadn't visually seen the individual.  So I - I

23   couldn't -- you know, I can only go by what I'm told.

24        Q    So just going by only what you -- what you

25   were told, were there any specific facts or -- or          02:31:48

Deputy Jeffrey Perine
November 8, 2018
EXHIBIT A

1    circumstances that led you to believe there were crimes,    02:31:51

2    other than the ones that we just discussed, that were

3    afoot?

4        A    I -- I don't recall exactly what was going

5    through my mind.  But I know that the three that I    02:32:02

6    listed were definitely something that I was thinking

7    about.

8        Q    Did -- did you ever receive any information

9    that the suspect, who turned out to be Mr. Adkins, was

10   trying to physically harm anyone?    02:32:18

11       A    Throughout the radio call, no.  I don't recall

12   any physical harm or attempt or anybody being pushed or

13   assaulted.

14       Q    Let me unpack that.  There's a couple of

15   things there.    02:32:35

16            Um, you don't remember any facts suggesting

17   that Mr. Adkins had actually harmed someone in the

18   context of the radio call; is that true?

19       A    In the context of the radio call, no.

20       Q    And you didn't receive any facts to suggest    02:32:49

21   that he had tried to physically harm someone during the

22   radio call; is that true?

23       A    My thinking or what's going through my mind

24   is, why are they trying to get into someone's house, you

25   know, in the morning on a -- on a Saturday when people    02:33:07

141

Atkinson-Baker, Inc.
www.depo.com

1    are typically home.  You know, it's concerning.                02:33:10

2           I -- I don't know if it's just a home invasion

3    possibly or if there's more to it.  So I -- I don't

4    recall -- I don't believe that anyone had physically

5    been harmed, but there's often a delay as well.  So I --    02:33:21

6    I didn't know what to expect.

7        Q    And so you described that there had been a

8    report for whatever reason, Mr. Adkins was apparently

9    trying to enter somebody's home, right?

10       A    Yes.                                                 02:33:37

11       Q    And certainly, that gave -- gave you reason to

12   wonder why -- why he was doing that, right?

13       A    Yes.

14       Q    Okay.  Now, aside from that, did you receive

15   any information to suggest that he was trying to           02:33:46

16   physically harm someone?

17           MS. HOLMES:  Objection.  Asked and answered.

18           THE WITNESS:  No.  I don't -- I don't recall

19   any information about that.

20   BY MR. SCOTT:                                                02:33:55

21       Q    Did you ever receive a report that Mr. Adkins

22   was armed?

23       A    None of the reporting party from my

24   recollection witnessed any weapons.

25       Q    Was there any suggestion that Mr. Adkins had a     02:34:07

Atkinson-Baker, Inc.
www.depo.com

1    weapon of any kind?                                    02:34:12

2        A    I don't believe -- I don't believe anyone

3    reported that.

4        Q    What other information did you receive before

5    you actually arrived at the scene --                   02:34:29

6        A    Just --

7        Q    -- aside from what we've already talked about?

8        A    Any other information would be, um,

9    Mr. Adkins' appearance.  Black male adult, I believe it

10   was a white shirt, uh, ponytail, sweating profusely, is  02:34:39

11   what kind of stuck out in my mind.

12       Q    Did the fact that you had received information

13   that Mr. Adkins may be under the influence of drugs, in

14   general, and/or PCP in particular, change the way that

15   you approached the scene at all?                        02:35:00

16           MS. HOLMES:  Objection.  Vague.  Incomplete

17   hypothetical.

18           THE WITNESS:  When I -- I arrived first and --

19   it changed the way, in terms of some -- some calls you

20   can head up, approach by yourself knowing your partner  02:35:11

21   is coming, but I -- I actually staged and waited for my

22   partner to get there with me, just due to someone saying

23   that the belief that he was on PCP, because that's not a

24   safe call for one, you know, deputy to go to, so...

25   ///                                                     02:35:32

143

Deputy Jeffrey Perine
November 8, 2018
EXHIBIT A

Atkinson-Baker, Inc.
www.depo.com

1    BY MR. SCOTT:                                          02:35:32

2         Q    What does that mean, to "stage"?

3         A    I pulled up the driveway, and the location was

4    upstairs and on a -- kind of a big balcony on the second

5    floor.  And I parked my car, waited maybe 30 seconds for   02:35:45

6    my partner to get there, that way we can utilize contact

7    cover.

8         Q    Did you feel that if, um, the situation was

9    such that it -- it was safe to the public and the people

10   that were already on the scene to wait for your -- your    02:36:04

11   partner to arrive?

12        A    Can you -- can you say that again?

13        Q    Yeah.  To put it differently, um,

14   understanding Mr. Adkins was, um, under the influence of

15   PCP or that was the information that you had, would you    02:36:16

16   have intervened without waiting for backup if you felt

17   you had to do that to protect a member of the public?

18             MS. HOLMES:  Objection.  Vague.  Incomplete

19   hypothetical.

20             THE WITNESS:  It all depends on -- on the       02:36:29

21   situation.  It -- when it comes to safety, if -- if a

22   call of -- I'll give you an example, 459 comes out, um,

23   it's recommended that we always have at least two people

24   go to those.  So staging is encouraged and I've been,

25   you know, told by supervisors, Don't ever go to these     02:36:48

144

Deputy Jeffrey Perine
November 8, 2018
EXHIBIT A

1    calls by yourself.  It is not safe.                    02:36:51

2    BY MR. SCOTT:

3        Q    Um, why didn't you wait for three or four

4    deputies?

5        A    There's only two deputies working in Lemon       02:36:58

6    Grove.

7        Q    Well, ultimately, at least four were on the

8    scene within a matter of minutes; isn't that true?

9            MS. HOLMES:  Objection.  Vague.

10           THE WITNESS:  I don't recall when they           02:37:10

11   arrived, but I put out the radio traffic that he's being

12   uncooperative.  And I -- being given emergency traffic,

13   and units were, um, coming -- our closest cover is

14   Spring Valley, so they were rolling code or lights and

15   sirens from Spring Valley to Lemon Grove.               02:37:29

16   BY MR. SCOTT:

17       Q    Which takes how long, in your experience?

18           MS. HOLMES:  Objection.  Vague.

19           THE WITNESS:  Anywhere from 5 to 15 to 20

20   minutes.                                                02:37:39

21   BY MR. SCOTT:

22       Q    Did you -- before you made contact with

23   Mr. Adkins, did you consider whether you should wait for

24   a third or fourth deputy to arrive from Spring Valley

25   before making contact?                                  02:37:54

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | Is that something that you thought about or | 02:37:56 |
| 2 | considered at all? | |
| 3 | A    Something that always -- we always consider. | |
| 4 | Q    Did you, in fact, consider it in this case? | |
| 5 | A    No.  My partner and I in Lemon Grove, we | 02:38:05 |
| 6 | pretty -- it's the two -- it was the two of us at that | |
| 7 | time and that's how we -- we handled our business. | |
| 8 | The only calls that we would have had more | |
| 9 | units or waited for would be something like occupied | |
| 10 | stolen vehicle or a hot stop involves at least, a | 02:38:20 |
| 11 | minimum of three deputies or maximum restraining | |
| 12 | someone, which is recommended at least three deputies, | |
| 13 | something along those lines.  But this call wasn't | |
| 14 | something that needed three deputies, just per the text | |
| 15 | of the call. | 02:38:39 |
| 16 | Q    All right.  I want to make sure I understand | |
| 17 | you, because of -- at first I heard you say something we | |
| 18 | always consider, but then I heard you say, but we didn't | |
| 19 | consider it in this case.  So help -- help me -- help me | |
| 20 | reconcile that. | 02:38:51 |
| 21 | MS. HOLMES:  Objection.  Mistreats prior | |
| 22 | testimony. | |
| 23 | BY MR. SCOTT: | |
| 24 | Q    So the question specifically is, did it cross | |
| 25 | your mind before you made contact with Mr. Adkins, Maybe | 02:38:59 |

146

Atkinson-Baker, Inc.
www.depo.com

```
 1   we should bring in a third and fourth deputy from, you    02:39:03

 2   know, from Spring Valley before we approach this guy,

 3   given the fact that, you know, there's some information

 4   he may be on PCP?

 5        A    Like I said, it crossed my mind always, you      02:39:13

 6   know, things cross my mind like that.  Like, have a

 7   backup plan.  But like you're kind of saying to me

 8   earlier, why didn't you approach him by yourself, well,

 9   I waited for my -- my partner.  So when two of us are

10   there, that's when ultimately, let's go and actually see  02:39:28

11   what is going on here and evaluate it ourselves.

12        Q    So did you, in fact, consider, Maybe we should

13   call Spring Valley?  Did you think about that actively

14   in your mind?

15             MS. HOLMES:  Objection.  Asked and answered.     02:39:45

16   Argumentative.

17             THE WITNESS:  I would say with any call,

18   that's going to run through my mind.

19   BY MR. SCOTT:

20        Q    And -- and then you decided not to do that; is   02:39:52

21   that right?

22        A    Yeah.  My partner and I decided to evaluate

23   ourselves.

24        Q    Did you discuss that out loud with Deputy

25   Vianzon?                                                   02:40:02
```

147

```
 1      A    No.                                          02:40:06

 2      Q      All right.   So what -- what did you see when

 3   you arrived at the scene?

 4      A    We walked up.   I saw two black male adults

 5   standing in front of -- I forget what unit number, on a,  02:40:18

 6   I guess, cement kind of area, in front of a bunch of

 7   condos or townhouses.

 8           And one matching the description, identified

 9   as Mr. Adkins, and the other one was a resident of one

10   of the houses.   Um, and immediately as I walked up, I    02:40:39

11   noticed the white shirt that he was wearing was covered

12   in sweat or water, as if, you know, so wet, like,

13   possibly he jumped in a pool or something, um, and sweat

14   was just dripping down his face, forehead, arms, things

15   like that.                                               02:41:01

16      Q    Did Mr. Adkins and the other male that was

17   there seem to be interacting with each other?

18      A    I couldn't tell.   They were standing kind of

19   close to each other, and my initial reaction -- I don't

20   know whether it was me or my partner at this point, but  02:41:19

21   we asked the other individual, "Hey, do you know him?"

22   He said, no, but something along the lines of

23   "Something's wrong with him."

24           Um, so then that's when we asked him, Okay.

25   We're going to talk to him.   And then he ultimately      02:41:33
```

148

1   walked, I believe, back into his apartment.                02:41:36

2       Q    Aside from the other male telling you that he

3   did not know Mr. Adkins, and stating that something

4   seems to be wrong with him, did -- did that black male

5   say anything else to you that you can recall?             02:41:52

6       A    Not that I can recall.

7       Q    What was that other male's demeanor like when

8   he was interacting with you?

9       A    He -- he just kind of seemed confused as to

10  what was going on, who he was talking to, um, that's      02:42:08

11  about it.  It -- it was a real brief interaction.

12      Q    I want to make sure we're talking about the

13  same person.  We're talking about not Mr. Adkins, but

14  the other gentleman that was standing there, right?

15      A    Yes.                                             02:42:23

16      Q    So you said that other gentleman seemed

17  somewhat confused when he was speaking to you and your

18  partner?

19      A    He seemed confused as to what Mr. Adkins was

20  doing.                                                    02:42:33

21      Q    I see.  Um, did -- did he express to you that

22  he felt to be in danger from Mr. Adkins?  Did he say

23  anything like that to you?

24      A    No.  We -- we asked him if he can leave, to

25  the best of my recollection, so we could speak with       02:42:45

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | Mr. Adkins. | 02:42:48 |
| 2 | Q    Did he report to you that Mr. Adkins was | |
| 3 | acting violently? | |
| 4 | A    No. | |
| 5 | Q    Did he say that Mr. Adkins was threatening | 02:42:55 |
| 6 | anyone or anything like that? | |
| 7 | A    No. | |
| 8 | Q    What else did he say, if you can remember, | |
| 9 | about Mr. Adkins and his behavior? | |
| 10 | A    Just what I told you earlier, that he didn't | 02:43:07 |
| 11 | know who he was. | |
| 12 | Q    All right.  So at that point, the second | |
| 13 | gentleman is -- is leaving; is that right? | |
| 14 | A    Yes. | |
| 15 | Q    What's Mr. Adkins doing at that point? | 02:43:20 |
| 16 | A    He's sweating.  He's breathing very heavily, | |
| 17 | and he's clenching his fist repeatedly. | |
| 18 | Q    Is he interacting with you when he's doing any | |
| 19 | of those things? | |
| 20 | A    He was grunting, um, loudly. | 02:43:33 |
| 21 | Q    Do you feel like he was directing the grunting | |
| 22 | specifically towards you?  Or was he sort of grunting, | |
| 23 | you know, in any direction? | |
| 24 |      I don't know if that question makes sense. | |
| 25 | A    He was looking directly at me when he was | 02:43:45 |

150

Atkinson-Baker, Inc.
www.depo.com

1    doing it.  So I -- I felt that it was possibly directed        02:43:48

2    at me.

3         Q    What happened next?

4         A    I asked him who he was, if he lived in the

5    area.  Um, "What's your name?"  Trying to figure              02:43:57

6    something out.  And he -- he continued to grunt and

7    stare at me, and just continued to clench his fists.

8              And that's when I believe that he's -- he

9    needs help.  He's under the influence of whether it's a

10   controlled substance, alcohol, something -- something is      02:44:15

11   going on.

12             So first thing I did, I said, "Hey, sir,

13   you're going to be detained right now.  I'm going to

14   detain you in handcuffs and figure out what's going on."

15             And so I circled around him and attempted to        02:44:26

16   grab one of his wrists for compliance.  And instead of

17   being able to pull his wrists behind his back, he did

18   a -- a gesture, kind of, like, shoved his wrist, kind

19   of, like, pushed me, so to speak with one arm.

20        Q    Can you show me with -- with your own arm, the      02:44:43

21   gesture that Mr. Adkins made?

22        A    So if he's -- would you like me to stand up?

23        Q    Uh, sure, if that's helpful to you.

24        A    So if I approach him from the back and he's --

25   he's doing one of these (indicating), um, I go to grab        02:44:57

Deputy Jeffrey Perine
November 8, 2018

EXHIBIT A

Atkinson-Baker, Inc.
www.depo.com

1    Taser out?                                              02:50:28

2          MS. HOLMES:  Objection.  Misstates prior

3    testimony.

4          THE WITNESS:  My prior knowledge that he did

5    try to strike me.                                       02:50:32

6    BY MR. SCOTT:

7       Q    Right.  So we've discussed that.  We discussed

8    grunting and we discussed fist pumping, right?

9       A    Uh-huh.

10      Q    Anything else?                                  02:50:42

11      A    Just the continued fist pumping and moving

12   towards me.  His body.

13      Q    Are -- are there any other physical mannerisms

14   that you can think of or that you remember that he did,

15   before you pulled out your Taser?                       02:50:54

16      A    Well, I mean, I -- when he pushed me back --

17   as I'm moving back, I pulled my Taser out.  I -- I

18   wasn't sure if he was going to continue to come at me,

19   if he was going to turn and stop.

20          So at that point, that's why I moved back as    02:51:07

21   quick as I could, to try to get to that distance where a

22   Taser might work, because I knew if I go hands on, it's

23   not going to be a fair fight.

24      Q    What makes you say that?

25      A    I believe from the text of the call, and when  02:51:21

157

Atkinson-Baker, Inc.
www.depo.com

1    I went to grab his arm, I generally try to stay fit and          02:51:24

2    work out, and usually I'll -- I'll move someone's arm a

3    little.  But his felt like -- kind of like a tree branch

4    or like a big part of a tree.  It -- it didn't move at

5    all.  It moved me the other way, and it was really          02:51:41

6    surprising the amount of strength I felt in that one

7    kind of push.

8         Q    Do you know, based on your training and

9    experience, um, what the phrase "de-escalate a

10   situation" means?          02:51:56

11        A    To the -- to the best of my ability, it would

12   be to -- at this point to de-escalate that, would be to

13   start talking with him, give him commands.  De-escalate

14   meaning make the situation -- kind of bring it down a

15   notch.          02:52:17

16             Is that what you're getting at?

17        Q    Well, I'm asking you, what does it mean to

18   de-escalate a situation, based on your training and

19   experience?

20             MS. HOLMES:  Objection.  Vague.          02:52:23

21             THE WITNESS:  To de-escalate would be to try

22   to find a way to -- to deal with the situation without

23   it escalating into -- into something where force or

24   anything is used.

25   ///          02:52:41

158

Deputy Jeffrey Perine
November 8, 2018
EXHIBIT A

Atkinson-Baker, Inc.
www.depo.com

```
 1   BY MR. SCOTT:                                        02:52:41

 2       Q    Have you been taught that you should try to

 3   de-escalate a situation when it's safe to do so, to

 4   avoid the use of force?

 5       A    Yes.                                         02:52:51

 6       Q    Did you try to de-escalate the situation with

 7   Mr. Adkins?

 8       A    Yes.

 9       Q    How did you try to do that?

10       A    Verbally and loudly ordered him to the ground.  02:52:58

11       Q    Now, that's after he moved his arm away and

12   you had pulled out the Taser?

13       A    Yes.

14       Q    Okay.  Let's back up.

15            Um, did you ever try to de-escalate the       02:53:08

16   situation prior to the Taser coming out?

17       A    Yes.

18       Q    In what manner?

19       A    I tried to place him in handcuffs.

20       Q    Okay.  What else did you try to do to        02:53:21

21   de-escalate the situation?

22       A    Asked him who he was.  Why he was there.  If

23   he was able to give me his information and reasonable

24   explanation as to why he was there, then there would

25   have been no need to -- to, you know, ask him to turn  02:53:34
```

159

Atkinson-Baker, Inc.
www.depo.com

1   around or to put handcuffs on him.  Said, Hey, I live,   02:53:38

2   you know, two doors down and I've been going for a jog

3   all night, you know, is a little different.

4        Q    Okay.  So asking what he was doing there was

5   the first example of you trying to de-escalate; is that   02:53:53

6   true?

7        A    Yes.

8        Q    Uh, what was the next thing that you did to

9   try to de-escalate the situation?

10        A    Just try to speak with him.  Figure out who he   02:54:02

11   is, what his name is.

12        Q    Okay.  What is the next thing that you tried

13   to do to de-escalate the situation after that?

14        A    Well, at that point, it -- to me it was

15   apparent that he was under the influence.  And in   02:54:13

16   attempt de-escalate any force, was to put handcuffs on

17   him.

18             And I made it clear, that your -- "Sir, you're

19   going to be detained in handcuffs until I figure out

20   what's going on."   02:54:29

21        Q    So after speaking to him, you decided that the

22   next step is to put handcuffs on him under the facts as

23   you've just described it?

24        A    Yes.  As he was standing there and clenching

25   his fists, I -- I felt for my safety and my partner's   02:54:41

160

Deputy Jeffrey Perine
November 8, 2018
EXHIBIT A

1    safety, all the concerned citizens that lived in the          02:54:44

2    nearby area, and not knowing what he's doing there and

3    what his intensions are, um, I felt that detaining him

4    at that point was -- was absolutely necessary.

5         Q    What else did you do to try to de-escalate the     02:54:59

6    situation?

7         A    I guess, notifying our dispatch that he's

8    uncooperative and getting more units, because as they're

9    coming with lights and sirens on, it's pretty easy to

10   hear those from a distance.                                   02:55:02

11        A lot of times, something like that, you know,

12   people hear that, they'll determine they're -- they're

13   not going to fight, they're going to cooperate, they

14   don't want more people coming.

15        Q    Uh, could you hear lights and sirens before        02:55:26

16   you pulled the trigger on the Taser?

17        A    No, not at that point.

18        Q    You -- you pulled the trigger on the Taser

19   before you heard lights and sirens?

20        A    I pulled the trigger after he lifted his arms       02:55:37

21   and walked towards me.

22        Q    And was that before or after you heard sirens?

23        A    That was after.  Oh, I pulled the trigger

24   before I heard the sirens.  Spring Valley is probably, I

25   don't know, 5 -- estimating 2 to 5 miles away.  So he --      02:55:53

Atkinson-Baker, Inc.
www.depo.com

1      Q     Uh, what else did he do, if anything, when he          03:00:12

2    was in that -- that track pose?

3      A     He was just rocking his body back and forth

4    and up down.  Kind of just moving, but staying in that

5    type position.  Just swaying his body as he was in that       03:00:26

6    pose.

7      Q     Did he do anything else aside from being in

8    this starting blocks pose and -- and swaying his body?

9      A     At that point, he was looking up at me.  And

10   although he was doing that, my fear is he's taking a          03:00:43

11   runner's position facing me, and he's going to run full

12   speed into me.  That's what's going through my mind.

13     Q     Well, did -- did he ever run full speed at

14   you?

15     A     No.                                                    03:00:57

16     Q     Did he reach for a weapon or anything like

17   that?

18     A     No, but at that point, I had no idea if he was

19   armed or not.  And it was a major concern of mine,

20   because he had a large white T-shirt on.  And I -- I had      03:01:08

21   no idea what was in his pockets or down his waistband.

22     Q     Um, so there's the unknown.  Yeah, maybe he

23   does have a weapon, maybe he doesn't.

24           Is that fair to say?

25     A     Yes.                                                   03:01:21

Deputy Jeffrey Perine
November 8, 2018

EXHIBIT A

Atkinson-Baker, Inc.
www.depo.com

```
 1       Q    All right.  Were there any specific facts to      03:01:21

 2   suggest that he did have a weapon beyond kind of the --

 3   the unknown?

 4            MS. HOLMES:  Objection.  Vague.

 5            THE WITNESS:  Nothing that I saw.  I didn't        03:01:29

 6   see any -- anything sticking out or anything like that.

 7   But I've seen multiple times, especially pocket knives

 8   are very small and easy to conceal, something that

 9   simple.  So no facts, but no --

10   BY MR. SCOTT:                                              03:01:46

11       Q    Did you see --

12       A    -- no information really on -- on seeing any

13   weapons and I was completely unsure.

14       Q    Okay.  And I didn't mean to interrupt you.

15       A    No problem.                                       03:01:55

16       Q    You didn't see, like, a -- a bulge in his

17   waistband, for example, did you?

18       A    No.

19       Q    Did you see him making any gestures towards

20   his waistband, for example, as -- as if he had a weapon   03:02:03

21   there?

22       A    No.

23       Q    Did you see him put his hands in his pocket

24   as -- as if there may have been a weapon there?

25       A    No.                                               03:02:14
```

Deputy Jeffrey Perine
November 8, 2018
EXHIBIT A

1      Q     Did you see any other gestures that he made          03:02:14

2    consistent with potentially having a weapon?

3      A     No.

4      Q     Was his behavior, during each of these three

5    incidents of going down into the track pose and then        03:02:29

6    looking at you, effectively similar?  Or did he change

7    other mannerisms during these three incidents?

8      A     From what I recall, they were -- they were

9    pretty similar.

10     Q     And have you now described all of the               03:02:44

11   mannerisms you can remember while he was doing that?

12         MS. HOLMES:  Objection.  Calls for a

13   narrative.

14         THE WITNESS:  What -- what were you asking?

15   BY MR. SCOTT:                                               03:02:52

16     Q     Yeah.  Have -- have you told me everything you

17   can remember, in terms of what his behavior was like,

18   when he was initially going down, assume sort of a track

19   pose and then got back up?

20     A     Other than the -- the fist clenching, just         03:03:05

21   his -- his veins were just pulsing.  They were, you

22   know, kind of sticking up as if he had just worked out

23   or done something.  And then his -- his arms and

24   everything were just soaking wet.  I think we talked

25   about the sweating a little bit.  Um, but other than       03:03:23

Deputy Jeffrey Perine
November 8, 2018
EXHIBIT A

Atkinson-Baker, Inc.
www.depo.com

1   that, I think I covered everything.                    03:03:24

2        Q    Okay.  Um, what happened next?

3        A    After the third time, I -- I still was

4   concerned that he was going to charge me.  Um, we're on

5   the second floor of a balcony.  And he -- I think        03:03:36

6   he's -- I'm going to remember, he's about my height, but

7   much thicker.  Um, so my concern is, he's going to grab

8   me and take me over the balcony or my partner, who's

9   smaller than I am.

10        So the third time -- each time I'm -- I'm          03:03:54

11  thinking he's going to comply and I'm hoping he's going

12  to comply.  The third time after he got up, I ordered

13  him -- I said, "You need to get on the ground right

14  now."  I'm trying to give him as many warnings, so to

15  speak, as I can, and that's when he looked at me and he  03:04:10

16  started lifting his hands, and he took a step towards

17  me.

18        Q    And -- and that's when you pulled the trigger?

19        A    Yes.

20        Q    Now, you said that you were up on a second     03:04:20

21  story balcony?

22        A    Yes.

23        Q    Is -- is -- is that where, um, the encounter

24  ended or -- or --

25        A    Started and ended.                            03:04:27

Deputy Jeffrey Perine
November 8, 2018

EXHIBIT A

Atkinson-Baker, Inc.
www.depo.com

1   Q     Okay.  Um, the -- we'll -- we'll watch the          03:04:29
2   video here before too long.  But the -- does the video
3   that you've seen of this incident or a portion of this
4   incident, does that capture the balcony that you're
5   describing?                                              03:04:44
6   A     No.  So it's -- it's like the front yard area.
7   And then to get to where we were, you have to go up
8   steps.  And the whole level -- it's on a real steep
9   hill, the whole level, um, you get to the steps and then
10  you hit the front doors.                                 03:05:01
11        The whole level, the front kind of patio area,
12  there's a bunch of chairs and benches where people will
13  eat or -- or do what have you.  And that whole balcony
14  or that whole area is what I was calling a balcony,
15  which traditionally is small, but I -- I guess a better  03:05:15
16  term would be the second floor.  The front patio area
17  was all on an elevated-type level.
18  Q     And -- and did you say that you were concerned
19  that potentially you or your partner could fall from
20  this elevated position?                                  03:05:33
21  A     Absolutely.
22  Q     What about Mr. Adkins?  Isn't one of the
23  things you have to consider in using a Taser, whether
24  the suspect is an elevated position?
25  A     Absolutely.  And we were pretty far from that      03:05:46

170

Deputy Jeffrey Perine
November 8, 2018
EXHIBIT A

Atkinson-Baker, Inc.
www.depo.com

1   area.  But if a physical fight did happen, my concern      03:05:49
2   was that we may end up over there at some point.
3        Q    So how close were you to the edge, so to
4   speak?
5        A    I couldn't -- I couldn't give you an exact      03:06:00
6   number.  I -- I can estimate.
7        Q    You can estimate.  Don't guess, but estimate.
8        A    Um, maybe 30 feet.  20 to -- 20 to 40 feet,
9   somewhere in that range.
10       Q    What happened after you deployed the Taser?      03:06:20
11       A    The Taser, it -- from where I'm standing, as
12   he came, I aimed towards his -- kind of torso area.
13   Maybe about -- estimating about 10 feet away.
14            Um, it -- it appeared that it got him, it
15   connected.  In terms of where it appeared to go,       03:06:46
16   however, he just stopped and looked up at me and then he
17   grabbed the barbs and began to rip them out of his body.
18            Um, and that's when I yelled at my partner, I
19   said, "Hey, my Taser did not work.  It didn't work."
20            Um, and then my partner began yelling, "On the   03:07:05
21   ground.  On the ground."  And I don't recall if he
22   continued towards me or my partner, but my partner
23   deployed the Taser at that point.
24       Q    Okay.  Let -- let me stop you there.
25            Um, when you first pulled the trigger, two      03:07:20

171

Deputy Jeffrey Perine
November 8, 2018
EXHIBIT A

Atkinson-Baker, Inc.
www.depo.com

1    barbs came out of that Taser?                                        03:07:23

2         A    Yes.

3         Q    And did both barbs appear to strike his body?

4         A    They -- whether it's his body or his clothing,

5    I couldn't tell you, because he did not -- nothing       03:07:32

6    happened.  He -- he just -- he kept coming.

7         Q    Did -- well, the barbs are attached to wires,

8    right?

9         A    Yes.

10        Q    And did the barbs and wires appear to stay in   03:07:43

11   one place on his body before he touched them?

12        A    I mean, I -- I never saw his body.  All I

13   could see is a big white shirt he was wearing.  So they

14   appeared to be in that area, but when someone is walking

15   towards you, you know, possibly trying to fight, you      03:08:00

16   know, I -- I couldn't tell exactly where they went in,

17   if they were inside the shirt, if they were outside the

18   shirt.

19             All I know is he began to grab and pull and

20   continued coming.  Um, so that's -- that's when I knew,   03:08:12

21   Hey, this didn't work.  It didn't work at all.

22        Q    You said a couple times he began to pull.

23             Did he get the barbs out from what you could

24   tell?

25             MS. HOLMES:  Objection.  Vague.  Misstates      03:08:23

172

Deputy Jeffrey Perine
November 8, 2018
EXHIBIT A

Atkinson-Baker, Inc.
www.depo.com

1    prior testimony.                                            03:08:24

2           THE WITNESS:  I have no idea if he was able to

3    pull them out, if they were even in.  At that point, I

4    had no idea.

5    BY MR. SCOTT:                                               03:08:33

6       Q     Well, were the wires still connected from your

7    Taser to either his shirt or his body, from what you

8    could tell?

9       A     From what I could tell, it appeared so.  But

10   I -- it -- they could have been -- one could have been,   03:08:44

11   both could have been.  I couldn't really tell exactly

12   the specifics.  But the barbs I remember were kind of

13   dangling through the air, and he was yanking on them.

14   So it's, like, yanking my Taser.

15      Q     Wait.  What do you mean the barbs were           03:08:58

16   dangling?

17      A     Not the barbs, the wires.  Sorry.

18      Q     So the -- the wires appeared to be, um, in the

19   air between your Taser on one hand, and -- and either

20   his shirt or his body on the other hand?                   03:09:12

21      A     Yes.  He's pulling and I feel the tugging.

22   He's pulling them out and pulling forward and backwards.

23   So I felt, you know, my Taser kind of jostling a little.

24           THE REPORTER:  Wait.

25           I felt my Taser kind of --                         03:09:28

Deputy Jeffrey Perine
November 8, 2018
EXHIBIT A

1          THE WITNESS:  Jostling a little.  Kind of          03:09:29

2   moving around.

3          MS. HOLMES:  Kind of.

4          THE REPORTER:  Kind of.  Yeah, I got that.

5   BY MR. SCOTT:                                            03:09:40

6      Q    Did you, um -- did you press the ARC button at

7   that point?

8      A    Not that I recall.

9      Q    And how long after you deployed that first

10  cartridge, did Deputy Vianzon deploy his Taser, if you   03:09:51

11  recall?

12     A    I don't -- I mean, if I had to give you an

13  estimate, maybe between 5 and 10 seconds, somewhere in

14  that range.

15     Q    Um --                                            03:10:11

16     A    After I deployed.

17     Q    So your best memory, in understanding and

18  respecting it's an estimate, is that you pulled the

19  trigger --

20     A    Yes.                                             03:10:21

21     Q    -- between 5 to 10 seconds past.  And then

22  Deputy Vianzon pulled his trigger?

23     A    It's an estimate.  I -- I couldn't tell you.

24  We were in the middle of quite a scarry situation.  And

25  time kind of is one thing, it's really -- really hard    03:10:38

174

Atkinson-Baker, Inc.
www.depo.com

1   to -- to estimate.                                          03:10:40

2        Q     And when you pulled the trigger, Mr. Adkins

3   was how far away from you?

4        A     I'd estimate maybe 10 feet.

5        Q     And so, um, did he do anything other than, as    03:10:52

6   you described, trying to pull on the wires of the barbs

7   that you shot, after you -- between when you pulled the

8   trigger and when Deputy Vianzon did?

9        A     It appeared that he continued to move towards

10  me.  That's what it -- it looked like he was going to     03:11:11

11  continue walking.

12       Q     Did he actually continue walking towards you?

13       A     As he started to, my partner and I yelling,

14  "Hey, it didn't work," he deployed his Taser, from what

15  I recall, Mr. Adkins' back side.  It might have been the   03:11:29

16  side.

17             Um, I was just trying to move -- my thinking

18  is moving to a safe spot, because I had my back against

19  the wall, and I wanted to be somewhere where I can move

20  around a little bit.  So as I'm kind of moving, I'm        03:11:43

21  yelling, "Hey, it didn't work.  It didn't work."  And I

22  hear his Taser.  And when it -- wherever it -- I don't

23  know where it connected or where -- what happened with

24  that, but he took his attention off me, and he began

25  turning -- it appeared turning towards my partner.  Um,    03:11:57

175

Atkinson-Baker, Inc.
www.depo.com

1    kind of moving back and forth and ripping and walking          03:12:01

2    this way and that way.

3         Q    At that point, did there appear to be four

4    wires stretched between your two -- your two respective

5    Tasers and Mr. Adkins?                                          03:12:13

6         A    I couldn't recall how many.  All I could see

7    was wires.  Whether it was two, three or four, I -- I

8    couldn't tell you.  I was just trying to get to a point

9    where me and my partner and everyone else can be safe,

10   and -- I -- I -- all -- all I could recall is that his         03:12:31

11   Taser didn't work either.  The deployment.

12        Q    And what makes you say that?

13        A    Because he -- he turned and just began ripping

14   the wires out of his back, out of his front.  And he

15   just -- he never became immobilized and never had that         03:12:47

16   desired effect that we've been trained that it should

17   do.

18             Um, so at that point, whether it wasn't

19   connected or something happened, his shirt, I didn't

20   know maybe something -- he had something underneath the         03:13:01

21   shirt.  Um, but something wasn't working.

22        Q    Did he get any of the probes out from what you

23   could tell?

24        A    I -- I couldn't tell, and I -- I couldn't

25   recall.                                                         03:13:14

176

1        Q      Well, let me ask it differently.        03:13:16

2               From what you saw, do you know whether he got

3    any of the probes out?

4        A      From what I saw, I -- I don't -- I didn't see

5    any that he had gotten out.        03:13:25

6        Q      So if --

7        A      I couldn't tell.  But I didn't -- like see one

8    on the ground or anything like that.

9        Q      Now, you said it didn't appear to be working;

10   is that right?        03:13:38

11       A      Uh, something along those lines.  I have to

12   check my exact verbiage.

13       Q      Okay.  But the, uh, is it fair to say that the

14   Tasers didn't have what you described as the desired

15   effect, right?        03:13:51

16              MS. HOLMES:  Objection.  Calls for

17   speculation.

18              THE WITNESS:  Correct.  They -- they did not

19   have the desired effect.

20   BY MR. SCOTT:        03:13:56

21       Q      What's the desired effect?

22       A      To immobilize and ultimately lock the subject

23   up.  And so they're going to not be able to stand and

24   continue to do certain movements.  They're most likely

25   going to go the ground.        03:14:10

177

Deputy Jeffrey Perine
November 8, 2018
EXHIBIT A

Atkinson-Baker, Inc.
www.depo.com

1    Q    So, um, other than the fact that Mr. Adkins    03:14:13

2    didn't go to the ground and stop moving, what else are

3    you thinking of, that makes you say that it -- it didn't

4    have its desired effect?

5         MS. HOLMES:  Objection.  Asked and answered.    03:14:25

6         THE WITNESS:  He -- he was moving around just

7    as he did before.  It -- it didn't change anything with

8    his standing and moving.  Um, if anything, he started

9    moving quicker and more.

10   BY MR. SCOTT:    03:14:39

11   Q    How do you -- did you allow for the

12   possibility that the probes went in, the current was

13   circulating through his body.  Um, but that he just

14   wasn't falling to the ground.

15        What -- I mean, did you allow for that    03:14:54

16   possibility?

17   A    Nothing from my training and experience would

18   lead me to believe that it was working, and he was just

19   standing and doing his normal daily routines, because

20   we've had -- in weapons training, we said no matter who    03:15:08

21   it is, no matter what drugs are on, if it connects, it

22   will do what it's intended to do.  And that's what I've

23   been fold and trained.

24        Um, so at no point, I -- at -- at this point,

25   I assumed both of ours didn't connect.  Something is    03:15:23

178

Deputy Jeffrey Perine
November 8, 2018
EXHIBIT A

Atkinson-Baker, Inc.
www.depo.com

1    going on.   Maybe the shirt is really baggy and it's --    03:15:27

2    it's catching something.   But I didn't -- I didn't

3    believe that it -- it had worked.

4        Q    So if he doesn't lock up and go to the ground,

5    your training teaches you to assume that the probes are    03:15:39

6    not working; is that right?

7              MS. HOLMES:   Objection.   Misstates prior

8    testimony.

9              THE WITNESS:   Yes.   If he -- if he's not -- if

10   he's not locked up and immobilized, then it -- it's not    03:15:50

11   working.   Because he -- nothing changed.   With his

12   demeanor, he never seized, he never fell to the ground,

13   nothing that I've seen or -- or been trained on had

14   happened.

15   BY MR. SCOTT:                                              03:16:05

16       Q    So, um, if the suspect doesn't lock up and

17   doesn't go to the ground, you assume that the -- that

18   the Taser doesn't work.   Is that -- is that consistent

19   with your training from San Diego.

20             MS. HOLMES:   Objection.   Compound.   Vague.    03:16:19

21   Incomplete hypothetical.

22             THE WITNESS:   My training would lead me to

23   believe that the two barbs, the positive and the

24   negative, they both did not connect.

25   ///                                                        03:16:31

179

Deputy Jeffrey Perine
November 8, 2018

EXHIBIT A

1    BY MR. SCOTT:                                         03:16:31

2        Q      To your knowledge, is that an assumption that

3    you make, consistent with the training that other

4    deputies in the San Diego Sheriff's Department receive?

5            MS. HOLMES:    Same objection and -- objections,   03:16:42

6    and calls for speculation.

7            THE WITNESS:   I don't know necessarily if it's

8    an assumption.   It's what I've been trained, that if the

9    positive and negative connect and the Taser is full

10   functioning, that it -- it should work.                03:16:54

11   BY MR. SCOTT:

12       Q      Even if the person is on PCP?

13       A      I've -- I've specifically been told through

14   training, that even if they're on PCP, um, or any other

15   drugs, it should still do the -- have the desired       03:17:06

16   effect.

17       Q      So what happened after Deputy Vianzon fired

18   the first two barbs from his weapon into Mr. Adkins?

19       A      It -- it didn't appear to stop him or slow him

20   down.   Um, so at that point, he -- he's kind of         03:17:26

21   continuing to grunt, and his fists are flying in the air

22   and he's pulling barbs.

23            I'm not sure if he's coming at me swinging,

24   but he's making just all kinds of -- kind of violent

25   movements.   Whether he's trying to rip them out or he --   03:17:43

180

Atkinson-Baker, Inc.
www.depo.com

1   he's getting ready to fight, both of those are going        03:17:46

2   through my head.

3        Q    Let me stop you there.   When you say, I'm not

4   sure if he's coming toward me fighting, was he in fact

5   coming towards you fighting?                                 03:17:57

6            MS. HOLMES:   Objection.   Misstates prior

7   testimony.

8            THE WITNESS:   He -- he was coming and walking

9   towards me, circling back towards my partner, towards

10  me.   It -- it was -- I didn't know where he was going to   03:18:06

11  go.   It was completely unpredictable at that point.

12  BY MR. SCOTT:

13       Q    Okay.   So, again, I'm -- I'm going to ask you

14  to stand up then.   And I want you to show me what you're

15  describing, in terms of his movements, after the first      03:18:15

16  two cartridges were fired at Mr. Adkins.

17            MS. HOLMES:   Which two cartridges?

18  BY MR. SCOTT:

19       Q    After yours -- your first one and

20  Mr. Vianzon's first one.                                    03:18:27

21       A    Okay.   So mine and then my partner's and what

22  he's doing at that point is, it appeared he -- he kind

23  of had some in the front and, from what I recall, some

24  in the back and he's -- he's grabbing and ripping and

25  he's walking around and just kind of moving his arms in     03:18:43

Atkinson-Baker, Inc.
www.depo.com

```
 1   all kinds of directions.                              03:18:46

 2         So it's just a constant movement while he's

 3   standing and walking, kind of pacing back and forth, in

 4   no particular direction, just back, forth, circle.

 5   That's about it.                                       03:19:00

 6     Q    Okay.  When -- when you say, "in no particular

 7   direction," does -- does that mean he did not appear to

 8   be coming specifically towards you, at that point?

 9     A    I couldn't tell where he planned to walk or

10   what he planned to do.  It -- it looked like he was     03:19:12

11   coming towards me, and he turned and walked towards my

12   partner.

13         Um, I didn't know what his intentions were,

14   but at points, he was walking in my direction and then

15   moving towards the other direction.  He just -- he      03:19:25

16   continued to move.

17     Q    So what happened next?

18     A    My partner yelled that his -- his Taser didn't

19   work.  It didn't connect.  Um, so as he's standing and

20   kind of fighting and -- whether he's getting ready to   03:19:40

21   fight us or, um, pull the barbs out, I -- I have no

22   idea, but my Taser is connected to the barbs that he's

23   trying to yank out.

24         So when I felt I had a clear angle, I deployed

25   my -- my second cartridge.                              03:19:59
```

                                                                  182

Deputy Jeffrey Perine
November 8, 2018

EXHIBIT A

Atkinson-Baker, Inc.
www.depo.com

1      Q      So that would now be the, uh, fifth and sixth      03:20:02
2    barb fired at Mr. Adkins?
3      A      Yes.
4      Q      Did the barbs appear to strike his torso?
5      A      No.   I mean, it -- it appeared in the area,      03:20:14
6    but with him running around and his big shirt and all
7    the barbs, he never -- he never stopped.   He -- he
8    continued to just move around and pull at them.
9      Q      Well, were the wires, like, dragging on the
10   ground or did you see the barbs on the ground?      03:20:29
11          MS. HOLMES:   Objection.   Vague.
12          THE WITNESS:   I don't recall any.   And I don't
13   remember if any were on the ground or not.
14   BY MR. SCOTT:
15     Q      Well, that fifth and sixth barb, did -- did      03:20:37
16   the wires appear to be going from your Taser to
17   Mr. Adkins, whether that be his shirt or his body?
18     A      Yes.   Whether his shirt or his body, they were
19   on him, in some way, it appeared.
20     Q      So at that point, you -- there are -- there      03:20:56
21   are four wires going between your Taser and Mr. Adkins?
22     A      Yes.
23     Q      What do you do then?
24     A      I let my partner know, "Hey, it didn't work
25   again."   And that's when I -- I didn't want to drop my      03:21:10

183

Deputy Jeffrey Perine
November 8, 2018
EXHIBIT A

Atkinson-Baker, Inc.
www.depo.com

1   Taser, because it can still be used to dry stun or arc,   03:21:13

2   um, against the skin.   It could potentially be a weapon

3   if anyone else gets it.

4   So I'm -- I'm trying to -- to either pull my

5   cartridges out, and I couldn't get a grasp on it,   03:21:24

6   because I'm keeping -- trying to keep eye contact on

7   Mr. Adkins and my art partner.

8   Um, and then ultimately I was struggling with

9   pulling those out.   And then he -- it appeared he -- I

10  don't -- I don't recall exactly which direction that   03:21:39

11  Mr. Adkins was moving, but at that point it was, like,

12  even though there's barbs and wires, I just holstered it

13  back in my holster, from what I recall.

14  Um, and then my -- my partner deployed his

15  second Taser cartridge and immediately kind of appeared   03:21:58

16  to be doing the desired effect we've been talking about.

17  Q   Chronologically, did you holster your Taser

18  before Deputy Vianzon fired his second cartridge?

19  A   I don't recall.

20  Q   When do you remember holstering your Taser?   03:22:29

21  A   I don't know at which point I holstered it.

22  Um, I -- I know at one point it was in my holster, and I

23  was -- it was hard to get in there, because the -- all

24  the barbs, all the wires.   So I don't recall at what

25  point I holstered it.   03:22:51

184

Deputy Jeffrey Perine
November 8, 2018
EXHIBIT A

Atkinson-Baker, Inc.
www.depo.com

1      Q      So you said that after Deputy Vianzon shot his      03:22:53
2   second cartridge, it appeared to have the desired
3   effect?
4      A      Yes.
5      Q      What happened then?      03:23:02
6      A      He -- at this point, we had moved -- I don't
7   want to say quite aways, but a -- a good amount towards
8   a specific house or townhouse right the front entryway.
9          Um, and it kind of -- he kind of fell
10   backyards, um, immediately kind of locked and fell      03:23:23
11   backwards and took kind of a seated position, into, um,
12   kind of a, right in front of a front door.   And he was
13   no longer clenching his fists or standing or pulling out
14   the barbs.
15      Q      So what's happened next?      03:23:40
16      A      We began to try to get him on his stomach, so
17   we could get him in handcuffs.
18      Q      How did you try to get him on his stomach?
19      A      Verbally.   Ordering him.   "Rollover on your
20   stomach."      03:23:53
21      Q      Did -- did, um, you order him on his stomach
22   or Deputy Vianzon or both?
23      A      I -- from what I recall, both of us were.
24      Q      Do you recall whether Deputy Vianzon used the
25   Taser to try to get Mr. Adkins to comply, in rolling      03:24:07

185

Deputy Jeffrey Perine
November 8, 2018
EXHIBIT A

1    over on his stomach?                                    03:24:11

2              MS. HOLMES:   Objection.   Vague.   Calls for

3    speculation.

4              THE WITNESS:   It -- with -- with all the noise

5    and all the people around us, it was pretty hectic and   03:24:17

6    unsafe, and I -- I don't recall exactly what or when

7    he -- he was utilizing his Taser.

8              I know -- I recall at one point he was ordered,

9    "Roll over.  Roll over," and he was refusing to.  And I

10   know at one point I heard, what sounded like the ARC, um,  03:24:38

11   other than that one time, I don't recall.

12       Q    Now, um, I want to kind of go to the point in

13   time when you said he was sort of on a seated position.

14       A    Uh-huh.

15       Q    And his hands were no longer clenched up.        03:24:52

16       A    Uh-huh.

17       Q    Do you remember just saying that?

18       A    Yes.

19       Q    Okay.  How far away from him were you at that

20   point?                                                    03:25:00

21       A    I -- I couldn't -- I have no idea.  Maybe --

22   can I estimate, please?

23       Q    Sure.  Please.

24       A    Maybe 5 to 10 feet away, estimate.

25       Q    And what about your partner?                     03:25:13

Deputy Jeffrey Perine
November 8, 2018
EXHIBIT A

Atkinson-Baker, Inc.
www.depo.com

1    A    Maybe around the same.  Maybe 10 to 15 feet,    `03:25:15`

2    if I had to estimate.

3    Q    Um, and then you ordered him to roll over on

4    his stomach?

5    A    Yes.  The goal was -- at this point, we -- we    `03:25:25`

6    finally got him to the ground, which we've been trying

7    to do the entire time.  And I can't handcuff someone if

8    they're sitting like that.  Knowing that I tried

9    previously and -- and it was, like, holding on to a log.

10    Um, I needed him in -- in a position to where    `03:25:40`

11    I can actually use leverage and get some cuffs on him.

12    So we conditioned to order him on his stomach.

13    Q    When you were issuing those orders to "roll

14    over on your stomach," was Mr. Adkins exhibiting

15    assaultive behavior at that -- at that time?    `03:25:58`

16    A    He -- at that point, he -- from what I recall,

17    he was not, um, he was in the seated position and he

18    wasn't -- I mean, he -- he was sitting down, so he's at

19    a position of disadvantaged by being seated.  Um, I

20    don't recall him doing anything too con- -- concerning.    `03:26:21`

21    Um, but a lot of it was the Taser probably

22    had -- had worked.  And, um, the only thing I recall is

23    he would not roll over, so I attempted to go in and he

24    began, you know, moving his arms away from me, which led

25    me to believe that he's still not cooperating.    `03:26:44`

187

Deputy Jeffrey Perine
November 8, 2018
EXHIBIT A

1      Q      Okay.  So let -- let's go back before you go          03:26:46

2  in.  Okay?

3      A      Okay.

4      Q      So Mr. Adkins is, uh, is seated on the ground.

5  And correct me if I'm wrong, does -- does not, at that          03:26:54

6  moment, seem to be exhibiting assaultive behavior; is

7  that true so far?

8      A      It's -- I -- I believe it's because the Taser

9  was actively working.

10     Q      Meaning, he was actively getting shocked at          03:27:05

11  that time?

12     A      If you pull the trigger and deploy the Taser,

13  it's going to run for 5 seconds, unless you shut the

14  Taser off.

15            So for 5 seconds, he's -- he's going to be          03:27:16

16  standing, and then he's going to be seated and it's --

17  it's still running.

18     Q      Okay.  When you were ordering him to roll over

19  on his stomach, was he -- to your knowledge, was he

20  being actually shocked at the same time you're telling      03:27:28

21  him to roll over?

22            MS. HOLMES:  Objection.  Vague.

23            THE WITNESS:  To -- to my knowledge, we were

24  ordering him, while he was -- while he's not being

25  tased, to try to gain compliance.  But I didn't have any    03:27:38

188

Atkinson-Baker, Inc.
www.depo.com

1   Taser in my hand or anything.                          03:27:42

2   BY MR. SCOTT:

3       Q    Okay.  Would you agree that a person can't --

4   if the Taser -- if the Taser is functioning properly, a

5   person cannot roll over while they're being tased; is    03:27:50

6   that true?

7            MS. HOLMES:  Objection.  Vague.  Incomplete

8   hypothetical.

9            THE WITNESS:  If -- if a Taser has the desired

10  effect, then, yeah, they should not be able to.         03:27:59

11  BY MR. SCOTT:

12      Q    Um, now a moment ago you said he was tased to

13  gain compliance.

14           What -- what did you mean by that?

15      A    When -- from what I recall, when I attempted    03:28:11

16  to go in to grab his hand or roll him over, um, he

17  wasn't complying.  Instead, he was kind of pushing away,

18  you know, like, Get away from me.

19           Um, so in order to, you know, at that point,

20  he's pushing at me again.  Um, so we order him over.     03:28:25

21  Any if he's not complying, we need to do something to

22  try to gain his compliance.

23           So to stop him from pushing, pulling at me or

24  grabbing me and bringing me down, taking my gun and

25  shooting me, we ultimately utilize the arc button to     03:28:39

189

Deputy Jeffrey Perine
November 8, 2018
EXHIBIT A

Atkinson-Baker, Inc.
www.depo.com

1    stop him.                                                    03:28:45

2        Q    It -- is it okay, um, to use a Taser to try to

3    gain compliance, if a suspect is not exhibiting

4    assaultive behavior?

5            MS. HOLMES:  Objection.  Vague.  Incomplete          03:28:59

6    hypothetical.  Calls for legal opinion.

7    BY MR. SCOTT:

8        Q    You can answer.

9        A    I'm sorry.  Can you repeat it --

10       Q    Yeah.  Based on your training, are -- are you      03:29:07

11   allowed to try to gain compliance by shocking somebody

12   with a Taser if they're not actually exhibiting

13   assaultive behavior at that time?

14           MS. HOLMES:  Objection.  Vague.  Incomplete

15   hypothetical.                                                03:29:20

16           THE WITNESS:  To my knowledge, they need to be

17   exhibiting, you know, assaultive behavior.

18   BY MR. SCOTT:

19       Q    So -- so, for example, if Mr. Adkins was

20   laying on the ground but not exhibiting assaultive          03:29:27

21   behavior, is it okay to shock him just to try to

22   encourage him to roll over?

23           MS. HOLMES:  Same objections.

24           THE WITNESS:  If -- if he's laying there and

25   just not moving or anything like that, then, yeah, it       03:29:40

190

Atkinson-Baker, Inc.
www.depo.com

1   shouldn't -- the Taser shouldn't be utilized at that        03:29:46

2   point.

3   BY MR. SCOTT:

4        Q    So it -- it's not okay to shock him just

5   because he's not doing what you say.  He -- has to be        03:29:51

6   exhibiting assaultive behavior; is that correct?

7             MS. HOLMES:  Objection.  Same objections.

8   Incomplete hypothetical.  Vague and misstates prior

9   testimony.

10            THE WITNESS:  Whether it's him trying to get        03:30:02

11  up or moving towards a deputy, you know, those -- those

12  would be from what we saw assaultive, but if he's just

13  laying there not -- not moving, then it -- it shouldn't

14  be used to -- to roll him over.

15  BY MR. SCOTT:                                                03:30:17

16       Q    Why not?

17       A    Because at -- at that point, if he's just

18  laying there and not doing anything, it -- it would --

19  from the surface, if someone is doing that, it wouldn't

20  be assaultive at that point.                                 03:30:26

21       Q    Once Mr. Adkins was laying on the ground, how

22  many wires do you remember going between Tasers in his

23  body?

24       A    I don't -- I don't recall.  I just knew that

25  there were wires.                                            03:30:48

191

Deputy Jeffrey Perine
November 8, 2018
EXHIBIT A

Atkinson-Baker, Inc.
www.depo.com

1       Q       More than one?                                    03:30:48

2       A       More than one wire?

3       Q       Yeah.

4       A       Yeah, were there --

5       Q       More than two?                                    03:30:54

6       A       Yeah.  I couldn't -- maybe -- and I couldn't

7   even guess.  I just -- I know that there were at least a

8   few.

9       Q       More than four?

10      A       I -- like I said, I couldn't recall an exact      03:31:05

11  number.

12      Q       Um, do you recall Mr. Adkins being tased again

13  after he was laying on the ground?

14          MS. HOLMES:   Objection.  Vague.

15          THE WITNESS:   I don't -- like I said earlier        03:31:23

16  that -- I remember at one point, I went in to try to

17  gain compliance and -- and roll him over and put him in

18  cuffs, and he had not comply.  And I know my partner --

19  I remember the one time, um, but other than that, I -- I

20  can't recall.                                                 03:31:37

21  BY MR. SCOTT:

22      Q       When you say you can't recall, are you

23  testifying -- I just want to have a clear record.

24          Are you testifying that you remember, and that

25  there was not additional tasing?  Or is it, like, I -- I   03:31:46

192

Deputy Jeffrey Perine
November 8, 2018
EXHIBIT A

Atkinson-Baker, Inc.
www.depo.com

1    just don't remember one way or the other?                03:31:49

2              MS. HOLMES:    Okay.    Objection.    Vague.    Calls

3    for speculation and misstates prior testimony.

4              THE WITNESS:    It's that I don't remember one

5    way or another, because my goal at that point is to get   03:32:00

6    him into handcuffs, and I'm doing everything I can to

7    focus on him, whether he is grabbing a weapon.    I'm

8    still looking to see if there is any weapons, because we

9    still don't know at this point.    Um, so my main goal

10   is -- is to get him in cuffs, um, not to, you know,       03:32:17

11   monitor the -- the -- what -- what my partner is doing

12   with -- with the Taser.

13              I -- and it was loud.    There's a lot going on.

14   It was hard -- hard to tell.

15   BY MR. SCOTT:                                              03:32:30

16      Q     Under department guidelines, don't -- don't

17   you have a responsibility to monitor how much exposure

18   Mr. Adkins had to Tasers at that point?

19              MS. HOLMES:    Objection.    Vague.    Incomplete

20   hypothetical.                                              03:32:43

21              THE WITNESS:    And at -- at that point, I --

22   we're still fighting.    It's not a safe situation.    So

23   I -- I don't know what the time frame was.    All I know

24   is we were still actively, um, he was still pretty much

25   not complying.    And there was still the possibility that 03:33:00

Deputy Jeffrey Perine
November 8, 2018
EXHIBIT A

1   he was armed that, who knows, he -- he can get up and          `03:33:02`

2   get some of the -- the wires out and -- and begin to

3   fight us.

4   BY MR. SCOTT:

5        Q     You were still fighting with Mr. Adkins after       `03:33:12`

6   he was already on the ground.

7              Is that what you just said?

8        A     Well, he -- when I went in to try to roll him

9   and put him in cuffs, he kind of pawed or swatted at me.

10  Um, my fear is that he's going to grab on to me.                `03:33:26`

11  Knowing that his strength was pretty phenomenal at that

12  point, that he's going to grab me and pull me down with

13  him, which would have been really bad with him being on

14  his back.

15             Um, so it wasn't what you would think of as         `03:33:39`

16  like I street fight or a fist fight, but he's -- he's

17  still fighting with me, yeah.

18       Q     You said he pawed or swatted at you?

19       A     Yeah.  It looked like he tried to grab me.  Or

20  that's -- that's what was going through my mind, is that       `03:33:54`

21  he's trying to grab me and bring me in with him.

22       Q     And -- and you interpreted that as an assault?

23       A     Absolutely.

24       Q     What else, if anything, did Mr. Adkins do,

25  that you considered assaultive?  And I'm confining this       `03:34:05`

194

Deputy Jeffrey Perine
November 8, 2018
EXHIBIT A

Atkinson-Baker, Inc.
www.depo.com

1   question to when he was already on the ground.          03:34:09

2        A     At that point, I'm just trying to -- to get

3   him over in handcuff -- I'm trying to get him on his

4   side or on his back.  And the only thing I can recall is

5   trying to grab on to his arms.  And just try to hold on    03:34:25

6   until our backup got there.

7        Q     Okay.  I want to make sure I have this clear.

8              After he was already on the ground, what did

9   Mr. Adkins do, that you considered to be assaultive?

10             MS. HOLMES:  Objection.  Asked and answered.     03:34:41

11             THE WITNESS:  He tried to grab me and pull me

12   to the ground.

13   BY MR. SCOTT:

14        Q     He tried to grab you and pull you to the

15   ground?                                                     03:34:47

16        A     That's what I -- that's what appeared to me.

17   That's what I told you.

18        Q     Anything else?

19             MS. HOLMES:  Same objection.

20             THE WITNESS:  I -- I can't recall if he was      03:34:56

21   still clenching his fist when the -- when the Taser was

22   not being deployed.  So other than that, I -- I don't --

23   I don't recall.

24   BY MR. SCOTT:

25        Q     Now, I want to clarify something.               03:35:05

195

1        When you -- when I asked you, is there          03:35:07

2    anything else, you said, I can't recall if he was

3    clenching his fist.

4        Now, does -- does that mean that you remember

5    him clenching his fist, or is that just -- it's kind of   03:35:16

6    something you're throwing out there?

7            MS. HOLMES:  Objection.  Vague.

8            THE WITNESS:  It -- it's something that I just

9    don't recall if -- if he was doing.  Because that --

10   that had been what he had been doing throughout our      03:35:27

11   encounter.  But at that point, I don't -- I don't

12   recall.

13   BY MR. SCOTT:

14       Q    I mean, it sounds like you're kind of floating

15   that out there as a possibility, but you don't actually   03:35:34

16   remember that happening; is that true?

17           MS. HOLMES:  Objection.  Argumentative.  Asked

18   and answered.  Vague.

19           THE WITNESS:  Yeah.  I just -- I don't recall.

20   I don't recall his exact movements.  I -- I guess that's   03:35:43

21   what I'm getting at.  I'm just trying to roll him and

22   get him on his -- on his stomach still.

23   BY MR. SCOTT:

24       Q    Okay.  So in terms of what you actually

25   recall, as opposed to what you don't remember, what,      03:35:55

```
 1   aside from him attempting to grab you and pull you down,     03:35:58
 2   do you remember him doing that you perceived as
 3   assaultive behavior?
 4           MS. HOLMES:  Okay.  Objection.  Asked and
 5   answered -- and just so I have a clear record for me,        03:36:09
 6   multiple times -- and argumentative.
 7           THE WITNESS:  I -- I don't recall any --
 8   anything other than that.
 9           MS. HOLMES:  Do you have a lot more questions
10   in this line of questioning?                                 03:36:19
11           Just because at some point -- we -- we've been
12   going for about an hour, so...
13   BY MR. SCOTT:
14       Q   What's the next thing that you remember
15   happening after you tried to get Mr. Adkins' arm?            03:36:31
16       A   Ultimately, from what I recall, um, Deputy
17   Vianzon, who had the -- I believe he had the Taser in
18   his hand, kind of began helping me, because he saw that
19   I wasn't going to be able to get him.
20           And then from what I recall, one of our -- we        03:36:53
21   call them Zebra units showed up and he's, um, kind of
22   like a reserve deputy, so to speak.  He showed up and
23   helped us kind of roll Mr. Adkins and -- and get the
24   handcuffs on.
25           And, again, we -- I was able to get a handcuff       03:37:11
```

Deputy Jeffrey Perine
November 8, 2018
EXHIBIT A

Atkinson-Baker, Inc.
www.depo.com

1    on one wrist, but I could not move his second arm to        03:37:14

2    connect with the other one.  So I had to actually take

3    out a second pair of handcuffs and -- and used two --

4    two pairs to widen or lengthen the handcuffs.  But he

5    still would not give us his arm.  And he had it -- when    03:37:29

6    we got him on his stomach, he had it kind of under his

7    stomach.  And like I said, we hadn't searched him for

8    weapons, so we're frantically trying to get that arm.

9         Q    Did you end up getting handcuffs on him?

10        A    Yes, we did.                                      03:37:43

11        Q    Before you got handcuffs on him, did he do

12   anything else that you remember being assaultive?

13             MS. HOLMES:  Objection.  Vague.  Asked and

14   answered.

15             THE WITNESS:  Is this back when he was on the     03:37:54

16   ground and I was standing?

17   BY MR. SCOTT:

18        Q    Yes.

19        A    So the same -- same question as earlier?

20        Q    Yeah.  But kind of with an end point of          03:38:00

21   getting the handcuffs on him.

22        A    Other than him --

23             MS. HOLMES:  Same objection.

24             THE WITNESS:  Other than him trying to grab me

25   and pull me down?                                          03:38:06

198

Deputy Jeffrey Perine
November 8, 2018
EXHIBIT A

1    over?                                                04:01:52

2        A    Yes.

3        Q    Deputy Vianzon is also yelling at Mr. Adkins

4    too, isn't he?

5        A    Yes.                                         04:02:01

6        Q    Now, understanding that it's just 8 seconds so

7    far, but between the portions that we watched, from

8    zero, zero to 8 seconds, have we, on the screen, seen

9    anything that you would describe as assaultive behavior

10   by Mr. Adkins?                                        04:02:16

11       A    With what he did in the prior, my contacts

12   with him, he's still holding his hands up.  Um, if --

13   if -- if he was being tased or arced, then his hands

14   should move down.  So he has his hands up, in my opinion

15   they're up -- up here.  Whether he's going to punch me   04:02:37

16   or grab me, they seem to be up by his face or eyes.

17       Q    So was the answer to my question that, yes,

18   there's assaultive behavior?

19       A    Yes.  I -- based on what he had done and

20   his -- his posture with his hands, I still considered at  04:02:53

21   this point, this to be assaultive.

22       Q    Okay.  I'm going to start at zero and I'm

23   going to press play.  And you tell me to pause as soon

24   as you see the first assaultive behavior from

25   Mr. Adkins.  Okay?                                    04:03:06

Atkinson-Baker, Inc.
www.depo.com

```
 1              Do you understand what I'm asking you to do?   04:03:08

 2      A    Yes, I do.

 3      Q    Okay.

 4                     (Video playing.)

 5              THE WITNESS:  Right now.                        04:03:17

 6                     (Video playing.)

 7          MS. HOLMES:  You -- did you already see it?

 8   BY MR. SCOTT:

 9      Q    I'm sorry.  Did you say, "Right now"?

10      A    Yeah.  I'm sorry, I spoke a little low.          04:03:19

11      Q    We'll start again.  I'm starting it at 0.0

12   seconds.

13                     (Video playing.)

14              THE WITNESS:  Now.  So about a second prior to

15   that, at the 2-second mark, he's arching his back up.    04:03:29

16   It looks like his right fist is clenched to me and his

17   left arm is -- is kind of wrapped around.

18   BY MR. SCOTT:

19      Q    So what -- what we just saw at just a hair

20   before 3 seconds qualifies as assaultive behavior?      04:03:43

21          MS. HOLMES:  He said 2 seconds.

22   BY MR. SCOTT:

23      Q    Yeah, 2 seconds.  That qualifies as assaultive

24   behavior?

25      A    With every situation or circumstance being       04:03:50
```

210

Atkinson-Baker, Inc.
www.depo.com

1   different and the -- the -- what happened prior to this      04:03:53

2   video, absolutely.

3            With -- with what happened with him moving and

4   grabbing, um, and -- and walking towards us, um, yes,

5   I -- I considered him putting his hands up to be a sign    04:04:06

6   that he's going to ultimately grab or pull or push or

7   punch us.

8            MR. SCOTT:  Okay.  I'm going to play again,

9   and -- and tell me to stop again when you see assaultive

10  behavior.                                                  04:04:19

11                 (Video playing.)

12            THE WITNESS:  Yeah, I need to -- it -- it's

13  still assaultive.  Nothing has changed.  The whole --

14  the past 5 seconds.  His arms are still up.

15  BY MR. SCOTT:                                              04:04:30

16       Q    And that's assaultive behavior, in your view?

17       A    With what happened in the -- in the prior

18  circumstance in this situation, I believe that to be

19  assaultive behavior.

20       Q    Assaultive behavior that could justify arcing   04:04:45

21  a Taser on him again?

22       A    With assaultive behavior that -- yeah, that

23  could justify the arcing.

24       Q    Okay.  Um, starting again.

25       A    I don't have a Taser in my hand.                 04:04:58

211

Atkinson-Baker, Inc.
www.depo.com

```
 1              MS. HOLMES:  Objection.  Calls for legal        04:08:53
 2    opinion.
 3    BY MR. SCOTT:
 4        Q    Based on your training and experience?
 5              MS. HOLMES:  Same objection.                    04:09:00
 6              THE WITNESS:  Based on my training and
 7    experience, he was -- he was still showing assaultive
 8    characteristics.  And he was completely unpredictable.
 9    And we did not know what he had in his pockets and his
10    waistband.  And he -- he's still moving his hands        04:09:13
11    around.
12              Yes, I -- I felt that was assaultive and -- and
13    assaultive behavior warrants the Taser to be utilized.
14    BY MR. SCOTT:
15        Q    The -- the tasing or the arcing that we just    04:09:24
16    saw from Deputy Vianzon at around 8 seconds, based on
17    your training and experience, was that consistent with
18    San Diego Sheriff's policy and procedure using Tasers?
19              MS. HOLMES:  Objection.  Calls for legal
20    opinion.  Calls for expert opinion.  Compound.  Vague.   04:09:40
21              THE WITNESS:  So with assaultive behavior
22    being kind of the -- the main thing, um -- and like I
23    said, every situation or circumstance is different.
24              And what we encountered here, him not following
25    commands and moving his hands, I feared that he was still 04:10:01
```

216

Deputy Jeffrey Perine
November 8, 2018
EXHIBIT A

Atkinson-Baker, Inc.
www.depo.com

1    attempting or going to grab, assault, or attack us if we      04:10:03

2    got close enough.   The answer is yes, I -- I felt that it

3    was still assaultive.

4              MR. SCOTT:   Okay.   I'm starting again at 14

5    seconds.                                                      04:10:17

6                        (Video playing.)

7    BY MR. SCOTT:

8         Q    Okay.   I paused it at 25 seconds.

9              Did it appear to you that -- that Deputy

10   Vianzon has begun arcing the Taser once again?                04:10:35

11        A    I -- I couldn't see or hear if he did.

12        Q    Okay.

13        A    I was -- I was focused on my actions, sorry.

14        Q    Okay.   Let's back it up.   I'll start it again

15   at 19 seconds.                                                04:10:47

16                        (Video playing.)

17   BY MR. SCOTT:

18        Q    I'm pausing at 27 seconds.

19             Did -- did that appear to be another arcing

20   employed against Mr. Adkins?                                  04:10:59

21        A    It -- it sounded like it.   Um, and it sounded

22   like -- I don't know the exact time it went off, but as

23   he was kind of pulling away from me or pulling me,

24   that's when it sounded or appeared as if the Taser is

25   utilized.                                                     04:11:17

217

Deputy Jeffrey Perine
November 8, 2018
EXHIBIT A

Atkinson-Baker, Inc.
www.depo.com

```
 1        Q     Do you know whether Mr. Adkins was pulling          04:11:19
 2  away from you, because he was being non-complaint?  Or
 3  whether he was pulling away from you, because he was in
 4  the middle of getting Tased?
 5            Do you have a way of knowing one way or the           04:11:29
 6  other?
 7        A     I -- I believe he was pulling away from me,
 8  and not being Tased.  I felt he was attempting to either
 9  pull away from me or pull me down, while I was trying to
10  actually put him in handcuffs.                                  04:11:44
11        Q     Okay.  So I'm starting at 19 seconds.  At 19
12  seconds, you have not yet tried to go hands on with
13  Mr. Adkins; is that right?
14            MS. HOLMES:  Objection.  Vague.  Misstates
15  prior testimony.                                                04:11:56
16            THE WITNESS:  I -- I had.  Yes, I had tried to
17  go hands on with him.
18  BY MR. SCOTT:
19        Q     When was that.
20        A     Our initial contact.                               04:12:00
21        Q     Okay.  Fair point.  So setting that aside, now
22  that Mr. Adkins is on the ground, at 19 seconds here,
23  have you yet tried to go hands on with Mr. Adkins?
24        A     At -- at this point, while he's on the ground
25  in this spot, no.                                               04:12:13
```

218

Deputy Jeffrey Perine
November 8, 2018
EXHIBIT A

Atkinson-Baker, Inc.
www.depo.com

```
 1        Q    Okay.  So tell -- tell me when we see a point      04:12:15
 2   where, in your view, Mr. Adkins tried to pull you to the
 3   ground?
 4        A    Okay.
 5                    (Video playing.)                            04:12:24
 6             THE WITNESS:  Now.
 7             MS. HOLMES:  We just lost screen.
 8             THE WITNESS:  It's going in and out.  So about
 9   23 seconds, maybe.
10                    (Video playing.)                            04:12:42
11             MR. SCOTT:  Has it happened yet?
12             THE WITNESS:  Right here.
13             MR. SCOTT:  23 seconds?
14             THE WITNESS:  Yeah.
15                    (Video playing.)                            04:12:46
16   BY MR. SCOTT:
17        Q    Was that it at 23 seconds?
18        A    Yes.
19             MS. HOLMES:  Can you play that again?  Sorry.
20   It kept cutting in and out all of a sudden.                  04:12:55
21             MR. SCOTT:  Sure.
22             Okay.  I'll start at 21 seconds.
23                    (Video playing.)
24   BY MR. SCOTT:
25        Q    Okay.  Pause at 24 seconds.                        04:12:58
```

Deputy Jeffrey Perine
November 8, 2018
EXHIBIT A

Atkinson-Baker, Inc.
www.depo.com

1          Has -- has it happened already?  He tried to          04:13:03

2    pull you to the ground?

3          A    I'm -- I'm letting you know that when this is

4    happening, this is what it -- it felt like, as if he was

5    trying to do to me.                                          04:13:13

6          Q    Okay.  Um, my question to you is, have we now

7    seen the incident that you described as making you feel

8    like he was trying to pull you to the ground?

9          A    Yes.

10         Q    And -- and it's now -- that -- that incident      04:13:25

11   of him trying to pull you to the ground is now over at

12   24 seconds?

13         A    I, um -- if we could pull the verbiage, I -- I

14   don't -- I think I -- what I said was, I feared he was

15   trying to pull -- going to try to pull me to the ground      04:13:37

16   or was attempting to pull me to the ground.

17              Not that he tried.  He grabbed me and pulled

18   me and tried to, you know, actually got me on the ground

19   or anything.

20         Q    Did Mr. Adkins try to grab you and pull you on    04:13:48

21   the ground?

22         A    It's -- it's --

23              MS. HOLMES:  Objection.  Calls for

24   speculation.

25              THE WITNESS:  It's hard to tell, because when     04:13:55

220

Deputy Jeffrey Perine
November 8, 2018

EXHIBIT A

1    he grabbed on to my hand, I -- tried pulling him and I    04:13:57

2    disengaged, because I don't want to go to the ground

3    with him.

4    BY MR. SCOTT:

5         Q    Okay.  I'm starting at 20 seconds again.    04:14:06

6                        (Video playing.)

7    BY MR. SCOTT:

8         Q    Okay.  I paused at 26 seconds.  And right

9    where I paused, Mr. Adkins was making a noise like

10   (making noises), right?    04:14:20

11        A    Uh-huh.

12        Q    Yes?

13        A    I -- I -- I couldn't hear that.

14                        (Video playing.)

15   BY MR. SCOTT:    04:14:27

16        Q    Did you hear it that time?

17        A    Yeah.

18        Q    Okay.  Did it appear to you that Mr. Adkins

19   at -- at 26 seconds was in the middle of getting arced

20   by Deputy Vianzon?    04:14:43

21        A    Yes.  And it appeared about three seconds

22   after he pulled away from me, possibly tried to pull me

23   to the ground.  That's about three seconds after, so,

24   yeah.

25        Q    Okay.  So now that we've paused it at 27    04:15:03

Atkinson-Baker, Inc.
www.depo.com

```
 1   seconds, Mr. Adkins has already committed the physical    04:15:06

 2   acts that you described as potentially, um, trying to

 3   pull you to the ground; is that -- is that correct?

 4        A    That's what I felt that he was trying to do,

 5   and so what I feared.                                      04:15:19

 6                    (Video playing.)

 7   BY MR. SCOTT:

 8        Q    Okay.  I've paused it at 46 seconds.  So we

 9   just watched from 26 seconds to 46 seconds; is that

10   correct?                                                   04:15:48

11        A    Uh-huh.

12             MS. HOLMES:  I'd do it a yes or a no, just for

13   the record.

14             THE WITNESS:  Yes, it was 20 -- pause at 27

15   seconds.                                                   04:15:55

16   BY MR. SCOTT:

17        Q    Okay.  Thank you.  So we just watched 19

18   seconds of more video, right?

19        A    Yes.

20        Q    And stopping at 46 seconds?                      04:16:01

21        A    Yes.

22        Q    During that 19 seconds that we just watched,

23   was Mr. Adkins being assaultive to you?

24        A    At -- at this point, he's -- he's still moving

25   his -- his hand and arms and places and directions.  I    04:16:14
```

Deputy Jeffrey Perine
November 8, 2018
EXHIBIT A

1    don't know whether he's putting them down or to mount          04:16:19

2    them up and hit me or grab a weapon.

3              He has them tucked into and under his -- his

4    stomach.  And I don't know if -- if they're coming out,

5    but I know that he -- he was kicking his feet around.          04:16:34

6    Um, and, again, I don't -- I don't know if he has any

7    weapons.

8         Q    So what -- what's the answer to the question?

9    Was me exhibiting assaultive behavior?

10        A    Right in -- in those 20 seconds or --                04:16:48

11        Q    Right.

12        A    -- 19 seconds?  Yes, he still was, I feel.

13                    (Video playing.)

14   BY MR. SCOTT:

15        Q    Okay.  I've paused it now at 55 seconds.             04:17:03

16             Does it appear that Deputy Vianzon just

17   employed another arc on Mr. Adkins?

18        A    Yes.

19        Q    You can hear Mr. Adkins making an audible

20   sound in response to being shocked again, right?              04:17:20

21        A    Yes.

22        Q    Is it your view that this most recent shocking

23   at 53 or 54 seconds was appropriate and consistent with

24   your training and experience?

25             MS. HOLMES:  Objection.  Calls for expert           04:17:36

223

Atkinson-Baker, Inc.
www.depo.com

```
 1    opinion.  Calls for legal opinion.                  04:17:38
 2              THE WITNESS:  At -- at this point, he's
 3    starting to move his head violently towards my lower
 4    half, and he's still moving his body around.  And
 5    whether -- he's not in handcuffs.  We don't have a   04:17:50
 6    single handcuff on him.  Um, so he's still -- the way
 7    his body is moving, his head and his feet, I believe
 8    he -- he still falls into that criteria.
 9    BY MR. SCOTT:
10        Q    Is -- is moving his head in the manner that 04:18:05
11    you just described, a threat to you at this point?
12        A    Absolutely.
13        Q    How so?
14        A    If -- if he can headbutt any part of my body,
15    with how strong I felt he was.  And I've -- I've      04:18:15
16    arrested, you know, a lot of people.  So far in my
17    career, I've never ever tried to handcuff someone and
18    not even been able to move their arm.
19             Um, so his -- his level of strength, um, that
20    I felt, was something I had never seen or dealt with  04:18:31
21    before.  So at that point while I'm getting on him,
22    it -- it almost -- my fear is he can probably put his
23    head right through my leg and knock it off.  That's how
24    strong he felt.
25        Q    Are -- are you testifying that you literally  04:18:51
```

224

Atkinson-Baker, Inc.
www.depo.com

1    thought that Mr. Adkins might be able to put his head          04:18:53

2    through your leg?  Or -- or --

3              MS. HOLMES:  Objection.  Argumentative.

4    BY MR. SCOTT:

5        Q    Is that what you're saying?                           04:19:01

6        A    I said that's how I felt.

7              If he was to violently move or thrust his head

8    at me, he -- he could injure me.  Absolutely.

9                   (Video playing.)

10   BY MR. SCOTT:                                                  04:19:35

11       Q    I paused it at a minute and 19.

12            Did you hear Mr. Adkins just make a sound

13   again?

14       A    Yes.

15       Q    Was that consistent with the sound that he           04:19:42

16   made around 55 seconds, when I just asked you if he had

17   been arced previously?

18              MS. HOLMES:  Objection.  Vague.

19              THE WITNESS:  It -- it sounded similar.

20   BY MR. SCOTT:                                                  04:19:53

21       Q    Based on what you see here, does it appear

22   that Mr. Adkins had been arced once again by Deputy

23   Vianzon?

24       A    That's -- that's what it appeared.

25                   (Video playing.)                              04:20:04

225

Atkinson-Baker, Inc.
www.depo.com

```
 1    BY MR. SCOTT:                                          04:20:04

 2         Q    I paused it at a minute and 37 seconds.  Um,

 3    at -- at this point, is Mr. Adkins in handcuffs?

 4         A    I -- I have one handcuff, and it appeared as

 5    if I went for my second set, to try it.  So I had one    04:20:34

 6    wrist with a cuff around it.  And I'm not sure at this

 7    point, because I can't see, I'm being shielded, if I had

 8    the second cuff on there.

 9         Q    At this point, at a minute and 37 seconds, did

10    you feel that Mr. Adkins was a danger to you and other   04:20:51

11    deputies?

12         A    Yes.

13         Q    Is it your view that any reasonably trained

14    deputy would feel the same way?

15              MS. HOLMES:  Objection.  Calls for expert      04:21:04

16    opinion.  Calls for legal opinion.

17              THE WITNESS:  Yes.

18                  (Video playing.)

19    BY MR. SCOTT:

20         Q    Um, I'm pausing it a minute and 42.           04:21:14

21              Who's the, um, Caucasian gentleman in the

22    foreground, with the sweat on his lower back there?

23         A    I -- I don't know who that is.

24         Q    You've never learned who that is?

25         A    No.                                           04:21:26
```

226

```
 1   can hear me in the video, "What did you take?  We're        04:36:17
 2   trying to help you."  That's all we were -- we were
 3   trying to help the guy.
 4   BY MR. SCOTT:
 5       Q    Okay.  So my question is a little different.       04:36:22
 6            Knowing what you know now, do you feel that
 7   there's anything you could have done different to -- to
 8   make this incident turn out different?
 9            MS. HOLMES:  Okay.  Objection.  Incomplete
10   hypothetical.  Calls for speculation and asked and          04:36:34
11   answered reference prior testimony.
12            THE WITNESS:  It's -- it's a very hard
13   question to -- to answer, because if I decide to take my
14   baton out and physically strike him at some point, my --
15   my concern always with this situation, is that he gets a    04:36:49
16   hold of me, he's going to take me down and he's going to
17   get my gun and shoot me.
18            Um, and not only that, if we don't take his focus
19   off everything else, who knows what house he's going to go
20   into and barricade himself.  So I think that -- I -- I      04:37:05
21   don't know what else we really could have done, um...
22   BY MR. SCOTT:
23       Q    So is the answer no?  I mean, I'm asking you.
24   Is -- is your --
25       A    I --                                               04:37:14
```

Deputy Jeffrey Perine
November 8, 2018
EXHIBIT A

Atkinson-Baker, Inc.
www.depo.com

```
 1        Q      -- testimony --                              04:37:14
 2        A      -- I don't know.
 3               MS. HOLMES:   Hold on.   Hold on.   Hold on.
 4  BY MR. SCOTT:
 5        Q      Is -- is your testimony that there's nothing  04:37:16
 6  you could have done differently or should have done
 7  differently?
 8               MS. HOLMES:   Same objections.
 9  BY MR. SCOTT:
10        Q      You can answer.                              04:37:25
11        A      So my answer is that if we did something
12  differently, I don't know what other outcomes that would
13  have had.   So I can't answer that.   I don't -- I don't
14  know.
15               Um, if we would have tried this, I don't know  04:37:36
16  what would have happened.   And it's just something where
17  we never want someone to be injured, um, or die.   But I
18  don't know what could have happened in other
19  circumstances.   We were just trying to help him.
20        Q      I'll ask it a different way.                 04:37:51
21               Has any supervisor at the sheriff's department
22  said to you or suggested to you that you should have
23  done this differently?
24        A      In this case?
25        Q      Yes.                                         04:38:03
```

240

Deputy Jeffrey Perine
November 8, 2018
EXHIBIT A

Atkinson-Baker, Inc.
www.depo.com

```
 1        A    We don't talk about this case.              04:38:03

 2        Q    Why not?

 3        A    Because I'm in a civil suit.  And, um, this

 4   was on a Saturday.  My sergeant's not even there.  Um,

 5   the only thing we've talked about is support and things   04:38:15

 6   like that and that they feel that I usually make good

 7   decisions.

 8        Q    Well, Deputy, this -- there was not a civil

 9   suit filed until sometime after the incident happened,

10   right?                                                  04:38:29

11           MS. HOLMES:  Objection.  Calls for

12   speculation.

13   BY MR. SCOTT:

14        Q    To your knowledge.

15        A    To my knowledge, yeah, I don't know when it   04:38:33

16   was filed.

17        Q    Well, you -- you didn't get served the papers,

18   like, you know, the -- the Monday after it happened, did

19   you?

20        A    No.  I was specifically told by our department 04:38:40

21   and our homicide who interviewed me after, um, the

22   incident, that this was being treated like a officer

23   involved shooting, an OIS, and they did not want me to

24   talk with -- with anyone about it.

25        Q    Okay.  Uh, has anyone, aside from your         04:39:04
```

241

Deputy Jeffrey Perine
November 8, 2018
EXHIBIT A

1   lawyers, has anyone ever, um, gone through the Taser          04:39:06

2   download report that we've discussed and asked you

3   questions specifically about those deployments or those,

4   um, barbs or any of the events described in that report?

5       A    No.  And this is the first time I saw it was     04:39:19

6   when I -- recently with my counsel.  I had never seen it

7   until we met maybe a week or so ago.

8       Q    So, again, you anticipated my next question.

9            So even aside from this incident, um, had you

10  ever experienced, you know, having a download of your       04:39:36

11  Taser reviewed in the regular course of business, for

12  example?

13      A    No.  I've never used my Taser prior to this.

14  And I haven't since then.  And on this day, homicide

15  actually collected my Taser as evidence, so I -- I         04:39:53

16  couldn't access it anyways.  And I don't know where they

17  put the Taser printout.

18      Q    Okay.  Well, I'll ask it differently.

19            I'll just represent to you that some

20  departments some places, you know, a sergeant may come      04:40:07

21  around and sort of audit the Taser, and just do a

22  download, you know, once a year or once every six

23  months, um, just to make sure that everything is, you

24  know, being used appropriately.

25            Has anything like that ever happened at the       04:40:21

242

1    San Diego Sheriff's Department to -- to your knowledge?    04:40:25

2          MS. HOLMES:   Objection.   Vague.   Incomplete

3    hypothetical.   Calls for speculation.   Misstates facts

4    in evidence.

5          THE WITNESS:   So to clarify.   You're asking    04:40:34

6    if, um, a supervisor has ever asked for my Taser to look

7    up its usage?

8    BY MR. SCOTT:

9        Q    Yeah.   Well -- well said.

10            Yeah.   Has that ever happened?    04:40:46

11       A    No.   In -- if a Taser is deployed, we don't

12   have access -- I don't have access to cartridges.   It

13   has to be done in, I believe, at a higher level.

14            So, um, if it's utilized, I'm going to be

15   missing a whole cartridge in there.   Um, and I've never    04:41:00

16   had any -- anyone collect or take my Taser to monitor or

17   look at it.   Only, um, perhaps weapons training during

18   our qualifications, but they just look at it to make

19   sure it's functioning.

20            They don't -- I've never had anyone plug it in    04:41:19

21   or pull, um, anything like this.

22            MR. SCOTT:   All right.   Um, I -- I don't have

23   any additional questions for you.

24            Is -- is there, um, anything that you can think

25   of, in terms of answers you've given, or discussions we've    04:41:29

243

Atkinson-Baker, Inc.
www.depo.com

1    had today that you'd like to clarify, or, you know, that          04:41:34

2    you misspoke or anything like that, as you sit here right

3    now?

4         You -- you'll have a chance to look at the

5    transcript later.  But is there anything you'd like to          04:41:43

6    clarify about what we discussed today at this juncture?

7         MS. HOLMES:  Objection.  Vague.  Calls for

8    speculation.

9         THE WITNESS:  I don't -- I don't think so.

10        MR. SCOTT:  That's all I have.          04:41:54

11        MS. HOLMES:  I'm going to just -- I have a

12   little bit of follow-up and clearing up.

13        I want to reserve the right, pursuant to the Code

14   of Civil Procedure, for Deputy Perine to, um, to be able to

15   review the deposition transcript and make any corrections.          04:42:04

16

17                        EXAMINATION

18   BY MS. HOLMES:

19        Q    Earlier you testified, uh, plaintiff's counsel

20   was asking you a question about if someone was lying on          04:42:29

21   the ground and not displaying assaultive behavior,

22   whether it would be appropriate to use a Taser to get

23   them to comply with verbal commands.

24        Do you recall that testimony?

25        A    Yes.          04:42:44

                                                                 244

1       Q      Is that what occurred during the incident, the      04:42:45

2   interaction with Mr. Adkins on the date of the incident?

3       A      No.

4       Q      Why?

5       A      Because throughout the situation, although      04:42:55

6   very fluid, a lot of movement, I didn't feel that it was

7   ever to the point where he was laying down, hands on his

8   side and motionless.  I felt there was always that

9   threat.  And seeing him do the minor, you know, smallest

10  movements, I -- I had cause for concern that, um, he was      04:43:10

11  ultimately displaying assaultive behavior.

12      Q      Did you give a statement to anyone about this

13  incident after the incident?

14      A      Yes.

15      Q      When was that?                                     04:43:23

16      A      The same day I was interviewed by our homicide

17  department.

18      Q      And that was more recently -- that was closer

19  in time to the incident than today, correct?

20      A      Correct.  It was the same day.                     04:43:37

21      Q      So would you expect your memory to be more

22  accurate on that day than it is today?

23          MR. SCOTT:  Objection.  Leading.  Object to

24  the form of the question.

25          THE WITNESS:  Yes, I would -- I would feel      04:43:49

AC0B693                                DECEMBER 6, 2018

LETTER TO DEPOSITION OFFICER/ERRATA SHEET

DEPOSITION OF:                         DEPUTY JEFFREY PERINE

DATE OF DEPOSITION:                    NOVEMBER 8, 2018

CASE:                                  ESTATE OF MARK ROSHAWN ADKINS, ET AL. VS.
                                       COUNTY OF SAN DIEGO, ET AL.

The following are the corrections which I have made to my transcript:

| PAGE# | LINE# | CORRECTION | REASON FOR CORRECTION |
|-------|-------|------------|-----------------------|
| NONE  |       |            |                       |

Please sign your name and date it on the below line. As needed, use additional paper to note corrections, dating and signing each page. If you have no corrections, please write the word "None" above and sign, date, and return this page.

EXECUTED this _ELEVENTH_ day of _DECEMBER_, 20 _18_,

at _ALPINE (SHERIFF'S STATION)_, _CA_,
      (City)                          (State)

_____
            (Signature)

EXHIBIT A

AC0 B693

Atkinson-Baker, Inc.
www.depo.com

1

2

3

4        I hereby declare under penalty of perjury that

5   the foregoing is my deposition under oath; that I have

6   read my deposition and have made the necessary

7   corrections, additions or changes to my answers that I

8   deem necessary.

9        In witness thereof, I hereby subscribe my name

10  this **ELEVENTH** day of **DECEMBER**, 2018.

11

12

13

14

15   _____

16   DEPUTY JEFFREY PERINE

17

18

19

20

21

22

23

24

25

248

Deputy Jeffrey Perine
November 8, 2018

EXHIBIT A

1

STATE OF CALIFORNIA    )

2                      :  ss.

COUNTY OF SAN DIEGO    )

3           I, Lorena Barrón, a Certified Shorthand Reporter

4  of the State of California, do hereby;

5           That the foregoing proceedings were taken

6  before me at the time and place herein set forth; that

7  any witness in the foregoing proceedings, prior to

8  testifying, were administered an oath, that a record

9  of the proceedings was made by me using machine

10 shorthand which was thereafter transcribed under my

11 direction; that the foregoing transcript is a true

12 record of the testimony given.

13          Further, that if the foregoing pertains to

14 the original transcript of the deposition in a Federal

15 case, before completion of the proceedings, review of

16 the transcript [ ] was or [ ] was not requested.

17          I further certify I am neither financially

18 interested in the action nor a relative or employee of

19 any attorney or any party to this action.

20

21          In witness whereof, I have hereunto set my

22 hand this 5ᵗʰ day of December, 2018.

23

24 _____

LORENA BARRÓN

25 CSR No. 12058

EXHIBIT A

# Exhibit B

# Exhibit C



EXHIBIT C

# Exhibit D



EXHIBIT D

# Exhibit E



**EVIDENCE⊘SYNC**™

| TASER Information | | Report Generated by | |
|---|---|---|---|
| Dept. | SAN DIEGO COUNTY SHERIFFS DEPARTMENT-HEADQUARTERS | Name | RandallRandall |
| Serial | X00-376854 | Badge ID | 1353 |
| Model | TASER X26 | Local Timezone | Pacific Standard Time (UTC -0700) |
| Firmware Version | Rev. 24 | Generated On | 23 May 2017 12:47:32 |
| Device Name | X00-376854 | | |

### Dates from : Sat May 20 07:00:00 2017  to : Tue May 23 13:00:00 2017

**Device (X26)**

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Duration [Seconds] | Temp [Degrees Celsius] | Batt Remaining [%] |
|---|---|---|---|---|---|
| 157 | 20 May 2017 08:39:16 | Trigger | 7 | 31 | 68 |
| 158 | 20 May 2017 08:39:22 | Trigger | 5 | 31 | 68 |
| 159 | 20 May 2017 08:40:06 | Trigger | 12 | 33 | 67 |
| 160 | 20 May 2017 08:40:24 | Trigger | 6 | 34 | 66 |
| 161 | 20 May 2017 08:40:42 | Trigger | 8 | 34 | 66 |
| 162 | 20 May 2017 08:40:52 | Trigger | 6 | 34 | 65 |
| 163 | 20 May 2017 08:41:07 | Trigger | 5 | 35 | 65 |
| 164 | 20 May 2017 08:41:29 | Trigger | 5 | 38 | 64 |
| 165 | 20 May 2017 08:42:05 | Trigger | 5 | 40 | 64 |
| 166 | 23 May 2017 11:53:09 | Sync | 23 May 2017 12:05:52 to 23 May 2017 11:53:09 | | |
| 167 | 23 May 2017 11:54:38 | Sync | 23 May 2017 11:54:39 to 23 May 2017 11:54:38 | | |
| 168 | 23 May 2017 12:10:07 | Sync | 23 May 2017 12:10:07 to 23 May 2017 12:10:07 | | |
| 169 | 23 May 2017 12:14:16 | Sync | 23 May 2017 12:14:16 to 23 May 2017 12:14:16 | | |
| 170 | 23 May 2017 12:34:50 | Sync | 23 May 2017 12:34:50 to 23 May 2017 12:34:50 | | |
| 171 | 23 May 2017 12:36:50 | Sync | 23 May 2017 12:36:50 to 23 May 2017 12:36:50 | | |

EXHIBIT E

# Exhibit F

1              UNITED STATES DISTRICT COURT

2             SOUTHERN DISTRICT OF CALIFORNIA

3               HONORABLE MARILYN L. HUFF

4

5    ESTATE OF MARK ROSHAWN ADKINS,    )   **CERTIFIED COPY**
     ET AL,                            )
6                                      )
                 Plaintiffs,           )
7                                      )
        vs.                            )  No. 18CV0371-H-JMA
8                                      )
     COUNTY OF SAN DIEGO,              )
9                                      )
                 Defendants.           )
10   _____)

11

12

13

14        VIDEOTAPED DEPOSITION OF PATRICK O'CONNOR

15           Wednesday, November 7th, 2018

16               San Diego, California

17

18

19

20

21

22
     ATKINSON-BAKER, INC.
23   (800) 288-3376
     www.depo.com
24
     Reported by: JUSTIN R.A. MCPHAIL, CSR No. 13873
25   FILE NO.:    AC0B688

                                                        1

Patrick O'Connor
November 7, 2018
EXHIBIT F

Atkinson-Baker, Inc.
www.depo.com

1   BY MS. ZUGMAN:                                  10:45:57

2       Q   All right.  Next paragraph under deputy

3   observations and actions.  If you could read just

4   the first four sentences, I'm going to ask you to

5   clarify some things.                             10:46:07

6       A   "In route to the call I heard deputies

7   transmit they had deployed an CED conductive energy

8   device Taser.

9           "I arrived on scene at about 08:27 hours.

10  I parked at the bottom of the apartment complex    10:46:26

11  driveway and ran up the driveway to the location on

12  the third tier of the property.

13          "I observed a black male, later identified

14  as Mark Adkins, lying on the floor near the front

15  door of an apartment."                           10:46:44

16      Q   Okay.  Pause there for a second.

17          With respect to your referencing, 08:27

18  hours was that confirmed by CAD?

19      A   I don't think so.

20      Q   Okay.  I'm just trying to figure out how    10:46:59

21  did you know it was 8:27 hours when you wrote this

22  report?

23      A   Looking at my watch.

24      Q   Okay.  And --

25      A   But it could have been on CAD.            10:47:18

Atkinson-Baker, Inc.
www.depo.com

1        Q    Okay.                                          10:47:19

2        A    But I just don't recall looking at it.

3        Q    When you say in this report you observed

4  Mark Adkins lying on the floor near the front door

5  in an apartment, do you recall the position of his    10:47:23

6  body?

7        A    He was moving.  Sometimes he was on his

8  left side; sometimes he was on his stomach.

9        Q    Was he lying on his back?

10       A    He was on his back sometime during that but  10:47:35

11  I don't know if it -- I don't know if it was there

12  when I got there.

13       Q    Okay.  Do you recall seeing his hands?

14       A    No.

15       Q    All right.  If you can continue reading the  10:47:45

16  next few sentences?

17       A    Let's see.

18       Q    It starts with, "Adkins was struggling."

19       A    "Adkins was struggling with Deputy Vianzon

20  and Deputy Perine.  Adkins was on his stomach face   10:47:57

21  down.  Adkins was moving his body from side to side

22  and was attempting to stand up.  Deputy Vianzon was

23  holding a CED.  Adkins had four CED probes attached

24  to his chest area."

25       Q    Pause there for a second.                     10:48:19

45

Patrick O'Connor
November 7, 2018
EXHIBIT F

Atkinson-Baker, Inc.
www.depo.com

1        When you say "Adkins was struggling with    10:48:20

2    Deputy Vianzon and Deputy Perine," was he on the

3    ground struggling with them?

4        A   Yes.

5        Q   How so?                                  10:48:28

6            MS. HOLMES:  Objection.  Vague.

7            THE WITNESS:  He was attempting to -- it

8    looked to me like he was attempting to stand up.

9    And he was, let's see, flopping back and forth and

10   going from back to side to stomach.              10:48:43

11   BY MS. ZUGMAN:

12       Q   Did you see him get his legs underneath him

13   to stand up?

14       A   Yes.

15       Q   Okay.  You say also Adkins was on his    10:48:50

16   stomach face down, do you recall that?

17       A   Yes.

18       Q   Is that the position you recall him being

19   when you actually arrived at the scene?

20           MS. HOLMES:  Objection.  Asked and        10:49:03

21   answered.

22           THE WITNESS:  I don't recall.

23   BY MS. ZUGMAN:

24       Q   Okay.

25       A   Okay.                                     10:49:10

46

Patrick O'Connor
November 7, 2018
EXHIBIT F

Atkinson-Baker, Inc.
www.depo.com

1    Q   Do you recall seeing the four CED probes    10:49:12

2   attached in his chest area?

3    A   I actually recall seeing four wires.

4    Q   That's why we're going over this.  There

5   are certain things that are not so clear.    10:49:25

6        So you recall seeing four wires coming from

7   his chest area?

8    A   Going to his chest area.

9    Q   Do you recall if he had a shirt on?

10   A   Yes, he did.    10:49:36

11   Q   If you could read the last section of that

12  paragraph, please.

13   A   Okay.

14       MS. HOLMES:  Starting from where?

15       MS. ZUGMAN:  "Deputy Perine was on his    10:49:48

16  knees."

17       THE WITNESS:  "Deputy Perine was on his

18  knees near Adkins's shoulders and was preventing him

19  from standing.

20       "I straddled my legs across Adkins legs    10:49:59

21  using my body weight 195 pounds to control his

22  movement.  I stayed between Adkins's ankles and

23  knees to prevent him from kicking at myself and the

24  deputies."

25       (A discussion was held off the record.)    10:50:08

Patrick O'Connor
November 7, 2018
EXHIBIT F

Atkinson-Baker, Inc.
www.depo.com

1        MS. HOLMES:  And it's right there -- she's        10:50:17

2   having him read the -- it's right there --

3             (A discussion was held off the record.)

4        THE VIDEOGRAPHER:  We're going off the

5   record at 10:51 a.m.                                   10:50:27

6             (A discussion was held off the record)

7        THE VIDEOGRAPHER:  We are back on the

8   record at 10:52 a.m.

9   BY MS. ZUGMAN:

10       Q   Deputy O'Connor, I'm going to read the        10:52:06

11  statements from your report and then ask you

12  questions about it.  Is that clear?

13       A   Yes.

14       Q   Okay.  Starting with "Deputy Perine was on

15  his knees near Adkins's shoulders and was preventing   10:52:15

16  him from standing.  I straddled my leg across

17  Adkins's legs using my body weight, 195 pounds, to

18  control his movement."

19            Let me ask you about this situation.  When

20  you arrived on scene, did you immediately go to Mark   10:52:34

21  Adkins and straddle your legs across his legs?

22            MS. HOLMES:  Objection.  Vague.

23            THE WITNESS:  Yes.

24  BY MS. ZUGMAN:

25       Q   Okay.  Continuing on.  "I stayed between      10:52:46

48

Patrick O'Connor
November 7, 2018
EXHIBIT F

Atkinson-Baker, Inc.
www.depo.com

1  Adkins's ankles and knees to prevent him from   10:52:55

2  kicking at myself and the deputies and from

3  standing."  Pause.

4       Do you recall him actually trying to kick

5  you and the other deputies at this point?   10:53:04

6       MS. HOLMES:  Objection.  Misstates the

7  paragraph.

8       THE WITNESS:  His legs were moving rapidly

9  and they were moving in a direction that could have

10  kicked me or the deputies.  So the -- the leg   10:53:21

11  movement was either kicking or trying to stand;

12  either one, I was trying to prevent.

13  BY MS. ZUGMAN:

14       Q   Do you recall earlier you said you saw four

15  wires coming from Adkins's chest area?   10:53:39

16       MS. HOLMES:  Objection.  Misstates prior

17  testimony.

18  BY MS. ZUGMAN:

19       Q   Do you recall that?

20       A   Yes.   10:53:46

21       Q   When you arrived on the scene, did you

22  consider whether his movements were due to being

23  tased?

24       A   No.

25       Q   Why not?   10:53:56

49

Atkinson-Baker, Inc.
www.depo.com

1   arrived?                                              10:56:04

2        A   At the time I arrived, I believe he was on

3   his left side, and his hands were drawn to his

4   chest.

5        Q   Did you see anything in his hands?          10:56:15

6        A   I did not.

7        Q   Okay.  Moving on.

8            "I commanded Adkins two times to, quote,

9   'show me his hands,'" end quote.  Pause.

10           Did he ever comply and show you his hands?  10:56:31

11       A   No.

12       Q   Where were they?

13       A   At the time he rolled over on to his

14  stomach, and I could not see his hands.

15       Q   Okay.  When you first arrived on scene, was 10:56:44

16  Adkins on his stomach face down?

17       A   I believe --

18           MS. HOLMES:  Objection.  Asked and

19  answered.

20           THE WITNESS:  Yeah, I think I said that he  10:56:53

21  was on his left side.  He was flopping back and

22  forth so it was -- it was fluid.

23  BY MS. ZUGMAN:

24       Q   Okay.  And to be clear with respect to this

25  report, do you feel that there is some statements    10:57:07

                                                              52

Patrick O'Connor
November 7, 2018
EXHIBIT F

Atkinson-Baker, Inc.
www.depo.com

1  that could clarify the chronology of what you wrote          10:57:15

2  down?

3          MS. HOLMES:  Objection.  Vague.

4          THE WITNESS:  I don't know what you mean.

5  BY MS. ZUGMAN:                                                10:57:24

6      Q    Okay.  Let's continue reading, and I'll ask

7  you later.

8          It says here, "Adkins shifted to his

9  stomach and his hands were under his body.  Adkins

10 continued to resist by kicking his legs."  Pause.            10:57:37

11         At this point, Adkins was on his stomach

12 and his hands were under his body; is that accurate?

13     A    Yes.

14     Q    And he continued to resist by kicking his

15 legs?                                                         10:57:53

16     A    Uh-huh.

17         MS. HOLMES:  Use verbal words.

18         THE WITNESS:  Oh, yes.  I'm sorry.

19 BY MS. ZUGMAN:

20     Q    Just so I have a clear image.  He was on     10:57:59

21 his stomach, his hands were under his body, and he's

22 kicking his legs?

23     A    Yes.

24     Q    Okay.  Moving on.  "Deputy Vianzon stated

25 that he would deploy the CED if Adkins did not               10:58:10

53

Patrick O'Connor
November 7, 2018
EXHIBIT F

Atkinson-Baker, Inc.
www.depo.com

1    comply.  I told Adkins to stop resisting two or          10:58:15

2    three times.  Deputy Vianzon deployed his CED."

3    Pause.

4           Is that the first time you saw

5    Deputy Vianzon deploy his CED in your presence?          10:58:24

6        A    Yes.

7        Q    When we say "deploy," what do you mean by

8    "deploy"?

9        A    In this particular case, I meant cycle.

10       Q    What happened after Deputy Vianzon cycled        10:58:43

11   his CED this first time?

12       A    The subject muscles contracted, and he --

13   he was -- he was mumbling at the time, and it got a

14   little louder.  But in my opinion, it didn't -- it

15   didn't seem to feel the pain compliance.  It didn't     10:59:13

16   look like it to me.

17       Q    At this point when Adkins's muscles

18   contracted, were you able to get control of his

19   hands?

20       A    No, ma'am.                                      10:59:27

21       Q    Do you know whether the cycling of the

22   Taser impacted his ability to move his muscles

23   voluntarily?

24           MS. HOLMES:  Objection.  Calls for

25   speculation.                                             10:59:42

54

Patrick O'Connor
November 7, 2018
EXHIBIT F

Atkinson-Baker, Inc.
www.depo.com

1          THE WITNESS:   I do not.                    10:59:44

2     BY MS. ZUGMAN:

3          Q     Okay.   Continuing.   "The CED did not appear

4     to affect Adkins, and he continued struggling.

5     Deputy Perine and I were unable to control Adkins's   10:59:58

6     hands and Adkins continued to kick.   Pause.

7          After that first cycling that you saw in

8     your presence, do you recall Adkins continued to

9     kick?

10         A     Yes.                                   11:00:14

11         Q     Do you know -- rephrase.

12         Do you recall that he was kicking while the

13    cycling was happening?

14         A     I do not.

15         Q     Continuing.   "I tried to grab and pull out   11:00:27

16    Adkins right arm from underneath his stomach."

17    Pause.

18         Were you having difficulty getting Adkins

19    right arm from underneath his stomach?

20         A     Yes.                                   11:00:42

21         Q     Do you know if the cycling that was

22    happening to Adkins made his arm muscles contract?

23         MS. HOLMES:   Objection.   Calls --

24    withdrawn.

25         THE WITNESS:   I don't know.                 11:00:52

55

Atkinson-Baker, Inc.
www.depo.com

1   BY MS. ZUGMAN:                                          11:00:55

2       Q   Did you consider that possibility at the

3   time?

4       A   No.

5       Q   Continuing.  "Deputy Vianzon again stated       11:01:02

6   that he would deploy the CED if Adkins did not

7   follow his instructions.  Adkins refused to comply

8   with repeated directions mumbling incomprehensibly."

9   Pause.

10      Do you have know or have an opinion as to           11:01:19

11  whether Adkins understood the commands that were

12  being given to him in that situation?

13      A   I couldn't know.

14      Q   Were you given any heads up by the dispatch

15  person that he may be under the influence or had       11:01:33

16  some other alarming condition?

17      A   I don't recall.  I don't remember hearing

18  her say that.

19      Q   Continuing.  "Adkins continued to resist by

20  thrashing himself around and kicking his legs."        11:01:50

21  Pause.

22      Can you describe to me what you mean by

23  "thrashing"?

24      A   Going back from his stomach to his side and

25  just wiggling, wriggling.                              11:02:11

56

Atkinson-Baker, Inc.
www.depo.com

1          Q     And at this point he was still kicking his        11:02:12

2    legs?

3          A     Yes, ma'am.

4          Q     Continuing on.   "Deputy Perine held onto

5    Adkins upper back while I continued to hold his        11:02:19

6    knees.  I was able prevent Adkins from standing but

7    Adkins kept on kicking."  Pausing.

8                At this point, you were holding on to his

9    knees he was still kicking?  Yes?

10         A     Yes, I'm sorry.        11:02:40

11         Q     What about his hands?  If you were holding

12   his knees, what about gaining control of his hands?

13               MS. HOLMES:  Objection.  Vague.

14               THE WITNESS:  So by controlling his knees,

15   I was controlling his knees with my body weight, and        11:02:53

16   then I was using my hands to attempt to -- to pull

17   his arm out to get access to his hands.

18   BY MS. ZUGMAN:

19         Q    Got it.  Thank you for the clarification.

20               Continuing.  "Deputy Vianzon deployed the        11:03:07

21   CED and Deputy Perine was then able to put Adkins

22   left hand behind his back, and I put a handcuff on

23   his left wrist."  Pause.

24               Is this the second time the Taser was

25   cycled in your presence?        11:03:28

57

Patrick O'Connor
November 7, 2018
EXHIBIT F

1        A    Yes.                                          11:03:30

2        Q    So when it says "deployed," it's really

3   cycled?

4        A    Yes, ma'am.

5        Q    After this second time the Taser was        11:03:41

6   cycled, were you able to grab his left wrist?

7             MS. HOLMES:   Objection.  Misstates

8   testimony.

9             THE WITNESS:   Deputy Perine got his left

10  hand put it behind his back, and then I put a          11:03:58

11  handcuff on his left hand.

12  BY MS. ZUGMAN:

13       Q    On his left wrist?

14       A    On his left wrist, yes, ma'am.

15       Q    Oh, so to clarify, you had the handcuffs?    11:04:07

16       A    No.   I believe it was Deputy Perine.   I'd

17  have to see it, I don't recall whose cuffs they

18  were.

19            (A discussion was held off the record.)

20            THE WITNESS:   Perine I believe it was.     11:04:16

21            MS. HOLMES:   It's P-e-r-i-n-e.

22            THE WITNESS:   Or Perine.

23  BY MS. ZUGMAN:

24       Q    "Deputy Perine applied a second set of

25  cuffs while I placed Adkins's right hand behind his    11:04:29

Patrick O'Connor
November 7, 2018
EXHIBIT F

Atkinson-Baker, Inc.
www.depo.com

1   back."  Pause.                                          11:04:33

2          Do you recall that there were two sets of

3   cuffs that were used on Adkins?

4        A   Yes.

5        Q   Do you recall why?                             11:04:40

6        A   His size.  It would be more comfortable for

7   him if we had two sets of cuffs.

8        Q   Continuing.  "Deputy Perine cuffed his

9   right hand.  Adkins continued thrashing his body and

10  howling."  Pause.                                       11:05:01

11         Do you recall whether Adkins was howling

12  because of the tasing being cycled?

13         MS. HOLMES:  Objection.  Calls for

14  speculation.

15         THE WITNESS:  No, because he was howling --      11:05:09

16  he was continuously howling.

17  BY MS. ZUGMAN:

18       Q   Based on your knowledge of how Tasers

19  operate, do you know if they make a popping sound if

20  they're cycling?                                        11:05:20

21       A   It's not a popping, it's -- they make a

22  sound, it's not a popping sound, but they make a

23  sound.

24       Q   How would you describe the sound when it

25  was cycling?                                            11:05:31

59

```
 1      A   It's hard to describe.  It's like a        11:05:33
 2  warbling.  A high pitched warbling.
 3      Q   When a Taser is deployed, is that a
 4  different type of sound than the warbling?
 5      A   Same.                                       11:05:48
 6      Q   All right.  Moving on.  "Deputy Womack 7605
 7  arrived and he and I place a nylon cord cuff around
 8  Adkins ankles only."
 9          At what point do you recall Deputy Womack
10  arriving on the scene?                              11:06:02
11          MS. HOLMES:  Objection.  Vague.
12          THE WITNESS:  A few minutes after Adkins
13  was handcuffed.
14  BY MS. ZUGMAN:
15      Q   Did Womack arrive after you believed Adkins 11:06:12
16  was controlled?
17      A   No.  He still had -- Adkins was not
18  controlled when he was cuffed.
19      Q   When Deputy Womack arrived did you speak to
20  him?                                                11:06:29
21      A   I don't recall.  I'm sure we communicated,
22  but I don't know what it was.
23      Q   And when he arrived, he and you placed a
24  nylon cord cuff around Adkins ankles; is that
25  correct?                                            11:06:43
```

60

Patrick O'Connor
November 7, 2018
EXHIBIT F

Atkinson-Baker, Inc.
www.depo.com

1      A    Yes.                                          11:06:43

2      Q    After putting the cord cover on Adkins

3   ankles, was he then controlled?

4      A    Not fully.

5      Q    Why not?                                      11:06:53

6      A    Still was thrashing, knees were still

7   moving.  My head was in proximity to his knees so

8   still something for me to think about.

9      Q    Okay.  Moving on.  "The cord cuff prevented

10  Adkins from kicking me with his legs."  Pause.       11:07:11

11         After the cord cuff was applied, did you

12  still worry that you were going to get kicked by

13  Adkins?

14     A    Yes.

15     Q    How would he kick you?                        11:07:23

16     A    Knees.  The ankles were secure, but the

17  legs were not.

18     Q    Okay.  Moving on.  "My head was in close

19  proximity to his knees and feet.  We placed him in

20  the recovery position."  Pause.                      11:07:34

21         What is the recovery position?

22     A    On your side.

23     Q    And why do they do that after someone has

24  been tased?

25     A    They do that no matter what that situation    11:07:44

61

Patrick O'Connor
November 7, 2018
EXHIBIT F

1   is because it's more comfortable for the subject.   11:07:46

2      Q   Okay.  Moving on.  "Adkins continued to

3   move his body in a forceful manner."  Pause.

4       What do you mean by "forceful manner" in

5   this situation?   11:07:55

6      A  Still attempting to stand, still

7   struggling, still moving his knees.

8      Q  Just to clarify, Adkins was doing all these

9   things after he was already handcuffed and the cord

10   was applied to his hands?   11:08:09

11      A  Yes.

12      Q  Moving on.  "At no time was Adkins struck.

13   Pausing."

14      Just to clarify, that means no one hit

15   Adkins; is that correct?   11:08:20

16      A  That is correct.

17      Q  Moving on.  I saw a Deputy Jimenez arrive

18   on scene to assist, but I did not see him use any

19   force.

20      At what point did Deputy Jimenez arrive at   11:08:40

21   the scene?

22      A  After Adkins was cord cuffed, he arrived at

23   the scene, but he didn't approach the subject.

24      Q  Why not?

25      MS. HOLMES:  Objection.  Calls for   11:08:52

1    speculation.                                         11:08:53

2          THE WITNESS:  I don't know.

3    BY MS. ZUGMAN:

4       Q   By the time Deputy Jimenez arrived on the

5    scene, was Adkins controlled?                        11:08:59

6       A   No.

7       Q   Do you know why Deputy Jimenez didn't

8    approach the -- assist the deputies?

9          MS. HOLMES:  Objection.  Calls for

10   speculation.                                         11:09:09

11         THE WITNESS:  I do not.

12   BY MS. ZUGMAN:

13      Q   Do you recall if anyone asked Jimenez to

14   approach and assist the deputies?

15      A   No, nobody asked him to.                       11:09:17

16      Q   Okay.  Moving to the next page.  It starts

17   with "I believe the force used was necessary to

18   prevent Adkins from escaping or hurting deputies

19   while he resisted their efforts to place him in

20   handcuffs."  Pausing.                                 11:09:34

21         Did you believe that Adkins was going to

22   escape the situation at that time?

23         MS. HOLMES:  Objection.  Vague.

24         THE WITNESS:  After he was already

25   handcuffed and cord cuffed?                           11:09:45

                                                          63

Atkinson-Baker, Inc.
www.depo.com

1   BY MS. ZUGMAN:                                          11:09:48

2        Q    At any time?

3        A    Oh, yes.  Yes.

4        Q    At what point did you think Adkins might be

5   possibly escaping the situation?                        11:09:56

6        A    From the moment I got there until he was --

7   his ankles were controlled.

8        Q    Okay.  With respect to hurting deputies,

9   what facts led you to think that he could hurt the

10  deputies in that situation?                             11:10:13

11       A    His thrashing body.

12       Q    Okay.

13       A    His flailing knees and feet and our

14  occasional inability to see his hands.

15       Q    At any point, did you ever see him have      11:10:27

16  anything in his hands?

17       A    I did not.

18       Q    Moving on.  "The fire department/paramedics

19  arrived on scene."  Let me pause.

20            By the time they arrived on the scene, to     11:10:44

21  your recollection, was Adkins in the recovery

22  position handcuffed with the cord around his ankles?

23       A    Yes.

24       Q    Moving on.  Deputy Perine and I again put

25  Adkins in the recovery position, rolling him on to      11:11:00

64

Patrick O'Connor
November 7, 2018
EXHIBIT F

Atkinson-Baker, Inc.
www.depo.com

```
 1        A    Yes.                                      11:41:41

 2        Q    Did you have any other role that you

 3   thought you needed to fulfill with respect to that

 4   situation?

 5             MS. HOLMES:  Objection.  Vague and        11:41:47

 6   unintelligible.

 7             THE WITNESS:  No.  I don't -- I don't

 8   exactly know what you're asking me.

 9   BY MS. ZUGMAN:

10        Q    When you first arrived at the scene and you  11:41:55

11   see Deputy Perine and Deputy Vianzon and

12   Mark Adkins, what are the first instincts that came

13   to your mind as to what you're trying to do to help

14   the situation?

15        A    First thing I was thinking about is I     11:42:12

16   wanted him to -- I wanted to secure the legs so that

17   he would stop kicking, and the second thing would be

18   to prevent him from standing.

19        Q    At any time while you were there at the

20   situation, did Mark Adkins successfully stand up?   11:42:28

21        A    No.

22        Q    Going down to paragraph four where it

23   starts with, "They were having difficulty keeping

24   the suspect down and could not secure his hands; so

25   Deputy Vianzon gave two warning that he was going to  11:42:47
```

80

Patrick O'Connor
November 7, 2018
EXHIBIT F

Atkinson-Baker, Inc.
www.depo.com

```
 1   be tased if he continued resisting."              11:42:50

 2          Based on that sentence, was the reason that

 3   Mark Adkins tased because he did not voluntarily put

 4   his hands behind his back?

 5          MS. HOLMES:  Objection.  Calls for           11:43:11

 6   speculation.

 7          THE WITNESS:  I don't know why but that

 8   would be one of the reasons.  He could not be

 9   controlled.

10   BY MS. ZUGMAN:                                      11:43:17

11      Q   Were there any other reasons why

12   Deputy Vianzon issued those two warnings before

13   tasing Adkins?

14          MS. HOLMES:  Same objection.

15   BY MS. ZUGMAN:                                      11:43:39

16      Q   You said it would be one of the reasons

17   with respect to his hands not being behind his back,

18   were there other reasons?

19          MS. HOLMES:  Same objection.  Misstates

20   prior testimony.                                    11:43:47

21          THE WITNESS:  Prevent -- prevent escape.

22   BY MS. ZUGMAN:

23      Q   It says, "The suspect was tased to no

24   effect."  Is that your terminology to no effect?

25      A   Let's see.  The tasing to me, it felt --    11:44:10
```

81

Atkinson-Baker, Inc.
www.depo.com

1   well, what I told the detectives is that it seemed        11:44:15

2   to me that he wasn't feeling any -- the pain

3   compliance portion of it was not effective.

4        Q   Okay.  The next sentence says, "The only

5   indication that he received any sort of shock was        11:44:32

6   that his howling got louder."

7            Do you recall saying that to the detective?

8        A   No, I don't recall that.

9        Q   Do you recall as you sit here today that he

10  would howl louder as the cyclings of tasings        11:44:47

11  occurred?

12       A   Yeah, that's true.

13       Q   It's true that his howling got louder each

14  time he was cycled?

15       A   He was howling intermittently, and it        11:45:07

16  seemed like while the tasing -- while the cycling

17  happened his howling got louder, yes.

18       Q   Okay.  Okay.  Moving down to the middle of

19  the paragraph.  It says there were only two Taser

20  deployments while Deputy O'Connor was there.        11:45:29

21           Let me clarify.  We talked earlier about

22  Taser cyclings; correct?

23       A   Uh-huh.

24       Q   Does this statement mean to say that there

25  are only two Taser cyclings that occurred while you        11:45:40

Patrick O'Connor
November 7, 2018

EXHIBIT F

Atkinson-Baker, Inc.
www.depo.com

1    were there?                                                      11:45:43

2         A    Those are the only two I saw, yes.

3         Q    Okay.  But deployment would not be the

4    accurate use for this purpose, this statement?

5         A    Not in our conversation.                               11:45:52

6         Q    Going down to the last paragraph, third

7    sentence.  It says, "The suspect was excessively

8    sweaty, which made it difficult to get his hands out

9    from under him."

10             Do you recall that Adkins was really               11:46:07

11   sweaty?

12        A    Yes.

13        Q    Do you know if it made it difficult to put

14   his hands behind him because he was slippery?

15        A    It would be more accurate to say it was      11:46:19

16   more difficult for me to get his hands behind him

17   because he was slippery.

18        Q    Going to the next page, page 4 of 4.  Bates

19   stamped CSD000101, the second paragraph, "The fire

20   department arrived and discussed what they were          11:46:45

21   going to do for about five minutes since the suspect

22   was still very violent."

23             Do you recall that it was approximately

24   five minutes for the paramedics and fire department

25   to decide whether they were going to give them --        11:46:59

Patrick O'Connor
November 7, 2018
EXHIBIT F

Atkinson-Baker, Inc.
www.depo.com

1    give him a shot?                                    11:47:02

2         A    I don't know what they were discussing, but

3    it was five minutes.  They were there for a while

4    before they gave him a shot.  I don't know what they

5    were talking about.                                 11:47:12

6         Q    Five minutes is accurate based on this

7    statement?

8              MS. HOLMES:  Objection.  Vague.  Calls for

9    speculation.

10             THE WITNESS:  Approximately.              11:47:23

11   BY MS. ZUGMAN:

12        Q    Going to the fourth paragraph, it states,

13   "The only other way to control the suspect was by

14   having more deputies there to lay on him.  Deputy

15   O'Connor could not keep his legs from moving, he      11:47:41

16   also could not get the right arm to move an inch."

17   Let me pause there for a second.

18             When Deputy Womack arrived, did anyone

19   suggest to him that he also put his body weight on

20   Adkins?                                             11:47:59

21        A    No.

22        Q    What about when Deputy Jimenez arrived?

23        A    No.

24        Q    Based on this statement, do you believe

25   that had Deputy Womack and Deputy Jimenez also put    11:48:09

                                                              84

AC0B688                                    DECEMBER 17, 2018

LETTER TO DEPOSITION OFFICER/ERRATA SHEET

DEPOSITION OF: PATRICK O'CONNOR

DATE OF DEPOSITION: NOVEMBER 7, 2018

IN RE: ESTATE OF MARK ROSHAWN ADKINS, ET AL. VS. COUNTY OF SAN DIEGO, ET AL.

The following are the corrections which I have made to my transcript:

| PAGE# | LINE# | CORRECTION | REASON FOR CORRECTION |
|-------|-------|------------|------------------------|
| NONE  |       |            |                        |

Please sign your name and date it on the below line. As needed, use additional paper to note corrections, dating and signing each page. If you have no corrections, please write the word "None" above and sign, date, and return this page.

EXECUTED this ___4___ day of __JANUARY__, 20 _19_,

at __SAN DIEGO__, __CALIFORNIA__,
        (City)                        (State)

_____
        (Signature)

EXHIBIT F

Atkinson-Baker, Inc.
www.depo.com

1              DECLARATION OF WITNESS

2

3

4          I hereby declare I am the deponent in the

5    within matter; that I have read the foregoing deposition

6    and know the contents thereof, and I declare that the

7    same is true of my knowledge except as to the matters

8    which are therein stated upon my information or belief,

9    and as to those matters, I believe them to be true.

10         I declare under the penalties of perjury of the

11   State of California that the foregoing is true and

12   correct.

13         Executed this _____4_____ day of _Janur_, 20_19_,

14   at _San Diego, CA_____, California.

15

16

17

18   _____
                Patrick O'Connor

19

20

21

22

23

24

25

129

Patrick O'Connor
November 7, 2018

EXHIBIT F

Atkinson-Baker, Inc.
www.depo.com

```
 1                    REPORTER'S CERTIFICATE

 2

 3          I, the undersigned Certified Shorthand

 4   Reporter, holding a valid and current license issued by

 5   the State of California, do hereby certify:

 6          That said proceedings were taken down by me in

 7   shorthand at the time and place therein set forth and

 8   thereafter transcribed under my direction and

 9   supervision.

10          I further certify that I am neither counsel for

11   nor related to any party to said action, nor in any way

12   interested in the outcome thereof.

13          The dismantling, unsealing, or unbinding of the

14   original transcript will render the Reporter's

15   certificate null and void.

16          Signature Requested.

17

18          IN WITNESS WHEREOF, I have subscribed my name

19   on this date:  December 10th, 2018.

20

21

22          _____

23          Certified Shorthand Reporter

24

25
```

130

Patrick O'Connor
November 7, 2018
EXHIBIT F

# Exhibit G



# County of San Diego

CHIEF MEDICAL EXAMINER
(858) 694-2895

DR. JONATHAN R. LUCAS
CHIEF DEPUTY MEDICAL EXAMINER
(858) 694-2895

**MEDICAL EXAMINER'S DEPARTMENT**

5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215

http://www.sdcounty.ca.gov/me/

## AUTOPSY REPORT

| | | | |
|---|---|---|---|
| **Name:** | MARK ADKINS | **ME#:** | 17-1202 |
| **Place of death:** | Sharp Grossmont Hospital<br>La Mesa, CA 91942 | **Age:** | 64 Years |
| | | **Sex:** | Male |
| **Date of death:** | May 20, 2017; 1300 Hours | | |
| **Date of autopsy:** | May 21, 2017; 0925 Hours | | |

---

CAUSE OF DEATH:    RESUSCITATED CARDIOPULMONARY ARREST IN THE SETTING OF ACUTE METHAMPHETAMINE AND PHENCYCLIDINE TOXICITY, AND RECENT PHYSICAL ALTERCATION / PHYSICAL EXTERTION WITH HISTORY OF CONDUCTIVE ENERGY DEVICE USE

Contributing:    CHRONIC ILLICIT DRUG ABUSE; DILATED CARDIOMYOPATHY

MANNER OF DEATH:    HOMICIDE

AUTOPSY SUMMARY:

I.    Cardiopulmonary arrest in the setting of acute methamphetamine and phencyclidine toxicity, and recent physical altercation / physical exertion with history of conductive energy device use:
   A.    Minor abrasions noted on the torso and extremities.
   B.    Several apparent recent puncture-type injuries on the posterior torso.
   C.    Toxicologic testing of antemortem blood detected methamphetamine and phencyclidine (see below).
   D.    Status post resuscitative efforts, with pulmonary vascular congestion and edema and early acute pneumonia.

II.    Acute and chronic illicit drug abuse, with:
   A.    Clinical history of methamphetamine abuse.
   B.    Acute methamphetamine toxicity (see below).
   C.    Dilated cardiomyopathy (550 gram heart, 1.5 cm left ventricular free wall thickness, moderate four chamber cardiac dilatation).

CSD000123

EXHIBIT G

III.    Clinical history of gastroesophageal reflux disease.


OPINION:  According to the Investigator's Report, the decedent was a 64-year-old man. Per San Diego Sheriff's Office Homicide Team II, at approximately 0815 hours on 5/20/17, dispatch received calls that the decedent was seen in a townhouse community, where he was reportedly jumping over fences and attempting to break into townhomes.  He reportedly appeared sweaty.  Two deputies arrived on scene at approximately 0820 hours and encountered the decedent by the door to unit C.  He was not following commands and deputies both deployed conductive energy devices (CEDs) around approximately 0830 hours.  It was reported that the first time, there was no effect and/or possibly no contact. The second time there was no effect again.  The deputies then gave him verbal commands with no effect; he continued not to follow commands.  A device was deployed a third time, after which he may have pulled the probes, and no effect was observed.  A device was deployed a fourth time, after which the decedent slowed down long enough for deputies to get his arm and cuff him, then other deputies arrived and assisted the original two in getting the decedent double cuffed.  By this point four deputies were involved. They reportedly did not place the decedent on his stomach, or sit on him.  They reportedly put him into a recovery position, at which time he was still described to be kicking.  They cord cuffed his legs and used that to assist in holding and controlling him, but they did not put him in a four point restraint.  Both of the original deputies denied use of a drive stun mode on the CEDs. Paramedics arrived shortly thereafter (at approximately 0834 hours), and at that time the decedent was still restrained, combative, and "noticeably diaphoretic". He was placed on a backboard, and at that time was still 'thrashing'.  He was administered one 5 mg dose of Versed and he became calm.  He was moved to the ambulance for transport. It was reported that within two minutes, as they were getting ready to transport him, they noticed that the decedent's eyes were 'rolling back in his head'.  He was found to be pulseless and apneic (approximately 0848 hours).  Cardiopulmonary resuscitation was initiated with a bag-valve mask, and Narcan was administered with no effect.  The active compression-decompression device was used during transport, but the decedent could not be intubated due to a clenched jaw.  He briefly regained weak pulses at some point, but lost them after a brief period.  He arrived at the Sharp Grossmont Hospital emergency department at 0907 hours in pulseless electrical activity and was transferred to emergency department staff, who continued resuscitative efforts.  At 0942 hours, they achieved sinus bradycardia and the decedent was prepared for transfer to the intensive care unit. Hospital records document that staff removed 5 CED probes from the decedent's back. Some time later the decedent developed pulseless electrical activity again and advanced cardiac life support measures were undertaken to no avail. The death was pronounced at 1300 hours. According to the decedent's mother and sister he had never been diagnosed with cardiac or any other medical issues, but did take medication for gastroesophageal reflux disease. He was reportedly a methamphetamine user and was described as a "weird guy" when he

CSD000124

EXHIBIT G

was using methamphetamine.

The autopsy examination showed a normally developed adult man with minor abrasions noted on the torso and extremities as well as several apparent recent puncture-type injuries on the posterior torso. Two of these appeared to be paired (approximately 4-1/2 inches apart) at the central upper-to-mid back; two appeared to be paired (approximately 1-1/2 inches apart) on the right side of the mid back; and a single puncture-type defect was present over the posterior right hip region. There was a pair of irregular dried foci (1-1/4 inches apart) on the right side of the mid back above the paired puncture sites at that location. A single additional possible puncture site was noted on the left side of the abdomen. No additional significant recent trauma was identified. A small plastic Ziploc-type plastic baggie (no identifiable contents) was recovered from the region of the hypopharynx on removal of the neck structures. Natural disease included an enlarged and dilated heart (550 gram heart, 1.5 cm left ventricular free wall thickness, moderate four chamber cardiac dilatation). Also noted were marked pulmonary vascular congestion and edema, and foci of early acute pneumonia, consistent with effects of resuscitated cardiac arrest.

Toxicological testing of antemortem blood (collected on 05/20/17 at 0957 hours) detected methamphetamine (6.7 mg/L) and metabolite amphetamine (0.14 mg/L) and phencyclidine [PCP] (6.6 ng/mL). Also detected were cannabinoids (THC-COOH <1.0 ng/mL), midazolam (<0.05 mg/L) and gabapentin (2.0 mg/L).

Based on the information available at the time of this report, including the autopsy findings and results of ancillary testing, the death is attributed to resuscitated cardiopulmonary arrest in the setting of acute methamphetamine and phencyclidine toxicity and recent physical altercation / physical exertion with history of conducted energy device use. Additional significant conditions include chronic illicit drug abuse and dilated cardiomyopathy. The manner of death is classified as homicide.

JACQUELYN MORHAIME, M.D.
Deputy Medical Examiner

Date signed:

CSD000125

EXHIBIT G

IDENTIFICATION:  The decedent is received in the supine position in a white zip-front body bag closed by tamper-evident red seal number "2390233" which is opened at 0925 hours.  A blue Medical Examiner's identification band, bearing the decedent's name and case number, is affixed to the external surface of the bag; this is subsequently removed and placed around the decedent's ankle.

WITNESSES:  In attendance from the San Diego Sheriff's Office are Norman Hubbert and Doree Racicot.  Assisting is Forensic Autopsy Specialist Jason Newman.

WITNESS PATHOLOGIST:


STEVEN C. CAMPMAN, M.D.
Deputy Medical Examiner

Date signed:


CLOTHING:  The body is unclad when initially viewed, with the exception of a gray metal wrist watch on the left wrist ("Quartz"). There are paper bags secured over the head, hands and feet.

EVIDENCE OF MEDICAL THERAPY:  In place are the following items:
• Endotracheal tube with external fixation device (comment: properly positioned on subsequent internal examination).
• Cervical spine stabilization collar.
• EKG pads (x13 anterior torso, x1 anterior right arm, and x1 lateral left shoulder).
• Single lumen vascular catheter, dorsum of right hand (with near-full attached 1 liter bag of normal sodium infusion).
• Blood-stained gauze over dorsum of right hand.
• Blood-stained gauze over radial aspect of right wrist.
• Triple lumen vascular catheter, right femoral region (with near full attached 250 ml bags normal sodium and norepinephrine).
• Right anterior tibial intraosseous needle (with near-full attached 250 ml bag dopamine HCL).
• Indwelling urinary catheter (with approximately 30 ml of yellow urine in urometer).
• Loose in the bag is a 360 mg / 200 ml amiodarone HCL.
• Vascular catheter, dorsum of left hand.
• Pulse oximeter monitor bandage, left index finger.
• Two identification bands on left wrist, one white and one red, each bearing the decedent's name and identifying information.
• Also loose in the body bag is a 10 ml sodium chloride injection syringe.

CSD000126

EXHIBIT G

- Pulse oximeter monitor bandage, right index finger.
- External defibrillator pads x2, anterior and posterior torso.
- There are focally blood-stained pieces of gauze taped over apparent recent puncture sites on the posterior torso.

POSTMORTEM CHANGES:  The body is well preserved and has not been embalmed. There is marked rigor mortis of upper and lower extremities, and jaw, but minimal rigor mortis of the neck.  Lividity is present over posterior surfaces of the body where it is faint, pink, and does not blanch significantly with pressure.  The body is cool (refrigerated).

## EXTERNAL EXAMINATION

The body is that of a normally developed, well-nourished, average-to-large framed, 70 inch, 228 pound man who appears younger than the given age of 64 years.

The scalp hair is straightened, black, and is disposed in a ponytail (up to 4-1/2 inches in greatest length, secured by a black hair rubber band at the back of the head).  The mustache and beard hair is shaven into a goatee style, with a 4 inch length braid at the tip of the chin (tied in a knot at the distal end).  The nose and facial bones are intact on palpation.  The ears are normally formed.  The earlobes are not creased.  There is a piercing site at the left earlobe and a 1/4 inch piercing defect at the left lobe.  The eyes have brown irides and the conjunctivae are without hemorrhage, petechiae, or jaundice. There is slight tach noire.  The nose is normally formed, and the nares are clean and unobstructed.  The oral cavity has natural teeth in good repair and an atraumatic mucosa. There are two well-healed linear scars at the right upper eyelid, up to 1/2 inch in greatest dimension.  There are multiple irregular and linear well-healed scars in the left eyebrow and left upper eyelid, up to 1 inch in greatest length.

The neck is symmetrical and without notable external injury.

The chest is normally formed, symmetrical, and without palpable masses.  There is a 3 inch area of irregular erythema and superficial abrasion on the central anterior chest (comment: consistent with effects of resuscitative efforts).  There is a 1-1/4 inch oblique well-healed linear scar at the right lateral chest.  The abdomen is flat and soft; no masses are palpable.  There is a 6 inch well-healed vertical linear midline scar on the upper abdomen and a 5 inch well-healed vertical linear midline scar on the low abdomen.  There are two irregular superficial abrasions at the left-central lower chest, up to 1/8 inch in greatest dimension.  The surface of the back is free of notable scars.

The upper extremities are normally formed.   There are two bleeding recent needle puncture sites (with surrounding blue-pink ecchymosis up to 1/2 inch) at the right antecubital fossa.  There is a 1 inch focally thickly crusted healing irregular scar at the distal

CSD000127

EXHIBIT G

ulnar right forearm.  The fingernails are short and unremarkable.  The left arm has a recent needle puncture site (with blue ecchymosis) at the proximal medial region of the antecubital fossa and a recent needle puncture site (with 1/4 inch blue ecchymosis) at the antecubital fossa.  There is a recent needle puncture site on the dorsum of the left hand. Additionally scattered over all surfaces of the upper extremities are numerous irregular and linear well-healed scars (up to 4 inches in greatest dimension), and scattered punctate scabs over the dorsal forearms.

The lower extremities are normally formed and have no edema, amputations, or deformity.  There are numerous foci of irregular, linear, and curvilinear hypopigmented well-healed scarring scattered over the anterior surfaces (individual scars up to 3 inches in greatest dimension).   There is a 1/2 inch flesh-colored pedunculated papule at the proximal anterolateral left thigh. The left great toe has been amputated.  The remaining toenails are of varying lengths and show focally marked thickening and opacification.

The external genitalia are those of a normal adult man, with both testes palpable in the scrotum.

TATTOOS:  There are multiple monochromatic professional tattoos on the torso and upper extremities of various designs including head of a lion on lateral right arm; apparent jester-type of figure and word "Big Game" on dorsal right forearm; money symbol and word "Playboy" with head of bunny on ventral right forearm; "Collette" on lateral right neck; apparent barbed wire with three-leaf clover on right pectoral chest; a spider on lateral left neck; phrase "True II Life" and unidentifiable script on left pectoral chest; swordfish and waves on lateral left arm; "L/P" on lateral left arm; firearm on ventral left forearm; cross symbol and illegible script on dorsal left forearm.

## INJURIES, EXTERNAL AND INTERNAL

### MINOR BLUNT FORCE INJURIES OF BODY:
The head has a grouping of few (approximately three) irregular superficial abrasions on the left frontal scalp (up to 1/4 inch in greatest dimension).

The torso has two superficial abrasions (up to 1/8 inch greatest dimension) on the left-central anterior chest.  The posterior aspect of the torso has a 1 inch superficial linear abrasion at the left upper back; 1/4 inch oblique linear superficial abrasion at the right-central mid back; 1 inch superficial linear abrasion at the left mid back; and 1/4 inch superficial abrasion at the right-central low back.

The right upper extremity has several (approximately four) foci of irregular superficial abrasion over the dorsum of the right hand and metacarpophalangeal joints of the right index and middle fingers (up to 3/16 inch in greatest dimension).

CSD000128

EXHIBIT G

The left upper extremity has several irregular and vague foci of superficial abrasion overlying and surrounding the left elbow (individually up to 1/4 inch in greatest dimension).

The right lower extremity has numerous irregular superficial abrasions over anterior surfaces, from the knee to the dorsum of the foot, up to 2 inches in greatest dimension.

The left lower extremity has numerous irregular superficial abrasions over anterior surfaces, from the knee to the dorsum of the foot, up to 1-1/2 inches in greatest dimension.

**APPARENT RECENT PUNCTURE SITES:**

The anterior torso has an apparent recent puncture site at the left side of the abdomen (approximately 3 inches to the left of the umbilicus).

The posterior torso has a < 1/16 inch apparent recent puncture site (with 1/4 inch ovoid skin erosion/abrasion at the lower left border) at the left-central upper back. There is a < 1/16 inch apparent recent needle puncture site (with 1/8 inch circular abrasion surrounding the lower border) at the central mid back (comment: there is approximately 4-1/2 inches distance between these two). There are two irregular foci of drying (each 1/8 inch, and each with dried flaking skin at the right borders) at the right side of the mid back; these are 1-14 inch distance apart and show no visible puncture sites. There are two apparent recent puncture sites, without changes on the surrounding skin, at the right side of the mid-to-low back, located approximately 1-1/2 inch distance apart. There is a single additional < 1/16 inch linear puncture site, without changes on the surrounding skin, over the right posterolateral hip. Two of the defects on the back (one puncture and one dried focus) show only scant subcutaneous fatty soft tissue hemorrhage.

*These injuries above, having been described, will no be repeated.*

## INTERNAL EXAMINATION

BODY CAVITIES: The organs are in their normal situs. The right pleural cavity has extensive adhesions at all surfaces. The remaining body cavities are without adhesions or recent hemorrhage. There is mesh material in the anterior abdominal wall underlying the previously described anterior midline abdominal scars.

CARDIOVASCULAR SYSTEM: The heart weighs 550 grams, appears enlarged and mildly dilated, and has a normal distribution of right dominant coronary arteries with focal 40% noncalcific atherosclerotic stenosis in the proximal region of the first diagonal branch of the left anterior descending artery. All remaining segments are widely patent. There is no recent thrombus. The myocardium is red-brown, firm, and uniform without focal fibrosis, softening, or hyperemia. There is concentric left ventricular hypertrophy and moderate four chamber cardiac dilatation. The right ventricle, left ventricle, and interventricular septum

CSD000129

EXHIBIT G

measure 0.5 cm, 1.5 cm, and 1.5 cm, respectively.  The endocardium is intact, smooth, and glistening.  The cardiac valve leaflets are of normal number, pliable, intact, and free of vegetations.  The atrial and ventricular septa are free of defects.  The aorta follows its usual course and has mild-to-moderate focal atherosclerotic changes.  There are no vascular anomalies or aneurysms.  The vena cavae and pulmonary arteries are without thrombus or embolus.

RESPIRATORY SYSTEM:   The right and left lungs weigh 1110 and 900 grams, respectively, and have the usual lobation.  The pleura are smooth and glistening; the lungs have moderate amounts of anthracotic pigment.   The lungs are well expanded and crepitant.  The parenchyma is dark red and exudes moderate amounts of fluid.  The lungs have no discrete foci of consolidation, hemorrhage, infarct, tumor, gross fibrosis, or enlargement of airspaces.  The bronchi are unremarkable.

HEPATOBILIARY SYSTEM:  The liver weighs 2030 grams.  The intact capsule is smooth and glistening.  The parenchyma is red-brown, slightly fatty appearing, and slightly fibrotic, but otherwise uniform without mass, hemorrhage, or yellow discoloration.  The gallbladder contains an estimated 5 ml of bile and no stones.  Its mucosa is uniform and the wall is not thickened.

The pancreas has a normal size, shape, and lobulated structure.  The parenchyma is pink-tan, firm, and uniform.

HEMOLYMPHATIC SYSTEM:  The spleen weighs 230 grams.  The capsule is smooth and intact.  The parenchyma is maroon, firm, and uniform.  There is no enlargement of the lymph nodes in the neck, chest, or abdomen.

ENDOCRINE SYSTEM:  The thyroid gland is not enlarged, and the lobes are symmetrical.  The parenchyma is uniform, firm, and red-brown.  The adrenal glands have the usual golden cortical ribbon and unremarkable medullae.  The pituitary gland is unremarkable.

GASTROINTESTINAL SYSTEM:   The esophagus and gastroesophageal junction are unremarkable.  The stomach contains approximately 30 ml of nondescript brown liquid without visible pills or pill residue.  The gastric and duodenal mucosae are intact and unremarkable.   The small and large intestines are unremarkable to inspection and palpation.  The appendix is present and unremarkable.

GENITOURINARY SYSTEM:   The right and left kidneys weigh 170 and 180 grams, respectively, and have a normal shape and position.  The cortical surfaces appear smooth.  The kidneys have the usual corticomedullary structure without tumors or cysts.  The pelves and ureters are not dilated or thickened.  The bladder is empty of urine, with indwelling catheter in place.   The mucosa is intact, and the bladder wall is not

CSD000130

EXHIBIT G

hypertrophied.   The prostate gland is of average size and grossly unremarkable.   The testes are not examined.

NECK:   The cervical vertebrae, hyoid bone, tracheal and laryngeal cartilages, and paratracheal soft tissues are without trauma.   The upper airway is patent.   The tongue is unremarkable.   A small clear plastic Ziploc-type baggie (1-1/2 inches square) falls from the region of the hypopharynx on removal of the neck.   This is coated in and contains scant biologic fluid-tinged residue, but no obvious solid or powdery contents.

MUSCULOSKELETAL SYSTEM:   The musculoskeletal system is well developed and free of deformity.   There are no fractures of the clavicles, sternum, ribs, vertebrae, or pelvis. The ribs are not brittle.   The skeletal muscle is dark red and firm.

HEAD:   The scalp is free of hemorrhage.   The calvarium and base of the skull are normally configured and have no fractures.   The dura is intact, and there is no epidural or subdural hemorrhage.

CENTRAL NERVOUS SYSTEM:   The unfixed brain weighs 1460 grams.   The leptomeninges are glistening and transparent without underlying hemorrhage, exudate, or cortical contusions.   The hemispheres are symmetrical and have a normal gyral pattern. There is no flattening of the gyri, narrowing of the sulci, midline shift, or evidence of herniation.   The arteries at the base of brain have no significant atherosclerotic changes or aneurysms.

Sections through the cerebral hemispheres have a uniform, intact cortical ribbon and uniform white matter.   The basal ganglia, thalami, hippocampi and other internal structures are symmetrical and without focal change.   The ventricles are not enlarged, and the linings are smooth and glistening.   Sections of the brainstem and cerebellum show an intact structure without focal lesions.

CSD000131

EXHIBIT G

## **SPECIMENS RETAINED**

TOXICOLOGY:  Samples of central and peripheral blood, vitreous humor, gastric contents, urine, liver, and plastic bag are retained for toxicology.

HISTOLOGY:  Representative sections of organs and tissues are retained.  Sections of the heart (2), lungs (5), liver (1), kidney (1), back puncture site (1), and back dried focus (x1) are submitted for histology.

Cassette summary:
Cassette 1:    Right lung (x3).
Cassette 2:    Left lung (x2).
Cassette 3:    Liver (x1), kidney (x1).
Cassette 4:    Myocardium (x1), coronary artery (x1).
Cassette 5:    Right-central mid back puncture (x1).
Cassette 6:    Right side of back, dried focus [upper] (x1).

PHOTOGRAPHS:  Digital identification photographs, overall photographs, and selected photographs of internal findings are taken.

RADIOGRAPHS:  None.

CSD000132

EXHIBIT G

## **MICROSCOPIC EXAMINATION**

<u>HEART</u>:   Section from heart shows orderly cardiomyocytes and mild perivascular and interstitial myocardial fibrosis. There is no necrosis, hemorrhage or inflammation. Section from coronary artery shows mild thickening of vessel wall by noncalcified atherosclerotic plaque.

<u>LUNGS</u>:   Sections from lungs show marked vascular congestion, edema fluid, and intra-alveolar blood; mild anthracosis; scattered foci of postmortem bacterial overgrowth (without associated acute inflammation). Larger airways are free of basement membrane thickening, eosinophilic inflammation, glandular hyperplasia or muscular hypertrophy. Alveoli show scattered areas of alveolar macrophages, and rare foci of neutrophilic infiltration consistent with early pneumonia.

<u>LIVER</u>:   Section from liver shows prominent sinusoidal congestion, mild chronic inflammation of portal tract regions, and scant micro- and macrovesicular fatty change. There is no significant fibrosis, necrosis, or acute inflammation.

<u>KIDNEY</u>:   Section from kidney shows autolysis of tubules, scattered diffusely sclerotic glomeruli, and scant thickening of small blood vessels. There is no significant inflammation.

<u>BACK PUNCTURE SITE</u>:   Section from back puncture site shows pigmented epithelium with focal denudation and adjacent eosinophilia and streaming of nuclei, and recent hemorrhage in the subcutis.

<u>BACK DRIED FOCUS</u>:   Section shows focal thinning of epidermis, eosinophilia and streaming of nuclei.

JM:SCC:clb
D: 5/21/17   T: 5/23/17
Rev.  8/31/17

CSD000133

EXHIBIT G



# County of San Diego

**DR. GLENN N. WAGNER**
CHIEF MEDICAL EXAMINER
(858) 694-2895

MEDICAL EXAMINER'S DEPARTMENT
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sdcounty.ca.gov/me/

**DR. JONATHAN R. LUCAS**
CHIEF DEPUTY MEDICAL EXAMINER
(858) 694-2895

## TOXICOLOGY REPORT

| | |
|---|---|
| Name: | **ADKINS, Mark** |
| Medical Examiner Number: | **2017-01202** |
| Date of Death: | **5/20/2017** |
| Time of Death: | **1300** |
| Pathologist: | **Jacquelyn Morhaime** |
| Specimens Received: | **Vitreous, Gastric, Liver, Urine, Antemortem Blood, Central Blood, Peripheral Blood 1, Peripheral Blood 2, Plastic Bag** |
| Date Specimens Received: | **5/22/2017** |

| Test Name (Method of Analysis) | Specimen Tested | Result |
|---|---|---|
| Alcohol Analysis (GC/FID-Headspace) | Antemortem Blood | |
|    Alcohol (Ethanol) | | Not Detected |
|    Acetone, Isopropanol, Methanol | | Not Detected |
| | | |
| Drugs of Abuse Screen (ELISA) | Antemortem Blood | |
|    **Amphetamines** | | **Presumptive Positive** |
|    **Benzodiazepines** | | **Presumptive Positive** |
|    Buprenorphine | | Not Detected |
|    **Cannabinoids** | | **Presumptive Positive** |
|    Carisoprodol | | Not Detected |
|    Cocaine metabolites | | Not Detected |
|    Fentanyl | | Not Detected |
|    Methadone | | Not Detected |
|    Opiates | | Not Detected |
|    Oxycodone | | Not Detected |
|    **Phencyclidine (PCP)** | | **Presumptive Positive** |
|    Zolpidem | | Not Detected |
| | | |
| Base Screen (GC/MS) | Antemortem Blood | |
|    **Gabapentin** | | **Detected** |
|    **Midazolam** | | **Detected** |
|    **Lidocaine** | | **Detected** |
|    **Etomidate** | | **Detected** |
| | | |
| Amphetamines (LC/MS) | Antemortem Blood | |
|    **Methamphetamine** | | **6.7 mg/L** |
|    **Amphetamine** | | **0.14 mg/L** |
|    Ephedrine | | Not Detected |
|    Pseudoephedrine | | Not Detected |
|    MDA | | Not Detected |
|    MDMA | | Not Detected |
|    Phentermine | | Not Detected |
|    Phenylephrine | | Not Detected |
| | | |
| **Gabapentin (LC/MS)** | Antemortem Blood | **2.0 mg/L** |
| | | |
| Benzodiazepines (HPLC/DAD) | Antemortem Blood | |
|    **Midazolam** | | **Detected (<0.05 mg/L)** |

---

CSD000134

EXHIBIT G



# County of San Diego

**DR. GLENN N. WAGNER**
CHIEF MEDICAL EXAMINER
(858) 694-2895

**MEDICAL EXAMINER'S DEPARTMENT**
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sdcounty.ca.gov/me/

**DR. JONATHAN R. LUCAS**
CHIEF DEPUTY MEDICAL EXAMINER
(858) 694-2895

| Cannabinoids (GC/MS) | Antemortem Blood | |
| --- | --- | --- |
| THC | | Not Detected |
| **THC-COOH** | | **Detected (<1.0 ng/mL)** |
| **Phencyclidine (PCP)** (GC/MS) | Antemortem Blood | **6.6 ng/mL** |

*Antemortem blood was collected on 05/20/2017 at 0957 hrs.*
End Results

Approved and Signed:
7/18/2017

Iain M. McIntyre, Ph.D.
Forensic Toxicology Laboratory Manager

2017-01202     An American Board of Forensic Toxicology (ABFT) Accredited Laboratory     Page 2 of 2

CSD000135

EXHIBIT G

# Exhibit H

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


Estate of Mark Roshawn Adkins, et al,

       Plaintiffs,

vs.           Civil Action No.: 18cv0371-

                      H-MDD


County of San Diego, et al.,

       Defendants.

_____/




VIDEOTAPED DEPOSITION OF ROGER CLARK

Taken at San Diego, California

April 19, 2019




Reported by Dana E. Simon - CSR

Certificate No. 12683




EXHIBIT H

Roger Clark - 4/19/2019

11:11:27  1      Q    What specific evidence can you cite to that

       2   Deputies Perine and Vianzon created a dangerous

       3   situation and escalated the encounter with Mr. Adkins?

       4            MS. ZUGMAN:  Asked and answered.

11:11:42  5            THE WITNESS:  It's in my opinion reflective in

       6   the uncontested sequence of events in terms of the

       7   encounter and the uncontested use of the two taser

       8   weapons and the recording, video recording of the

       9   events.

11:12:03 10   BY MS. HOLMES:

      11      Q    So you do not dispute -- you do not dispute

      12   Deputy Perine and Deputy Vianzon's description of the

      13   encounter?

      14            MS. ZUGMAN:  Misstates testimony.

11:12:14 15            THE WITNESS:  Of course I do.  And I don't know

      16   exactly what part of their description you have in mind.

      17   But what I have in mind is their offering that, and

      18   rationale in the record, that they felt it necessary to

      19   use the taser such as -- tasers, plural, such as they

11:12:41 20   did because Mr. Adkins was assaultive and combative.

      21   BY MS. HOLMES:

      22      Q    So is it your opinion that they created a

      23   dangerous situation, escalated the encounter when they

      24   started using the taser?  Is that when that started, or

11:13:03 25   was it before?

EXHIBIT H

Roger Clark - 4/19/2019

11:13:03  1      A      When they -- no.  I'm not at all -- I don't
          2   consider the -- their response to the scene and their
          3   encounter as excessive or unnecessary.  I think it's --
          4   I have no judgment about it other than, as you know in
11:13:31  5   my report, I said I consider that it should have been --
          6   could have been very easily handled with verbal skills.
          7            Nevertheless, I'm not critical of the first
          8   tasing.  But when he's on his back and down, then it's a
          9   gratuitous use of the taser that's absolutely
11:13:56 10   unnecessary.  And it's their -- their escalation, not
         11   his, that causes it.
         12      Q      Just so I'm clear, you say you're not critical
         13   of the first tasing.  Which tasing are you referencing?
         14      A      Well, it's not recorded.  Apparently there were
11:14:12 15   two firings of each taser before the video starts.  And
         16   he's on his back.  So their allegation that he was some
         17   way dangerous or posed a credible threat -- probably the
         18   best word -- when they encountered him, and, therefore,
         19   was necessary for their use of taser to subdue him.
11:14:44 20   It's not part of my -- it's not part of my commentary or
         21   opinions.
         22      Q      So you're not critical of the initial use of
         23   the taser?
         24      A      I don't think there's enough information
11:14:54 25   provided that would put the initial use of the taser as

Roger Clark - 4/19/2019

11:15:00  1  part of the concern that I expressed in the other

2  remaining parts of the opinions.  Let me add this.  The

3  first opinion is a global opinion, and the remaining

4  four are parts of the global opinion.  So having said

11:15:19  5  that, certainly the tasings that occurred are

6  significantly beyond the reasonable necessity.

7     Q    So is it still your opinion, as written on page

8  20 of your report, quote:  "This situation could have

9  and should have been resolved using verbal skills alone

11:15:41 10  early on in the encounter," close quote?

11          MS. ZUGMAN:  Asked and answered.

12          THE WITNESS:  That's exactly what I just said

13  earlier to response to the question.  I don't see how it

14  was necessary to use a taser at all.  But I don't think

11:15:56 15  that that's the initial -- or that's the issue here.

16  It's the, as I said earlier, the gratuitous tasings that

17  continued on were absolutely not justified.

18  BY MS. HOLMES:

19     Q    What -- during your time in law enforcement,

11:16:22 20  what experience do you personally have encountering

21  suspects who are under the influence of PCP?

22          MS. ZUGMAN:  Incomplete hypothetical.

23          THE WITNESS:  I made some arrests with persons

24  on PCP.

11:16:37 25  ////

EXHIBIT H

Roger Clark - 4/19/2019

| | | |
|---|---|---|
| 13:23:31 | 1 | DECLARATION UNDER PENALTY OF PERJURY |
| | 2 | |
| | 3 | |
| | 4 | I, ROGER CLARK, the witness herein, declare under |
| 13:23:31 | 5 | penalty of perjury that I have read the foregoing in its |
| | 6 | entirety; and that the testimony contained therein, as |
| | 7 | corrected by me, is a true and accurate transcription of |
| | 8 | my testimony elicited at said time and place. |
| | 9 | |
| 13:23:31 | 10 | Executed this __25__ day of __APRIL__ 2019, at |
| | 11 | ___SANTEE____, ____CA_____. |
| | 12 | (City)                    (State) |
| | 13 | |
| | 14 | |
| 13:23:31 | 15 | |
| | 16 | |
| | 17 | |
| | | ROGER CLARK |
| | 18 | |
| | 19 | |
| 13:23:31 | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

SHELBURNE SHERR COURT REPORTERS, INC. (619) 234-9100
www.sscourtreporters.com

140

EXHIBIT H

Roger Clark - 4/19/2019

| | | |
|---|---|---|
| 13:23:31 | 1 | STATE OF CALIFORNIA) |
| | 2 | )ss. |
| | 3 | COUNTY OF SAN DIEGO) |
| | 4 | I, Dana E. Simon, Certified Shorthand Reporter |
| 13:23:31 | 5 | No. 12683, for the State of California, do hereby |
| | 6 | certify: |
| | 7 | That, prior to being examined, the witness named |
| | 8 | in the foregoing deposition was duly sworn to testify to |
| | 9 | the truth, the whole truth and nothing but the truth; |
| 13:23:31 | 10 | That said deposition was taken down by me in |
| | 11 | shorthand at the time and place therein named, and was |
| | 12 | thereafter reduced by me to typewritten form, and that |
| | 13 | the same is a true, correct, and complete transcript of |
| | 14 | said proceedings; |
| 13:23:31 | 15 | Before completion of the deposition, review of |
| | 16 | the transcript {x} was { } was not requested.  If |
| | 17 | requested, any changes made by the deponent (and |
| | 18 | provided to the reporter) during the period allowed are |
| | 19 | appended hereto.  I further certify that I am not |
| 13:23:31 | 20 | interested in the outcome of the action. |
| | 21 | Witness my hand this___22nd___day of |
| | 22 | ___April_____2019. |
| | 23 | _____ |
| | 24 | Dana E. Simon, CSR No. 12683 |
| 13:23:31 | 25 | |

SHELBURNE SHERR COURT REPORTERS, INC. (619) 234-9100
www.sscourtreporters.com

141

EXHIBIT H

# Exhibit I

**San Diego County Sheriff's Department - Addendum Section F**

---

**ADDENDUM F SECTION
USE OF FORCE GUIDELINES**

---

The preservation of order and the observance of law are best achieved through voluntary compliance rather than force or compulsion. The higher the level of public voluntary compliance and cooperation, the less need for the use of force. To that end, the use of force must always be considered secondary to the desirability of voluntary compliance to law.

The enforcement of law and performance of law enforcement duties may require the use of physical force and physical restraint. Both law and department policy authorizes the use of force. Deputies are protected under criminal and civil law when using force in a legally appropriate and proper manner. It is incumbent on the department and all sworn personnel to ensure force and restraint are used in a manner that not only provides for the greater public safety, but in such a way as to engender public trust and confidence as well.

**POLICY:**

It shall be the policy of this Department whenever any Deputy Sheriff, while in the performance of his/her official law enforcement duties, deems it necessary to utilize any degree of physical force, the force used shall only be that which is necessary and objectively reasonable to effect the arrest, prevent escape or overcome resistance. Deputies shall not lose their right to self-defense by the use of reasonable force to effect the arrest, prevent escape, or overcome resistance (per 835(a) P.C.). Deputies shall utilize appropriate control techniques or tactics which employ maximum effectiveness with minimum force to effectively terminate or afford the deputy control of the incident. The use of force and subsequent reporting must be in accordance with the procedures set forth in these guidelines (see Policy and Procedures Section 6.48).

Note: Serious injury means a serious impairment of physical condition, including but not limited to: loss of consciousness, concussion, bone fracture, protracted loss or impairment of function of any bodily member or organ, a wound requiring extensive suturing, and serious disfigurement.

**REPORTING USE OF FORCE:**

Force includes the pointing of any firearm or weapon designed to fire a projectile and any incident involving the actual or attempted detention of a subject at gunpoint (defined as holding the barrel of a weapon on target).

Deputies (or other employees) who use force to overcome resistance or to control or apprehend a subject must verbally inform their supervisor as soon as practical, but in no event later than the end of shift. Whenever any physical force used by a deputy results in a complaint of injury or an injury that necessitates medical treatment of a subject, a supervisor will be notified immediately.

---

CSD001474

EXHIBIT I

**San Diego County Sheriff's Department - Addendum Section F**

All deputies (or other employees) using force must clearly articulate the force used in writing. All deputies who witness force resulting in serious injury must document their observations in writing. All uses of force will be documented in the narrative of an arrest report, crime report, inmate status report, or deputy's report by the primary reporting deputy. The force used by each deputy, and force that results in serious injury which is observed by a deputy or other employee, will be documented in a deputy's report, to be attached to the primary report. The names of all employee witnesses shall be listed in the primary deputy's report. If in doubt as to the necessity or type of report required, seek direction from a supervisor.

Exception: In deputy involved shootings and use of force resulting in death or a high probability of death , the involved deputies and witnessing deputies will be interviewed by the Homicide detective or other detective as assigned by the Homicide sergeant.

Additionally, one Use of Force Supplemental form (SO-120) will be completed by the primary reporting deputy for each incident to include all levels of force used. During incidents where force is used on multiple subjects, a separate SO-120 form will be completed for each subject. Text on the supplemental form, SO-120, is optional but all the appropriate boxes shall be checked. The use of force reports and supplemental SO-120 form must be completed and submitted no later than the end of shift. In those cases when there is no case number, the event number should be substituted. Station/Facility Captains will be required to review all Use of Force Supplemental forms (SO-120), Use of Force reports and any other supporting documentation of the previous month no later than the 10th of each current month. The Division of Inspectional Services will be responsible for verifying that all Use of Force reports have been completed and approved.

During the service of high-risk preplanned warrants and tactical operations, the Special Enforcement Detail will document all uses of force that pertain to the pointing of any firearm or weapon at a subject in their Department approved After Action Report as required by their individual unit operating procedures. They will also complete an SO-120.

When physical force is used to overcome resistance or to control or apprehend a suspect, Special Enforcement Detail personnel will comply with the Use of Force Guidelines set forth in Policy and Procedure Addendum F Section.

Supervisors and/or investigating deputies will make every attempt to identify and interview all necessary civilian witnesses to use of force incidents. Professional staff employees who witness force resulting in serious injury shall be interviewed. Whenever possible, interviews will be recorded.

In all cases where force is used, photographs will be taken of the suspect regardless of injuries. Photographs will also be taken of where the force was applied. All injuries to deputies or subjects shall be documented in the NetRMS report. All photographs taken shall be attached to the NetRMS report and submitted into evidence. Photographs will also be taken of any resulting property damage. A Medical Records Release Form, PAT-43, will be used to obtain copies of treated subjects' medical records for inclusion in the report.

**Use of Force Guidelines**                                                                                           2
**3/2/16**

CSD001475

EXHIBIT I

**San Diego County Sheriff's Department - Addendum Section F**

All images depicting uses of force produced by or legally in the possession of the Sheriff's Department, whether video or still photos shall be entered into evidence, and their existence noted in the primary use of force report.  The images, if available, should be viewed by the supervisor who approves the use of force report(s).

The basic questions addressing who, what, when, where, how and why, must be answered.  In addition, the following must be specifically included:

- What did the subject do?  (Provocation)
- What could have happened if the subject was not stopped?
- What did you do to counter the subject's actions?

When an adult prisoner, in a field arrest situation, requires medical treatment as the result of physical force being applied by a deputy, and the prisoner refuses medical examination and/or treatment, the arresting/transporting deputy will complete an original and one copy of form J-223 (Statement of Refusal of Medical Treatment).  The original will be presented to the Jail Intake Nurse at the time the prisoner is evaluated for intake into the jail.  The copy will be attached to the NetRMS report.

All juvenile arrestees requiring medical treatment as the result of physical force being applied by a deputy will be processed in accordance with section 739(d), Welfare and Institutions Code.

All use of force reports will be reviewed via the chain-of-command to the level of captain.  Any supervisor within the chain-of-command may initiate an administrative investigation.  All reports (arrest/juvenile contact reports, inmate status reports, medical reports, etc.) will be processed in a timely manner and not withheld pending follow-up investigative reports.

**Supervisors Responsibilities:**

A supervisor or designee will respond to the scene or medical facility to investigate uses of force that result in a complaint of injury or an injury that necessitates medical treatment and investigate the circumstances surrounding the incident.  The supervisor will ensure that all witnesses were identified and interviewed, proper photographs were taken of all injuries and damage, and legal means of obtaining records of medical treatment is accomplished. In serious injury cases, the supervisor will be responsible for interviewing the subject about the force used during the incident.  Whenever possible the interview will be recorded.

The supervisor or designee will notify the facility or communications center watch commander of the findings.

If the supervisor or watch commander deems an incident to be of significant magnitude, additional action may be initiated, such as notification of supervisors via the chain-of-command, Peer Support, Internal Affairs, the Homicide Unit, etc.

CSD001476

EXHIBIT I

**San Diego County Sheriff's Department - Addendum Section F**

**LEGAL ASPECTS:**

All sworn employees should familiarize themselves with policy and law that relate to the use of force.  The following list represents some of the more pertinent areas:

- Conformance to Federal, State and local laws, and department policies
- Use of Force
- Use of Lethal/less Lethal Weapons
- Physical Force
- Use of Firearms - Deadly Force
- Inhumanity to prisoners
- Assaults by officers under color of authority
- Lawful resistance, by whom made
- Duty of a person to refrain from using force or weapon to resist arrest
- Method of arrest; reasonable restraint
- What force may be used?
- Personal rights
- Peace Officer liability
- Punishment for assault
- Deprivation of rights under color of law
- Civil Rights Act
- Civil action for deprivation of rights
- Action for neglect to prevent
- Self Defense

**FORCE OPTIONS**

Force options are choices available to deputies concerning the methods outlined in these guidelines.  Deputies should choose the available force option, which is reasonable and necessary for the circumstances at the time. Subjects must not gain the advantage in a physical confrontation; therefore, deputies may need to use a force option that exceeds the subject's force level. The Use of Force Options Chart, including "Levels of Resistance" and "Principles of Control" follows, accompanied by an explanation of its various components.

**Warnings:**  In situations where any force used is capable of causing serious injury or death, there is a requirement that, whenever feasible, the deputy must first warn the suspect that force will be used if there is not compliance.

## Levels of Resistance:

Psychological intimidation refers to a subject's nonverbal cues indicating the subject's attitude, appearance and physical readiness to resist.

**Verbal noncompliance** is evidenced by a subject's expressed unwillingness to comply with a deputy's commands.

**Use of Force Guidelines**                                                                                             4
**3/2/16**

**San Diego County Sheriff's Department - Addendum Section F**

**Passive resistance** is represented by a refusal to respond to verbal commands but also offers no form of physical resistance.

**Active resistance** refers to overt physical actions intended to prevent a deputy's control, but that does not attempt to harm the deputy.

**Assaultive behavior** is represented by conduct that suggests the potential for human injury. Such behavior may be conveyed through body language, verbal threats and/or physical actions.

**Aggravated active aggression** refers to subject actions that will potentially result in serious injury or death to a deputy or any other person.

## Principles of Control:

**Deputy presence** is the psychological impact of an authority figure.

**Verbal direction or redirection** refers to verbiage or commands given by a deputy.

**Non-lethal chemical agents** are used as a means of overcoming resistive or assaultive behavior. They may be used prior to hands-on control, if a physical confrontation appears to be unavoidable and injury may result.

**Hands-on control** is used as a means of overcoming resistive or assaultive behavior. Soft hand control may be used to control subjects whose behavior does not demand more severe tactics. Hard hands control, powerful hand or leg strikes, carotid restraint, etc., are techniques used to control more assaultive suspects.

**Intermediate weapons** fall into two categories. Soft intermediate weapon controls include the use of batons, Cord Cuff restraints, etc., when used for restraint, joint locks or come along tactics. Hard intermediate weapon control includes saps and batons when used to deliver strikes. Less lethal munitions used for long range impact and electronic immobilization devices also fall within the intermediate weapon's category.

**Lethal force** refers to the use of tactics that may result in serious injury or death.

The Use of Force Options Chart is a visual representation of various force options commonly available and is not intended to be all-inclusive. Ultimately, evaluation of the situation, knowledge of options and good judgement must prevail in determining the level of force that is reasonable and necessary for the given situation.

Factors that will affect a deputy's choice of force options include but are not limited to:

- A subject's age and physical stature
- Demonstration of pugilistic intent
- Physical condition and/or injuries to the subject
- The Deputy's knowledge of other factors representing imminent danger

**Use of Force Guidelines**                                                                                  5
**3/2/16**

CSD001478

EXHIBIT I

**San Diego County Sheriff's Department - Addendum Section F**

- The number of subjects and/or deputies
- The subject's state of sobriety
- Subject's proximity to weapons
- Availability of options for deputies

**USE OF FORCE OPTIONS CHART -- VARIABLES: LEAST AGGRESSIVE TO MOST SEVERE**



CSD001479

EXHIBIT I

**San Diego County Sheriff's Department - Addendum Section F**

When a subject is cooperative, verbalization may be a viable control technique. Verbalization techniques include advising, persuading and warning. A deputy with a physical position of advantage and a mature, professional attitude and appearance, may use verbalization techniques to prevent escalation of a situation. These techniques include:

- Clearly explaining what you want the subject to do
- Explaining any actions about to be taken
- Allowing a subject to save face in front of peers
- Recognizing that a subject's remarks are not a personal attack

Deputies should attempt to de-escalate confrontations by using verbalization techniques prior to, during and after any use of physical force. Commands should be given in clear, concise terms, i.e., "don't move," "slowly raise your hands over your head." **Keep it simple.**

**Arm guidance and firm grip:**

When verbalization proves ineffective, arm guidance or a firm grip may suffice to overcome resistance. Arm guidance or a firm grip that results in injury requires documentation.

**Sudden Death Syndrome (SDS):**

After physical confrontation some subjects may be at risk of sudden death. Such prisoners may be suffering from drug-induced psychosis, genetic psychosis or excited delirium. These prisoners may exhibit some of the following symptoms:

- Tremors
- Convulsions
- Seizures
- Delirium
- Hallucinations - visual (seeing things), tactile (feeling bugs on the skin), auditory (hearing voices).
- Assaultive behavior
- "Superhuman" strength
- Dilated pupils
- Paranoia
- Non-purposeful behavior, meaningless acts (e.g. licking windows)
- Rapid, slow or irregular pulse rate
- Hyperthermia - high body temperature, sweating
- Confusion
- Yelling or screaming incoherently
- Thrashing after being restrained

A subject who exhibits symptoms of drug-induced psychosis or excited delirium should be immediately evaluated by a physician at an approved hospital.

CSD001480

EXHIBIT I

**San Diego County Sheriff's Department - Addendum Section F**

The decision whether to transport a prisoner by a patrol car or paramedics should be based on the deputy's judgement as to which option will provide the fastest access to advanced life support and professional medical care. If paramedics provide transport, at least one deputy will accompany the paramedics to the treatment facility. If the subject is transported in a Sheriff's vehicle, when practical two deputies will make the transport. The passenger deputy should monitor the subject's breathing, skin color and level of consciousness.

**Non-lethal chemical agents:**

Department issued Oleoresin Capsicum (OC) spray and PepperBall are the only non-lethal chemical agents to be carried and utilized by authorized department personnel, with the exception of agents deployed by the Special Enforcement Detail.

The PepperBall delivery system with OC/water filled projectiles will be carried and deployed by deputies trained in the system. Although the PepperBall system is listed as a less lethal munition in this guide, the OC filled projectiles have far less potential for injury than other less lethal munitions.
OC is used to subdue subjects by spraying the agent onto the face. In order to be effective the active ingredient must come in contact with the eyes and mouth. The spray should not be aimed directly at the eyes. The force of the stream leaving the projector could damage the soft tissue of the eye. The agent should be just as effective if the bridge of the nose or the chin is targeted.  OC may not be effective from less than three feet.

Professional staff will complete a department approved training curriculum before being issued canisters of less than 2.5 ounces of OC.  Professional staff may use OC in a self-defense posture only.

Peace officers may use non-lethal chemical agents in an offensive manner. They may deploy OC where their presence and verbal commands have been ineffective. Non-lethal chemical agents may be used to control a threatening subject when a physical confrontation is imminent. It may also be used when there is a potential for injury to deputies, suspects/inmates and other persons.

The decision to use non-lethal chemical agents on handcuffed prisoners must be carefully weighed. Non-lethal chemical agents are intended to reduce, limit or prevent injuries when lesser force options would not likely be effective in allowing a deputy to gain control of the subject.  Non-lethal chemical agents will not be used on a restrained prisoner who is verbally abusive but not violent.

Some of the common deployment errors made when using non-lethal chemical agents are:

- No tactical plan prior to deployment
- Spraying too close
- Spraying too long and too much
- Not moving while spraying
- Missing your target

**Use of Force Guidelines**                                                                                              8
**3/2/16**

CSD001481

EXHIBIT I

**San Diego County Sheriff's Department - Addendum Section F**

- Moving in too soon
- Cross contamination
- No other force option considered

It is the responsibility of the deputy deploying non-lethal chemical agents to ensure that appropriate decontamination measures are undertaken as soon as practical after application. The subject should be handcuffed prior to decontamination because the duration of incapacitation will vary depending upon the type of agent used and the individual's reaction to the agent. Avoid placing the subject in a prone position any longer than necessary to complete the handcuffing process. Instruct the subject to calm down and relax.

Move the subject to an uncontaminated area. If a fan is available, you may direct the airflow over the subject's face. Place the fan at a safe distance. Flush the face with cool water keeping in mind that the water may reactivate the agent in some instances. Continually monitor the subject for any abnormal reactions to the agent. Any unanticipated reaction requires immediate medical attention. If otherwise normal effects of agent exposure persist beyond forty-five minutes, medical attention must be obtained.
If there is any doubt as to the nature of the reaction, seek medical attention.   You must notify your supervisor as soon as practical but no later than the end of shift following the application of non-lethal chemical agents.

**Transporting after application of OC spray**

If the subject is transported in a Sheriff's vehicle, the deputy will monitor the subject's breathing, skin color and level of consciousness.  Any abnormal or questionable physical presentation demands immediate medical attention.

**CONTROL COMPLIANCE TECHNIQUES**

When a deputy needs to make an arrest or restrain an in-custody subject and the individual's actions are actively resistant or; assaultive, reasonable compliance techniques such as arm locks, wrist locks, nonlethal chemical agents, pressure point tactics (touch & penetrating pressure, non striking) and baton compliance techniques (nonstriking) may be necessary to obtain control and compliance.

**Swarm Technique:**

When a deputy needs to make an arrest or restrain an in-custody subject and the individual's actions are actively resistant and/or assaultive, the swarm technique may be used. This technique is accomplished by a group of deputies working in unison, using their combined body weight to gain control of a resisting subject.

The swarm technique requires preplanning and a coordinated, simultaneous effort by all involved deputies.  The "swarm technique" reduces the risk of injury, while allowing maximum control.  The swarm technique should not be attempted on a suspect/inmate who is believed to be armed.  Physical contact should not be made until all means of verbal control have been exhausted or proved otherwise ineffective and a sufficient number of deputies are present.

CSD001482

EXHIBIT I

**San Diego County Sheriff's Department - Addendum Section F**

**Striking techniques:**

Striking techniques are those techniques that a deputy employs using personal body weapons, i.e., fists, hands, arms, elbows, legs, head, feet and knees. Strikes are techniques in which injury may occur. There is no expectation for a deputy to receive the first strike before employing striking techniques; however, the deputy must articulate the necessity and reasonableness for striking first. Unorthodox tactics such as head butting may be used to escape grappling holds when other personal body weapons are otherwise trapped by the attacker.

**Hand techniques, Fists:**

Punching techniques may be necessary when a suspect/inmate is assaultive, or the subject exhibits signs of imminent physical attack. A fist strike to a subject's face when reasonable and necessary is not prohibited; however, it is preferable to use an open hand (palm heel) technique to reduce the likelihood of injury to the deputy's hand.

**Kicking techniques:**

Kicking techniques such as front or rear kicking motion may be appropriate when a subject is judged to be assaultive.
The physical structure of the leg is generally stronger and may have greater impact capability than the arm, hand or fist. When using a kicking technique, deputies should fully consider the reasonableness and necessity for doing so.

As with impact weapons, deputies should avoid hitting/kicking a subject's head, neck, throat, spine, kidney and groin due to the potential for serious injury or death. Striking these areas should be avoided unless the subject's actions suggest an imminent threat of death or serious injury to the deputy or others and no reasonable alternatives are available.

**Carotid Restraint:**

Carotid restraint is a method of rendering a subject unconscious by restricting the flow of blood to the brain by compressing the carotid sheaths on the side of the neck.

The primary method of compressing the carotid sheaths is to encircle the neck with the arm so that the inner blade of the forearm and biceps areas compress the sides of the neck. The arm forms a "V" around the neck with the deputy's elbow in front of the subject's windpipe. **The carotid restraint should never be held for more than thirty (30) seconds. Pressure is never applied to the windpipe.** The subject's head is usually stabilized in this position by the deputy placing his/her head against the back of the subject's head, then pushing the subject's head into the "V."

The carotid restraint may be used on subjects who are actively resisting or assaultive. The intent of the hold is to render the subject unconscious to allow the deputy time to gain control. The carotid restraint is classified as controlling force. In certain situations, such as those involving a subject who is mentally ill or exhibiting the symptoms of excited delirium, the carotid restraint may be more effective than using an impact weapon.

**Use of Force Guidelines**                                                                                         10
**3/2/16**

**San Diego County Sheriff's Department - Addendum Section F**

**Caution must be used in applying the carotid restraint. Deputies must take all precautions to insure that the hold does not slip into a bar arm or windpipe chokehold. If circumstances do not permit proper application of the hold, it should not be attempted. If, during application of the hold, the deputy's arm slips, the deputy must make the necessary adjustments for proper application or release the hold and resort to another form of control.**

If, while applying the carotid restraint hold, the subject loses consciousness while standing, the deputy should support the subject and move to the kneeling restraint position to avoid injury to himself or the subject.



Whenever possible, the carotid restraint should be applied as a "two-deputy" technique. The second deputy, in addition to providing cover, is responsible for observing the application of the hold to ensure it is correctly applied and the thirty-second time parameter is not exceeded. The cover deputy should also monitor the subject's levels of consciousness and communicate that information to the deputy applying the hold.

Most subjects will lose consciousness within 5 to 15 seconds of proper application of the hold however; times may vary depending upon the condition of the subject. **If, after 30 seconds of applying the hold, the subject remains conscious, the deputy should release pressure on the neck and use another force option.** If there are multiple deputies at the scene (3-5), a viable option is the "swarm technique." If the deputy is alone and cannot safely move to another force option, he should maintain control of the subject's head and neck with reduced pressure until help arrives. The carotid restraint hold should not be used on an individual more than twice during an enforcement contact unless there are no other means of control.

**Use of Force Guidelines**                                                                 11
**3/2/16**

EXHIBIT I

**San Diego County Sheriff's Department - Addendum Section F**

**Medical / Transportation Requirements:**

Once the subject is under control, the deputy must closely monitor the subject's physical condition.  The following procedures should be exercised:

- Roll the subject onto his/her side, or into a seated position
- Monitor breathing and, if necessary, establish an airway
- Check for pulse at the wrist
- Check the subject's facial skin color (a gray or blue tint is a sign of severe medical distress)
- Confirm recovery of consciousness within thirty (30) seconds (voluntary movement, ability to converse, awareness of place, time and date)
- Continuously monitor the subject's physical condition for a minimum of  two hours or until medically cleared.

**If the subject has not regained consciousness within thirty (30) seconds, has difficulty breathing, is not at a functional level of consciousness, exhibits symptoms of medical distress, or if the deputy has any doubt regarding the subject's medical condition, the deputy must seek immediate medical attention.**  If paramedics provide transport, at least one deputy will accompany the paramedics to the treatment facility.

**Any subject who is rendered unconscious by means of carotid restraint and recovers satisfactorily, will be immediately transported to a hospital for a medical evaluation.**  If the subject is transported in a Sheriff's vehicle, when practical, two deputies will make the transport.  The passenger deputy should monitor the subject's breathing, skin color and level of consciousness.

If during transport a medical problem arises, deputies should call paramedics to the scene and render first aid until they arrive.  Depending on the situation, deputies may choose to transport the subject to the nearest emergency medical facility while rendering first aid.

**Reporting procedures:**

When deputies render a subject unconscious by means of a carotid restraint, they must verbally inform their supervisor immediately or as soon as practical, but in no event later than the end of shift.  Application of the carotid restraint, as in any use of force, must be detailed in appropriate reports.

When the subject is booked into county jail, the deputy will notify the intake/receiving nurse and deputies that a carotid restraint was applied, whether the subject lost consciousness, and any other pertinent details.

CSD001485

EXHIBIT I

**San Diego County Sheriff's Department - Addendum Section F**

**EQUIPMENT USED IN FORCE TECHNIQUES**

**Cordcuff / Ripp Restraint Device:**

The Cordcuff / Ripp restraint is typically made of a length of nylon strap approximately one half inch wide and forty inches in length.  It has a loop on one end and a brass snap at the other. Safe application of the cord cuff restraint generally requires two deputies.

The Cordcuff restraint is for use around a subject's ankles to prevent kicking, or around the subject's waist to prevent transferring cuffed wrists from the back to the front of the body.  The leg restraint may be used when the subject's hands are handcuffed behind his/her back and the handcuffs are double locked.  Caution must be used when applying the cord cuff leg restraint.  **Under no circumstances will a deputy apply the Cordcuff leg restraint to the head or neck of a subject.**  When applying the Cordcuff restraint, one deputy is responsible for the application and a second deputy is responsible for controlling the subject.

The Cordcuff / Ripp restraint device may be used on violent subjects who, by kicking, pose a threat to themselves, others, or to equipment.  Additionally, it may be used in lieu of leg chains to hobble subjects who present an escape risk.

The "maximum restraint technique" is used on violent subjects that are not controlled by other means.  Application of maximum restraint entails the use of at least two Cordcuff / Ripp restraint devices.  This application results in restricted movement of both the hands and feet.

**As soon as possible after a subject is maximally restrained, he will be rolled onto his side or into a seated position.   The arresting deputy must continually monitor the subject for consciousness and breathing.**

**Transporting:**

If the subject is transported in a Sheriff's vehicle, when practical, two deputies will make the transport.  The passenger deputy should monitor the subject's breathing, skin color and level of consciousness.

**Reporting Procedures:**

The arresting deputy will verbally notify his/her immediate supervisor as soon as possible but no later than the end of shift.  The deputy's written report will include all pertinent facts relative to the use of the Cordcuff restraint technique as well as notification of a supervisor.

**Restraint chairs:**

Restraint chairs are located in court and detention facilities.  These chairs may be used to control people who are violent and require maximum restraint.  Restraint chairs are not to be used to secure a compliant, nonviolent person.

CSD001486

EXHIBIT I

**San Diego County Sheriff's Department - Addendum Section F**

**Reporting procedures:**

When a restraint chair is used in a detention setting, supervisory approval is necessary and documentation must clearly articulate the justification.  The chairs must be in a location permitting constant observation by staff.

**Spit Sock:**

Because of the inherent health risks, deputies may deal with spitting assaults / attacks on persons or property by use of a department approved "Spit Sock." The current department approved, Stearns Wear spit sock is a light weight, sheer, protective mesh material.  When placed over a subject's head and face, neither vision nor breathing is impaired; however, saliva will not penetrate the material.

Spit Socks are not reusable and must be discarded after use.

When possible, application of the Spit Sock should be accomplished by two deputies.  One deputy will maintain constant observation of the subject.  A subject's mouth and/or nose shall never be obstructed. **The Spit Sock will not be tightened in any manner to secure the mask around the prisoner's neck.** If signs of medical distress develop, the deputy shall remove the Spit Sock and seek immediate medical attention.

**Reporting procedures:**

Use and justification of the Spit Sock must be articulated in detail in the arrest or other appropriate reports.

**Conducted Energy Device (CED):**

The CED is a less lethal, electronic control device that is extremely effective for temporary immobilization of subjects.  The CED produces 50,000 volts of electricity that cause involuntary muscle contraction and temporarily incapacitates a subject.

As a force option, the CED shall only be used as a means of subduing and gaining control of a subject displaying assaultive behavior.  Use of the CED shall be restricted for use under circumstances where it is deemed reasonable and necessary to minimize the potential for human injury.

Only deputies trained in the use of a CED will deploy the device.  If possible, only one device should be deployed against a single suspect/inmate.

A subject who has been contacted by a CED is typically immobilized within two to three seconds.  Cover deputies should move in quickly and restrain the subject while he/she is under control of the CED.  The subject's recovery time should be rapid.

**Use of Force Guidelines**                                                                                        14
**3/2/16**

EXHIBIT I

**San Diego County Sheriff's Department - Addendum Section F**

**Precautions:**

CEDs are considered less lethal and may have contributed to suspect/inmate deaths, so care must be exercised in their use.  The CED should not be aimed at a subject's head, neck, or groin, nor should it be used when a subject is in danger of falling from a significant height. Deputies should evaluate whether the use of the CED is appropriate based on the suspect's age (children, elderly) or physical condition (i.e. under the influence, physically handicapped, pregnant) versus the level of threat posed by the suspect.

The electric current shall be discharged only as long as reasonable and necessary to bring a subject under control or a complete CED cycle (5 seconds).  Multiple cycles must be reasonable to gain control of a suspect/inmate.  Deputies will not use a CED on a restrained suspect/inmate who is under control.

The CED may be used in "drive stun" mode (placing the unit in direct contact with the suspect/inmate) if reasonable to protect the deputies or others from injury and to gain control of the suspect/inmate, however, caution should be used to avoid the subject gaining control of the CED.  The CED should not be intentionally placed against the suspect/inmate's face, neck, head, or groin.

The CED can ignite flammable liquids (gasoline or alcohol based chemical sprays).  Current issue Defense Technology OC is non-flammable and will not ignite.

**Medical Treatment:**

Once the suspect/inmate is handcuffed and under control, deputies shall immediately monitor for the signs and symptoms discussed previously under "Sudden Death Syndrome."  The suspect/inmate should be rolled onto their side or into a seated position and be continually monitored for consciousness and breathing.

All suspects will be transported to a medical facility for booking clearance after all probe or drive stun applications and removal of the CED probes. Probes may be removed by paramedics at the scene to facilitate transportation.  If the suspect is transported in a Sheriff's vehicle, when practical, two deputies will make the transport.  If used in a detentions setting, detention facility medical staff shall be contacted to initiate a medical evaluation of the subject. The CED probes shall be removed by detention medical staff and the subject shall be examined by a physician as soon as practical.

**Reporting procedures:**

The arresting deputy will verbally notify his/her immediate supervisor as soon as possible but no later than the end of shift.  The deputy's written report must include all pertinent facts relative to the use of the CED, including the CED  factory serial number, and notification of a supervisor.  CED activation information shall be downloaded and attached to the Use of Force Report in NetRMS.

CSD001488

EXHIBIT I

**San Diego County Sheriff's Department - Addendum Section F**

**Warnings:** In situations where any force used is capable of causing serious injury or death, there is a requirement that, whenever feasible, the deputy must first warn the suspect that force will be used if there is not compliance.

**Stun Belt/"Bandit":**

The Stun Belt, "Bandit" (or similar electronic technology) is an electronic control device that is placed on a subject who presents significant risk of escape or assaultive behavior, typically during transportation or court proceedings. The device may be activated by remote control. Once activated, the device delivers 50,000 volts of electricity over a period of eight seconds. The stun belt, "Bandit" or similar device must be approved for deployment by a supervisor.

**Precautions:**

Electronic control devices are considered less lethal and care must be exercised in their use. A subject receiving a charge is likely to lose balance and fall to the ground. Reasonable precautions should be exercised to reduce the potential for injury.

**Medical Treatment:**

Once control has been established all inmates shall be immediately rolled onto their side or into a seated position and monitored for consciousness and breathing. All inmates shall be immediately evaluated by emergency medical personnel and transported to a medical facility for examination by a physician.

**Reporting Procedures:**

Deputies must verbally inform their supervisor as soon as practical, but in no event later than the end of shift when the stun belt has been activated. The deputy's written report must include all pertinent facts relative to the use of the Stun Belt and notification of a supervisor.

**Nova Shield:**

The Nova Shield is a riot shield equipped with conductive strips that deliver 50,000 volts of electricity that will incapacitate a subject in the same manner as electronic devices previously described. The device is used to drive back or pin violent subjects, usually in a detention setting. The Nova Shield must be approved prior to deployment by the watch commander or designee.

**Precautions:**

The Nova Shield is considered less lethal and care must be exercised in its use. A subject receiving a charge is likely to lose balance and fall to the ground. Reasonable precautions should be exercised to reduce the potential for injury.

CSD001489

EXHIBIT I

**San Diego County Sheriff's Department - Addendum Section F**

**Medical Treatment:**

Once control has been established all inmates shall be immediately rolled onto their side or into a seated position and monitored for consciousness and breathing.  The inmate shall be immediately evaluated by detentions medical staff and examined by a physician as soon as practical.

**Reporting Procedures:**

Deputies must verbally inform their supervisor as soon as practical, but in no event later than the end of shift when the Nova Shield has been activated. The deputy's written report must include all pertinent facts relative to the use of the Nova Shield and notification of a supervisor.

**Warnings:**  In situations where any force used is capable of causing serious injury or death, there is a requirement that, whenever feasible, the deputy must first warn the suspect that force will be used if there is not compliance.

**Impact Weapons and Control Devices:**

Impact weapons are those devices used primarily for striking and are used secondarily for control hold techniques.  Control devices are used primarily for control hold techniques and secondarily for striking.  Deputies equipped with any type of impact weapon or control device must be certified competent with the instrument by the Defensive Tactics Coordinator or his designee.

The decision to use an impact weapon as a striking device must be based upon the seriousness of the threat and the deputy's reasonable belief that the deputy cannot overcome the resistance or assault, or gain compliance of the subject, by use of lesser force options.  Once a decision is made to use impact tactics, the deputy must remain mindful of injuries that may be caused by the impact weapon if used on bones or joints.  Deputies should generally start with strikes to muscle mass.  If muscle strikes prove ineffective, deputies may find it necessary to escalate to striking bones and joints.  Other factors to be considered are the subject's age, physical stature and condition, state of sobriety, proximity to weapons, etc.

Deputies should avoid hitting a subject's head, neck, throat, spine, kidney or groin due to the potential for serious injury or death.  Striking these areas should be avoided unless the subject's actions suggest an imminent threat of death or serious injury to the deputy or others and no reasonable alternatives are available.

CSD001490

EXHIBIT I

**San Diego County Sheriff's Department - Addendum Section F**

**Department approved equipment:**

- Fixed rigid side handle baton
- Fixed rigid straight baton (department issued)
- Expandable batons -- straight or side handles (optional)
- Flashlight
- Sap, flat beavertail (optional)

**\* Note: The Orcutt Police Nunchaku "OPN" is no longer authorized/approved equipment and is prohibited for use by the Department.**

**Less Lethal Specialty Munitions:**

Less lethal specialty munitions are projectiles used to stop assaultive behavior which, if not stopped, may result in injury or death. These projectiles are manufactured from wood, foam rubber, and other softer-than-lead materials. This type of munition can cause serious injury or death.  Generally, it is the intent of law enforcement to use this type of munition to increase the chances of not having to use lethal force.  When used properly, by trained personnel, this type of munition is less likely to result in death or serious injury.

**Less lethal munitions in the Sheriff's inventory include:**

- 12-gauge bean bag rounds
- 37 mm less lethal rounds
- 40 mm less lethal rounds
- Stingball and Stinger grenades
- PepperBall Systems

**Procedures:**

"Trained" personnel may use less lethal munitions as deemed reasonable and necessary based upon the circumstances of the incident.  Absent exigent circumstances, the Watch Commander or designee shall be notified prior to deployment of specialty munitions in the detention setting.

**Reporting procedures:**

Deputies must verbally inform their supervisor as soon as practical, but in no event later than the end of shift when specialty munitions have been deployed. The deputy's written report must include all pertinent facts relative to the use of the specialty munitions and notification of a supervisor.

It is suggested that photographs be taken to accurately depict the scene, damage and any injury that occurs as a result of the deployment of specialty munitions. Copies of all reports must be sent to the Training Division Defensive Tactics Coordinator.

**Use of Force Guidelines**                                                                                 18
**3/2/16**

EXHIBIT I

**San Diego County Sheriff's Department - Addendum Section F**

**Injury or Death:**

**Whenever a subject is struck by a specialty munition, first aid will be administered, if necessary.  Any abnormal or questionable physical presentation demands immediate medical attention.**

In the event of death caused by a specialty munition, Department personnel will follow the procedures set forth in section 8.2 of the Sheriff's Department Manual of Policy and Procedures and in the detentions setting, section M.7 of the Detentions Services Policy and Procedure.

**Canines:**

Law enforcement trained canines are a viable force option when employed under the direction of their handlers according to the department's Canine Unit Manual.  Canines are typically used in search scenarios, for deputy protection and for apprehension of fleeing subjects wherein this degree of force is justifiable.

**Firearms / Deadly Force:**

**DEPUTIES SHALL USE DEADLY FORCE ONLY AFTER THE DEPUTY REASONABLY BELIEVES THAT THE FORCE USED IS NECESSARY:**

- **In defense of human life, including the deputy's own**

- **In defense of any person in immediate danger of death, or the threat of serious physical injury**

- **To apprehend a fleeing felony suspect, if the felony involves death or serious physical injury or the threat thereof, or the deputy has reasonable cause to believe there is substantial risk that the suspect, if allowed to escape, would pose a significant threat of death or serious physical injury**

Detailed guidelines are found in Department P&P 8.1.

**GLOSSARY**

The following terms apply only to the San Diego County Sheriff's Department Use of Force Manual.

**Arm Guidance** is the light touching of a persons arm or elbow used to direct them to a new location. Arm guidance with no resistance from the subject being guided would not be considered a use of force and consequently not reportable.

**Use of Force Guidelines**                                                                                           19
**3/2/16**

CSD001492

EXHIBIT I

**San Diego County Sheriff's Department - Addendum Section F**

**Controlling force** is the minimum amount of force needed to control a subject who will not submit to verbal commands.  This level of force involves application of control/pain which usually does not result in injury.

**Deadly force** is that force that will likely cause death or serious bodily injury.

**Physical force** is that force applied to overcome resistance and/or achieve compliance, including any use of a department approved lethal, less lethal or non-lethal weapons, pain compliance and control techniques.

**Reasonable force** refers to affecting an arrest using only that force reasonable for restraint of the subject and to get the subject to submit to custody.

**Unreasonable or excessive force** is evident when the type, degree and duration of force employed were neither necessary nor appropriate.

**Weapon** for the purpose of these guidelines is any item, other than a body part, capable of inflicting bodily injury or death.  These include:  firearms, saps, batons, taser guns, bean bag shotguns, pepperball launcher, etc.  (Revised 03-02-16)

CSD001493

EXHIBIT I

# Exhibit J

Atkinson-Baker, Inc.
www.depo.com

1            UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF CALIFORNIA

3

4  ESTATE OF MARK ROSHAWN    )
    ADKINS, ET AL.,         )

5                      )     **CERTIFIED COPY**
        Plaintiffs,     )

6                      )
      vs.              )  No.  3:18-cv-00371-H-LL

7                      )
    COUNTY OF SAN DIEGO, ET AL., )

8                      )
        Defendants.     )

9  _____)

10

11

12

13

14

15      VIDEOTAPED DEPOSITION OF COUNTY OF SAN DIEGO

16         BY AND THROUGH CHRIS CROSS

17           San Diego, California

18            January 10, 2019

19

20

21

22  ATKINSON-BAKER, INC.
    (800) 288-3376

23  www.depo.com

24  Reported by:  MARGARET KINNEY, CSR No. 11398

25  FILE NO.:  AD0032D

Atkinson-Baker, Inc.
www.depo.com

1    and then there's an instructor-level certification.

2        Q   According to San Diego County policy, do

3    deputies have to receive some sort of specific training

4    in order to use a Taser?

5        A   Yes.                                          11:40

6        Q   And what is that -- what is the policy on that?

7        A   So the initial requirement is that they complete

8    an eight-hour, end-user-certification course in order to

9    be eligible to carry a Taser.

10       Q   So the -- the rule is that in order to carry a   11:40

11   Taser a -- a sheriff's deputy has to have completed an

12   initial eight-hour Taser certification course?

13       A   Correct.

14       Q   What is the rule for recertification or

15   continued training to allow that same deputy to continue  11:41

16   to carry a Taser?

17       A   I don't know if rule's the right word,

18   necessarily.  I mean, there is ongoing training that

19   deputies receive through our Continuing Professional

20   Training, or CPT, which, as you may or may not know, POST  11:41

21   requires, minimally, 24 hours of perishable skills

22   training every two years.

23       Q   So you say "rule" wouldn't be the right word?

24       A   Well, I'm not -- there are the initial training

25   requirements, like we talked about, or to complete that   11:42

1    eight-hour certification course.  Deputies in general are

2    required to complete ongoing training, including the use

3    of Taser and a variety of -- and a variety of different

4    force options, primarily through our Continuing

5    Professional Training program, or CPT.                    11:42

6         Q    So I just want to make sure I got this.

7         A    Sure.

8         Q    There is kind of a hard and fast requirement

9    that a -- that a deputy receive this initial eight-hour

10   certification before they can carry a Taser; is that     11:42

11   true?

12        A    That's correct.  They -- they have to certify in

13   order to carry the device.  Similarly, they have to

14   complete basic firearms instruction, for instance, in

15   order to be qualified to carry a handgun.                11:42

16        Q    What does that mean, "to certify"?

17        A    It means they have to successfully pass the

18   end-user certification course.

19        Q    And then how is that documented?  How -- how do

20   we know if a particular deputy is, quote/unquote,        11:43

21   certified?

22        A    It's going to be recorded in -- through our

23   Inservice Training Division and/or our Weapons Training

24   Unit.  Additionally, if the course is POST certified,

25   then it may be reflected in their POST profile or        11:43

Atkinson-Baker, Inc.
www.depo.com

1    POST training summary.

2        Q   Is there, for example, a list someplace that --

3    that would say the following deputies are presently

4    certified to carry a Taser?

5        A   There may not be a stand-alone list,                    11:43

6    necessarily, but it's going to be reflected in each

7    deputy's individual training records whether he or she

8    has completed the end-user certification course or not.

9        Q   So in terms of this term, "certification," is

10   that, essentially, kind of a -- a binary thing based on   11:44

11   whether they've completed the eight-hour initial course

12   or not?

13       A   I'm not sure what you mean by "binary thing."

14       Q   Meaning if a deputy has not completed the

15   initial eight-hour Taser course, they are not certified   11:44

16   to carry a Taser; is that true?

17       A   That's correct.

18       Q   If a deputy has completed the initial eight-hour

19   Taser course, then they are certified to carry a Taser;

20   is that true?                                             11:44

21       A   That's correct.  They would be certified to

22   carry a Taser, and they would be issued a Taser at the

23   same time.

24       Q   All right.  Now -- so let's -- let's use the

25   deputy that just got a Taser, having completed an         11:44

1    eight-hour certification course.

2         A    Sure.

3         Q    Okay.  So that -- that deputy is now,

4    quote/unquote, certified, having successfully completed

5    the -- the eight-hour course, right?                          11:44

6         A    Correct.  And he or she has been issued a Taser.

7    Prior to that they didn't have a Taser.  It wasn't a-- it

8    was not an available force option.

9         Q    All right.  12 months later if -- if that deputy

10   has not received any additional Taser training beyond the    11:45

11   first eight-hour initial course, are they still,

12   quote/unquote, certified to carry Tasers in the eyes of

13   San Diego County?

14            MR. KISH:  Objection.  Assumes facts.

15   Incomplete hypothetical.                                      11:45

16            THE WITNESS:  One -- one more time, please?

17   BY MR. SCOTT:

18        Q    Yeah.

19            Could we read that back, please.

20            (Record read.)                                       11:45

21            THE WITNESS:  I don't know if I can answer that

22   because deputies receive ongoing training in a variety of

23   different subjects, including use of Taser.  It may also

24   be part of the qualifications process -- the firearms

25   qualification process; does that make sense?                  11:46

Atkinson-Baker, Inc.
www.depo.com

```
1   BY MR. SCOTT:

2       Q   You say that Tasers may be part of the firearms

3   qualification process?

4       A   So some of the -- the logs that we talked about

5   early on that were generated by WT, our Weapons Training      11:46

6   Unit.  It's my understanding that we're required to

7   certify twice a year with our firearm.  One -- one out of

8   those two qualifications -- one out of those two annual

9   qualifications involves less lethal weapons, including

10  the use of Taser; does it make sense?                          11:46

11      Q   I -- I'm not sure.  The -- so are Tasers, to

12  your knowledge, part of the firearms qualification

13  process?

14      A   Yes.

15      Q   And -- and what is the requirement for             11:47

16  qualifying with Tasers on a recurring basis?

17      A   Well, again, that's where you may have to

18  actually talk to somebody, potentially, from our

19  Weapons Training Unit.  Again, it's my understanding

20  that -- but since I -- since I haven't been directly      11:47

21  involved in that particular unit in some time, it's my

22  understanding that we're required to qualify with our

23  firearms twice a year.  That part I'm sure of.  In

24  addition to that, one out of those two qualifications

25  also includes less lethal weapon systems, such as a      11:47
```

AD0032D                                    FEBRUARY 11, 2019

LETTER TO DEPOSITION OFFICER/ERRATA SHEET

DEPOSITION OF:  Chris Cross, PMK County of San Diego

DATE OF DEPOSITION: January 10, 2019

CASE:   Estate of Mark Roshawn Adkins v. County of San Diego, et al.

The following are the corrections which I have made to my transcript:

| PAGE# | LINE# | CORRECTION | REASON FOR CORRECTION |
|-------|-------|------------|------------------------|
|       |       | — NONE —   |                        |
|       |       |            |                        |
|       |       |            |                        |
|       |       |            |                        |
|       |       |            |                        |
|       |       |            |                        |
|       |       |            |                        |
|       |       |            |                        |
|       |       |            |                        |
|       |       |            |                        |

Please sign your name and date it on the below line. As needed, use additional paper to note corrections, dating and signing each page. If you have no corrections, please write the word "None" above and sign, date, and return this page.

EXECUTED this _____ day of FEBRUARY, 20 19
at _____ EL CAJON _____, CA _____.
                        (City)                    (State)

_____
            (Signature)

EXHIBIT J

Atkinson-Baker, Inc.
www.depo.com

1

2

3

4

5

6

7

8          I, CHRIS CROSS, do hereby declare under penalty

9     of perjury that I have read the foregoing transcript of

10    my deposition; that I have made such corrections as noted

11    herein, in ink, initialed by me, or attached hereto; that

12    my testimony as contained herein, as corrected, is true

13    and correct.

14          EXECUTED this _27_ day of _FEBRUARY_ ,

15    20_19_, at _EL CAJON_ , _CA._ .
                    (City)              (State)

16

17

18    _____
                CHRIS CROSS

19

20

21

22

23

24

25

                                                    186

PMK: Chris Cross
January 10, 2019

EXHIBIT J

Atkinson-Baker, Inc.
www.depo.com

```
 1   STATE OF CALIFORNIA  )
                          : ss
 2   COUNTY OF SAN DIEGO  )

 3

 4         I, the undersigned, a Certified Shorthand

 5   Reporter of the State of California, do hereby certify:

 6         That the foregoing proceedings were taken before

 7   me at the time and place herein set forth; that any

 8   witnesses in the foregoing proceedings, prior to

 9   testifying, were placed under oath; that a verbatim

10   record of the proceedings was made by me using machine

11   shorthand which was thereafter transcribed under my

12   direction; reading and signing was requested; further,

13   that the foregoing is an accurate transcription thereof.

14         I further certify that I am neither financially

15   interested in the action nor a relative or employee of

16   any attorney of any of the parties.

17         IN WITNESS WHEREOF, I have this date subscribed

18   my name.

19

20   Dated:  January 18, 2019

21

22

23   _____

24   MARGARET KINNEY
     CSR No. 11398

25
```

187

# Exhibit K

Atkinson-Baker, Inc.
www.depo.com

1                 UNITED STATES DISTRICT COURT

2                SOUTHERN DISTRICT OF CALIFORNIA

3

4           Civil Action No. 3:18-cv-00371-H-MDD

5

6    ESTATE OF MARK ROSHAWN ADKINS,    )      **CERTIFIED COPY**
     et al.,                          )
7                                     )
                          Plaintiffs, )
8                                     )
              vs.                     )
9                                     )
     COUNTY OF SAN DIEGO, et al.,     )
10                                    )
                          Defendants. )
11   _____)

12

13

14               30(b)(6) DEPOSITION OF

15    DEFENDANT COUNTY OF SAN DIEGO DESIGNATED WITNESS

16            BY AND THROUGH JOSEPH JARJURA

17                San Diego, California

18                   March 7, 2019

19

20

21   ATKINSON-BAKER, INC.
     www.depo.com
22   800-288-3376

23   File No. AD020BD

24   Reported by:  KATHLEEN S. McLAUGHLIN, CSR No. 5845

25

Atkinson-Baker, Inc.
www.depo.com

```
 1    beginning of the deposition here.                          8    10:18:2

 2          But if you feel like you're getting outside

 3    of your lane or you are no longer speaking on behalf

 4    of the San Diego Sheriff's Department, can I put the

 5    burden on you all to flag that and let us know that,    7    10:18:3

 6    "I'm no longer speaking for San Diego, for the

 7    defendant on that particular issue"?  Is that fair?

 8          MR. KISH:  Yes, I think we can --

 9          MR. SCOTT:   Okay.

10    BY MR. SCOTT:                                           8    10:18:4

11      Q    So going forward, then, as long as we're

12    talking about categories 3 and the subparts there,

13    we'll assume you're speaking for San Diego unless

14    you all tell me otherwise; fair?

15      A    Fair.                                            0    10:19:0

16      Q    Okay.

17      A    Sorry.

18      Q    Okay.  So with that, let me kind of start

19    somewhat broadly, I suppose.

20          To your knowledge what, if anything, does a     8    10:19:1

21    San Diego Sheriff's Department have to do in order

22    to be permitted to carry a Taser and potentially use

23    a Taser in the course of their duties?

24      A    Well, this is assuming after they've

25    graduated from the academy and now are actually in     7    10:19:3
```

1   service, I guess what we would call, they do not get   2   10:19:4

2   anything in the academy.

3          So, once they graduate the academy, for a

4   law enforcement deputy they would go to our four-day

5   Taser less lethal course.  That would be the minimum   5   10:19:5

6   thing that they would have to do.

7      Q    Okay.  So for starters, you had said that

8   you're assuming that our hypothetical deputy here

9   has already graduated from the police academy.

10     A    Yeah.   3   10:20:1

11     Q    Right.  So they've started work at the San

12  Diego Sheriff's Department; right?

13     A    Yes.  After the academy.  They don't --

14  they do not get the training in the academy specific

15  to being able to carry a Taser.  They get training   2   10:20:2

16  on overall use of force, Addendum F, our policies,

17  procedures, which Taser is part of.  But to actually

18  carry a Taser, they must attend this course.

19     Q    Okay.

20          And did -- did you say that, to your   1   10:20:4

21  knowledge, at the police academy deputies do not

22  receive specific Taser training; just more broadly

23  use-of-force training?

24          MR. KISH:  Objection.  Misstates his

25  testimony.   5   10:20:5

Atkinson-Baker, Inc.
www.depo.com

1    BY MR. SCOTT:                                          6    10:20:5

2        Q    Please correct me if I'm wrong.  I'm trying

3    to understand your answer.

4        A    Sure.  Depending on when they go through

5    the academy, sometimes they have actual Taser      4    10:21:0

6    holsters on their belt.  They may have what we call

7    blue gun Tasers or fake Tasers, for lack of a better

8    term, where they may position it on their belt, they

9    may get used to wearing it on their belt to --

10   again, it just depends.                             4    10:21:2

11            Taser may get mentioned and usually does

12   get mentioned as a use-of-force option when we cover

13   use of force.  However, they do not get the specific

14   training that allows them to carry a Taser until

15   after they've graduated.                            9    10:21:3

16       Q    Okay.  To your knowledge, beyond having a

17   fake Taser, for lack of a better word, and hearing

18   it described in overall use-of-force training, to

19   your knowledge, is there any hands-on training or

20   use of the Taser as part of police academy training?  7   10:21:5

21            MR. KISH:  Objection.  Compound.

22            THE WITNESS:  So, yes, there could be.

23   There could be hands-on training.

24            Again, they have it on their belt.  So to

25   get them used to drawing a Taser or manipulating the   9   10:22:0

Joseph Jarjura
March 07, 2019                                        19

EXHIBIT K

| | | |
|---|---|---|
| 1 | other force options on their belt, that could be | 4 | 10:22:1 |
| 2 | considered hands-on training. | |
| 3 |         At some points we run them through a force | |
| 4 | option simulator.  If the Taser is an option for | |
| 5 | them, they may have the opportunity to draw a Taser. | 6 | 10:22:2 |
| 6 | Again, they haven't gotten Taser-specific training, | |
| 7 | but it may be just to get them used to the actual | |
| 8 | draw and then be able to speak about it. | |
| 9 | BY MR. SCOTT: | |
| 10 |    Q    Okay. | 2 | 10:22:4 |
| 11 |         The drawing and the hands-on training that | |
| 12 | you just described, that's using the blue or fake | |
| 13 | Taser, though? | |
| 14 |    A    Yes. | |
| 15 |    Q    Okay.  All right. | 0 | 10:22:5 |
| 16 |         So now set aside the police academy.  So | |
| 17 | once someone is a law enforcement deputy at the San | |
| 18 | Diego Sheriff's Department, you said that there's a | |
| 19 | four-day less lethal course that they take part in? | |
| 20 |    A    Yes.  For law enforcement deputies that | 8 | 10:23:0 |
| 21 | graduate the Regional Academy, in order for them to | |
| 22 | carry a Taser, they have to go through our | |
| 23 | four-day -- it's calls -- we call it Taser less | |
| 24 | lethal and less lethal Taser course. | |
| 25 |    Q    Is -- I know that there's a number of tools | 2 | 10:23:2 |

Atkinson-Baker, Inc.
www.depo.com

1   that can be considered less lethal uses of force.      5     10:23:2

2   Is that correct?  Taser is not the only quote,

3   unquote, less lethal tool.

4           Is that right?

5      A    Correct.                                        6     10:23:3

6      Q    So, you know, bean bag guns or other tools

7   like that are also considered less lethal?  Is that

8   right?

9      A    Correct.

10     Q    Is -- are those other tools, those other      6     10:23:4

11  less lethal options, part of that four-day course,

12  or is the whole thing a Taser course?

13     A    They are -- the other options are part of

14  the course as well.

15     Q    Okay.                                          6     10:23:5

16          So this four-day minimum course that you

17  described has Taser as part of it, but the whole

18  course is not specifically devoted to Tasers.  Is

19  that a fair statement?

20     A    Correct.                                       7     10:24:0

21     Q    Okay.

22          How much of the four-day course is

23  specifically devoted to Tasers?  If you know.

24     A    I wouldn't be able to give you an exact

25  number.  I can tell you it is -- it's over the       5     10:24:1

Joseph Jarjura
March 07, 2019                                       21
EXHIBIT K

Atkinson-Baker, Inc.
www.depo.com

1    minimum required by Taser, which is 16 hours.  It's          8    10:24:1

2    over that.

3        Q    Okay.  So this may be an example of

4    estimating as opposed to guessing.

5        A    Okay.                                                9    10:24:2

6        Q    You yourself have gone through this

7    training, I take it?

8        A    Yes.

9        Q    Do you also participate as a trainer in the

10    four-day less lethal course?                                 6    10:24:3

11        A    Yes.

12        Q    All right.

13            So, based on that background, how many

14    hours would you estimate of the four-day course is

15    devoted to Taser training specifically?                      6    10:24:4

16        A    I'd estimate 20 to max maybe 24.

17        Q    And how many times have you yourself either

18    gone through this four-day course as a student or

19    participated in the four-day course as a trainer?

20    Again, I'm asking for an estimate.                           9    10:25:1

21        A    Okay.  Thank you.  I'm just going to say 20

22    to maybe 24 times.

23        Q    Okay.  So quite a few, I guess.

24        A    Yes.  We do it after every academy

25    graduation, which is four times a year, unless we           9    10:25:3

Atkinson-Baker, Inc.
www.depo.com

1   field?                                                    2        10:34:4

2      A    So if I'm understanding, are you saying are

3   they allowed to carry a Taser after the four-day

4   course?

5      Q    I guess that's another way to ask the same      2        10:34:5

6   question, yes.

7      A    Yes.

8      Q    And is there a test or is there something

9   at the end of the four-day course that they have to

10  pass to enable them to carry the Taser?               1        10:35:0

11     A    Yes and no.  They take a test provided by

12  Taser, and they have to pass that test.  They're

13  being evaluated by us throughout the course.

14         If we feel that there's something that they

15  have a deficiency on, then we would try to remediate  0        10:35:2

16  them during the course.

17         But ultimately if -- if we felt that it

18  just wasn't going to work out for them at this

19  point, then, no, we wouldn't give them a Taser.  We

20  would make them come back and get more training.      5        10:35:3

21     Q    Okay.  So it sounds like there's a

22  curriculum that Taser itself provides that includes

23  a test at the end of it.

24         Is that right?

25     A    Yes.  So we have curriculum as well.  But    9        10:35:4

1    per Taser's curriculum, there is a -- actually,                4        10:35:5

2    technically, I think it's two tests, depending on

3    how you look at it, that they have to pass.

4        Q    Are there any tests other than the one or

5    two tests that Taser provides?                                  6        10:36:0

6            MR. KISH:  Objection.  May call -- may be

7    beyond the scope.

8    BY MR. SCOTT:

9        Q    To your knowledge.

10       A    Are you speaking for the Taser in               3        10:36:1

11   general -- I mean specifically or the class in

12   general?

13       Q    Good clarification.  So I'll ask it -- I'll

14   reask the question.

15           For Taser specifically are there any tests       4        10:36:2

16   that you're aware of beyond the ones that Taser

17   provides that are required for a deputy to be able

18   to carry the Taser in the field?

19       A    No.

20       Q    What's the rest of the curriculum that          3        10:36:4

21   Taser provides?  If you know.

22           MR. KISH:  Same objection.  It's beyond the

23   scope.

24           THE WITNESS:  So Taser's curriculum is 16

25   hours is what they're supposed to get.  It is --         5        10:36:5

1    BY MR. SCOTT:                                           5    10:39:2

2        Q    So at least, to your knowledge, every

3    deputy that has done the four-day course and passed

4    whatever Taser's tests are, are then permitted to

5    carry a Taser.                                          8    10:39:3

6             Is that a true statement, as far as you

7    know?

8        A    Assuming they were there for the entire

9    time?  Yes.

10       Q    Who is responsible, if you know, for        9    10:39:4

11   determining whether a deputy is qualified to carry a

12   Taser?

13       A    What do you mean by determines if they're

14   qualified?

15       Q    Well, so it sounds like a deputy has to do   7    10:40:0

16   this four-day course in order to be able to carry a

17   Taser in the field; right?

18       A    Yes.

19       Q    How is it that they actually get the Taser

20   and are permitted to carry it around?  What's the     0    10:40:2

21   mechanism at the end of the four-day course?

22       A    Okay.  I understand.

23            So they're given the Taser at the beginning

24   so that they can use it throughout the four-day

25   course.                                                0    10:40:3

1        So, assuming that they pass everything that        10:40:3

2   we're asking them to do, they would just keep their

3   Taser and then leave the class.

4        Q    Can you ever think of a time where a deputy

5   has not passed the Taser or the test that Taser has        10:40:4

6   provided?

7        A    I can say there's been times where they

8   haven't initially passed it and then we remediate

9   them and then they passed it after that.  But as far

10  as never passing it completely, no.        10:41:0

11       Q    Are there any rules or procedures or

12  guidelines for how many times a deputy is permitted

13  to take the test that Taser provides?

14       MR. KISH:  Taser guidelines?

15  BY MR. SCOTT:        10:41:2

16       Q    The Taser test that you described before.

17       MR. KISH:  Objection.  Vague.  May be

18  beyond the scope of the designation.

19       THE WITNESS:  If they're -- if Taser has

20  it, I'm not aware of it.        10:41:3

21  BY MR. SCOTT:

22       Q    What about the San Diego Sheriff's

23  Department?  Are there any internal rules that,

24  like, look if you -- you know, if you fail the

25  Taser test, you know, twice, then you have to        10:41:4

1   But it's not specific that it must be for Taser.                    2   10:54:2

2       Q    Is there any -- aside from the use-of-force

3   training that you just described, is there any

4   in-service training whatsoever that is required on

5   an ongoing basis to allow a deputy to continue to            7   10:54:4

6   keep their Taser?

7       A    Can you say it again?

8       Q    Yes.

9            Aside from the semi-annual qualifications,

10  is there any in-service training specific to Tasers          1   10:55:0

11  that's required to allow a deputy to remain

12  certified with their Taser?

13      A    Well, it may be confusing so -- I

14  apologize.

15           The training that is required does include         7   10:55:1

16  Taser, but it's not specific where it's only Taser.

17  So it's use-of-force training.  Taser is part of

18  that -- part of that training.  But it's not only

19  Taser training.

20      Q    And to what extent is Taser training           2   10:55:3

21  incorporated in that use-of-force training?

22      A    As far as what?

23      Q    Well, you said that Taser is part of

24  use-of-force training and that there is a -- there

25  are requirements for ongoing use-of-force training.         9   10:55:4

```
 1    Do I have that right?                                    2     10:55:5

 2       A    Yes.  I guess I'm confused as to -- you

 3    said as -- are you looking for a percentage?  I'm

 4    confused as to what you mean.

 5       Q    Well, I guess what I'm trying to get to is      2     10:56:0

 6    what, if anything, is required to make sure that

 7    deputies, you know, are fresh on their training for

 8    Tasers, that they're up to speed on any new

 9    developments having to do with use of Tasers and

10    whether there's anything that the in-service unit        8     10:56:1

11    does to achieve those goals.  That's kind of the --

12    what I'm trying to get to.

13              Does that make sense?

14       A    It does.  So what I -- as far as the -- the

15    Inservice Training Unit sends out -- let's say there     0     10:56:3

16    was an update that we needed to get out to

17    everybody.

18              So we would send out that update.

19    Sometimes it's just a review.  That's not

20    necessarily new training.  It's to remind people --      2     10:56:4

21    so it might just be training.  It's not necessarily

22    new training, but it's to remind people, hey, read

23    this bulletin just as a refresher.  So I wouldn't

24    necessarily say that those are required.  They're

25    something that we do.                                    8     10:57:0
```

1          Now, if something new comes out and                    0        10:57:1

2     changes, then, of course, we would push that out.

3     But some of the things that are reviewed, they're

4     not required.  We just -- we would just do them.

5          As far as the --                                       1        10:57:2

6       Q    I'm sorry to interrupt you, but just to

7     make sure I'm closing the loop on that.

8          So I understand you to say that the

9     training unit will sometimes send out updates or

10    bulletins.                                                   0        10:57:3

11          Is that by email to deputies?

12      A    Yes.  That's pretty much.

13      Q    So it might say here is a reminder about,

14    you know, this particular issue regarding Tasers or

15    here is something to -- here is a new thing to think         2        10:57:4

16    about with Tasers, and that's in like a

17    bulletin-type format?

18      A    Yes.  Email, bulletin.  It comes through

19    their computers, and that's how they would get that.

20      Q    How does the training unit monitor whether            5        10:57:5

21    the deputies have, you know, opened the email and

22    digested that new information?

23      A    Well, if it's -- not to get too off track,

24    but there's a Learning Management System which

25    tracks -- if it went out through the Learning               3        10:58:1

Atkinson-Baker, Inc.
www.depo.com

1   Management System, then it's tracked, and they're                6      10:58:1

2   given a specific amount of time to do that training

3   and, again, it's all electronically tracked.

4         If it's not and it's sent out through what

5   we would call -- let's say -- SharePoint is the name              8      10:58:2

6   that most people would use -- it goes to everybody.

7   So everyone is getting that email.  So it's, for

8   lack of a better term, understood that you did

9   receive the email.

10        As far as to be able to track if someone                   1      10:58:4

11  opened it, I'm not a technology guy so I honestly

12  don't know.  It's just assumed that you got this

13  training, and you opened it.  You're responsible for

14  it.  Put it that way.

15      Q   Okay.  So it's sort of assumed and                        4      10:58:5

16  understood that if a deputy gets an email from the

17  training department, they're supposed to open it and

18  read it?  Is that a fair statement?

19      A   Yes.

20      Q   But from what I hear from you, beyond that                4      10:59:0

21  there's really no system to follow up and make sure

22  that the deputies have, in fact, read the emails and

23  understood that new material.

24        Is that right?

25      A   Unless it was sent out through our LMS                    9      10:59:1

```
 1   system, which is the Learning Management System, if          2    10:59:2

 2   a bulletin or training was sent out that way, they

 3   can electronically track it.

 4       Q    Do you know whether any Taser updates or

 5   supplemental trainings have been sent out through           5    10:59:3

 6   the LMS system?

 7       A    To be honest, I don't know.  I don't know

 8   if -- most of them, to my knowledge, are through

 9   SharePoint.  There may have been some through LMS.

10           I don't handle the LMS.  We have different        2    10:59:5

11   people that do it.  Sometimes we have professional

12   staff that sends them out.  So, again, I'm not a

13   computer person so they didn't really ever assign

14   that to me.  So . . .

15       Q    Well, if -- so let's look at it from the         6    11:00:0

16   other end, then, in terms of you being the

17   recipient.

18       A    Mm-hmm.

19       Q    If you get a training update through the

20   LMS system, is there something in particular that          4    11:00:1

21   you have to do as a -- as the recipient of that

22   update?

23       A    Yeah.  You have to open up the training,

24   and then at the end you have to click was this

25   completed or not, yes or no.                               0    11:00:3
```

1    Q    And in your own experience, do you recall                    2    11:00:3

2    ever doing that for a Taser-related issue in the

3    last five years?

4    A    Nothing is jumping out at me.  The majority

5    of them are through our email, through SharePoint.                5    11:00:4

6    There could have been, but I really don't -- nothing

7    is jumping out at me right now.

8    Q    And SharePoint you said is essentially an

9    email that goes to all the deputies.  Is that right?

10   A    Yeah.  It might even be the system -- I               5    11:01:0

11   don't know why they call it SharePoint.  But, yes,

12   it's an email that goes out.

13         Some can go out department-wide.  Some of

14   them can go out to specific groups, I believe, if

15   you want to do it.  The same thing with LMS.  I'm             9    11:01:1

16   not that knowledgeable about the systems and how

17   they do them.  But, yes, in general, it goes out

18   department-wide.

19         And if you don't mind, I never actually

20   answered one of your --                                           1    11:01:3

21   Q    Please do.

22   A    -- questions earlier.

23         You talked about that training.  So Taser

24   is part of our four hours that we do every two years

25   for use-of-force training.                                        0    11:01:4

Atkinson-Baker, Inc.
www.depo.com

1       During that four hours there's a lot of            3    11:01:4

2   different topics.  There's things that are touched.

3   They will run through scenarios and through all the

4   scenarios they potentially have the option to use

5   Taser.                                                  5    11:01:5

6       So they get -- if you want to call it

7   required or not, they have to perform the training

8   that we provide, and they must do those four hours.

9   But there's nothing that says it has to be four

10  hours of Taser.                                         8    11:02:0

11      Q    So every two years there is a training

12  requirement to have a use-of-force refresher course,

13  I guess, for lack of a better word?

14      A    That's not specifically, but that would be

15  a good general knowledge.  It would be a safe enough    5    11:02:2

16  statement.

17          It's -- the training has to be provided on

18  two-year cycles.  Four hours is a minimum mandatory

19  for arrest and control, which is basically the use

20  of force.                                               0    11:02:4

21          There may be additional training depending

22  on the course.  But the four hours minimum is arrest

23  and control, and it's on a two-year cycle.  So it's

24  not specific to every two years on this date where

25  it's every two years from the same date.                6    11:02:5

Joseph Jarjura
March 07, 2019                                      53
EXHIBIT K

```
 1     Q    Okay.                                          9    11:02:5
 2          So does any given deputy have to do an
 3     arrest and control, which I guess is essentially the
 4     use-of-force four-hour training every two years, or
 5     are you making a distinction?                        5    11:03:1
 6     A    No.  Every law enforcement deputy has to go
 7     through our -- we put together this course, and we
 8     run it for two years.  They're two-year cycles.
 9          Everyone according to POST, you know --
10     yeah.  So everyone according to POST has to attend   1    11:03:3
11     an every two-year cycle.
12          What I'm saying is you might go, for
13     example, January 30th of 2019.  That might be the
14     beginning of the two-year cycle.  And you go then.
15     The next cycle would start in January of '21, but it 8    11:03:4
16     doesn't mean you have to go by January 30th.  You
17     could go in August of that year.  It technically
18     would not be within a two-year calendar time;
19     however, it is in the two-year cycle requirement.
20     Q    Okay.  So I think I understand what you're      7    11:04:0
21     saying.  Let me make sure I do.
22     A    Sure.
23     Q    Every two years there's a new use-of-force
24     or arrest-and-control training course.
25     A    Yes.                                            8    11:04:1
```

1    Q    And that course is four hours minimum;                    8    11:04:1

2    right?

3    A    It's part of a larger course that we call

4    CPT.  But the four hours is minimum dedicated to

5    arrest and control.  Use of force.                             8    11:04:2

6    Q    And each time there's a new two-year cycle

7    of that course, a deputy needs to participate in

8    that course?

9    A    Yes.  It's mandatory.

10   Q    All right.                                                 9    11:04:3

11       Now, if they do -- if they hit the very

12   beginning of a new cycle and then hit later on in

13   the next cycle, it may be more than two years in

14   between; right?

15   A    Correct.                                                   9    11:04:4

16   Q    But they do have to hit each two-year

17   cycle; right?

18   A    Yes.

19   Q    Okay.  That does make sense.

20   A    Okay.                                                      6    11:04:5

21   Q    Now, within that use-of-force training or

22   updated training, is there specific -- like

23   Taser-specific training within that, or is it more

24   kind of, you know, this is, you know, one of the

25   options in using force that is to be considered?            3    11:05:1

```
 1        Q    And so I want to summarize what we          5    11:33:2
 2   described.  I don't want you to correct me if I'm
 3   wrong about any of this; okay?
 4             I understood you to say that after the
 5   person does their initial four-day less lethal     3    11:33:3
 6   program, there are then annual qualifications that
 7   happen with the Weapons Training Unit.
 8             Is that right so far?
 9        A    Yes.
10        Q    And in terms of any additional Taser       9    11:33:4
11   training that is provided by the Inservice Training
12   Unit, there are general use-of-force ongoing
13   trainings that are four hours in length; right?
14        A    That's correct.
15        Q    And those happen on two-year cycles?        7    11:34:0
16        A    Correct.
17        Q    And as part of those use-of-force
18   trainings, there is usually components that have to
19   do with Taser within that; right?
20        A    Yes.                                        9    11:34:1
21        Q    Beyond those things, are there any specific
22   Taser trainings that are required by the Inservice
23   Training Unit on an ongoing basis?
24        A    There's -- I think the word that's holding
25   me up -- and I'm not trying to not answer it -- is   4    11:34:3
```

Atkinson-Baker, Inc.
www.depo.com

| | |
|---|---|
| 1 | when you say "specific." |
| 2 | We do -- we do have trainings that are |
| 3 | required throughout the year.  Taser would be |
| 4 | mentioned in it or a portion of it.  But it's not |
| 5 | solely just Taser.  Similar to the way our four-day |
| 6 | class is.  That's why we don't just have a just |
| 7 | Taser course.  We do Taser less lethal.  So I'll |
| 8 | give you an example. |
| 9 | We put out an excited delirium video, and |
| 10 | it's twice a year they have to watch it.  Taser is |
| 11 | mentioned in that as part of the training.  So it's |
| 12 | not specific to Taser, but Taser would be in there. |
| 13 | Q    I'm sorry to interrupt.  Forgive me for |
| 14 | interrupting you. |
| 15 | When you say it's mentioned within there, I |
| 16 | mean is that -- is there any more kind of specific |
| 17 | training on, you know, how to or, you know, you |
| 18 | should do this or you shouldn't do that regarding |
| 19 | Tasers, or is it just literally the fact that it is |
| 20 | mentioned within some of these other topics? |
| 21 | A    There is talk about how to use -- under |
| 22 | what circumstances to use your Taser, maybe what |
| 23 | kind of mode to be in, whether you would do drive |
| 24 | stun or you would do probes. |
| 25 | But it's -- I wouldn't say it necessarily |

Timestamps:
11:34:3
11:34:5
11:35:1
11:35:2
11:35:4
11:35:5

1  gets into the -- it does not get into the manual            0    11:36:0

2  manipulation of it.

3     Q    Or like actual physical use of the Taser?

4     A    Correct.  Or physical use of the Taser for

5  the video.                                                  3    11:36:1

6     Q    Okay.

7          So we've talked about the fact that Tasers

8  may be mentioned in the two-year cycles of

9  use-of-force training; right?

10    A    No.                                                 0    11:36:3

11         MR. KISH:  Objection.  Misstates his

12  testimony.

13         THE WITNESS:  Sorry.

14  BY MR. SCOTT:

15    Q    Please straighten me out if I've misstated          3    11:36:3

16  that.

17    A    Sorry.  So it's not that Tasers are only

18  mentioned in that.  They're actually -- we train

19  with them, but it's not -- what I was trying to

20  explain -- I know I'm doing a bad job.                     4    11:36:4

21         It's just not Taser-specific.  It's not

22  that they get four hours of Taser.  So I will -- I

23  can give you an example.

24         One of the drills we regularly do are force

25  option transitions.  So they will physically           8    11:36:5

Atkinson-Baker, Inc.
www.depo.com

1    training that you were just describing?                    1:07:19

2        A    Yes.

3        Q    So that would be 1664 and 1665 for Deputy

4    Perine, apparently?

5        A    Yes.                                               1:07:28

6        Q    And then, similarly, if we turn to page

7    1669, that would apparently reflect Deputy Vianzon's

8    POST training?

9        A    Yes.

10           MR. KISH:   There's another page on the            1:07:41

11   back.

12           MR. SCOTT:   Thank you for that.

13   BY MR. SCOTT:

14       Q    I should have said 1669, et seq.   1669 and

15   1670 reflects Vianzon's POST training?                     1:07:49

16       A    Yes.

17       Q    And the remainder, though, of those -- of

18   this exhibit is quote, unquote, in-service training

19   which may or may not have been put on by your unit

20   in particular?                                             1:08:03

21       A    Correct.   It still might be POST training

22   and so you might have duplicates on both -- both

23   files, I guess.

24       Q    Okay.   So why don't we start with Deputy

25   Perine.   And let's try to do this chronologically.        1:08:22

1   I believe we have to start at page 1663.                    1:08:25

2        A    Okay.

3        Q    And please correct me if I'm wrong.

4             It appears to me that if we sort of go up

5   the training record, then we will be able to discuss    1:08:36

6   this in chronological order.  Is that your

7   understanding, too?

8        A    I agree, yes.

9        Q    Okay.

10            So if we start, then, at page 3 of 3 of       1:08:46

11  Deputy Perine's Individual Training Activity -- and

12  I'm talking about the in-service component of it --

13  page 3 seems to describe training that he received

14  in the year 2014.

15            Do you agree with that?                        1:09:05

16       A    Yes.

17       Q    All right.  And I guess there's like one

18  additional class that leaks on to the preceding page

19  for 2014 as well?

20       A    Yes.                                            1:09:14

21       Q    Okay.

22            Look four entries down on page 1663.

23  There's a training that appears to be dated

24  November 6, 2014.

25       A    Yes.                                            1:09:32

Atkinson-Baker, Inc.
www.depo.com

1    Q    And it reads "Less Lethal/TASER Training"?    1:09:33

2    A    Yes.

3    Q    Is this course the initial four-day minimum

4    course that we had talked about earlier this

5    morning?    1:09:49

6    A    Yes, it is.

7    Q    So this November 6, 2004, course, at least

8    for this deputy, was the course that he was required

9    to complete and pass the test from Taser to then be

10   quote, unquote, certified to carry a Taser.    1:10:02

11        Is that right?

12   A    Yes.

13   Q    Do you see any other -- any other training

14   entries for 2014 that would have included hands-on

15   Taser training?    1:10:19

16   A    There is potential for hands-on Taser

17   training because of their use-of-force classes.   I'm

18   going -- but I couldn't say that it's designed

19   necessarily for hands-on training.

20   Q    And which ones are you thinking of?   And    1:10:46

21   I'm limiting this to 2014 for now.

22   A    The line above the "Less Lethal/TASER

23   Training," it says, "Restraint Chair Refresher."

24   That's use of force having -- dealing with getting

25   somebody into the -- into the Pro-Straint chair.    1:11:02

Atkinson-Baker, Inc.
www.depo.com

```
 1                  (Reporter interrupts for          1:11:10

 2          clarification of the record.)

 3          THE WITNESS:  They usually just say

 4   "Pro-Straint" and get out the "R-E."  But if they

 5   call it individually, they say restraint chair, but  1:11:16

 6   either will work.

 7          So the restraint chair, they will not only

 8   do a practical on getting somebody in there; they

 9   will usually cover use of force.

10          "Cell Extractions."  So in Cell Extractions  1:11:29

11   they do a practical and run-through of getting

12   somebody out of the cell.

13          Get -- Taser is a force option that they

14   would have available to them so that wouldn't

15   necessarily -- I couldn't say they specifically did  1:11:47

16   it, but there might be an opportunity for some type

17   of manipulation.  But use-of-force training would be

18   in those two.

19      Q    Any others?

20      A    I wouldn't -- nothing is jumping out at me.  1:12:04

21      Q    All right.

22          So Cell Extractions and Restraint Chair

23   Refresher sort of necessarily involve the use of

24   force, or they could involve the use of force;

25   right?                                              1:12:26
```

Atkinson-Baker, Inc.
www.depo.com

1    A    Yeah.  Because what we're doing is an

2  overall use of force.                                              1:12:26

3    Q    And Tasers are one use-of-force option.  So

4  Tasers could have come up in that -- in that context

5  for those two classes we just discussed?                           1:12:40

6    A    Correct.

7    Q    Is it fair to say, though, that neither

8  restraint chair nor cell extraction are designed to

9  train on Taser specifically?

10    A    Yes.  That's fair.  They're not -- they're      1:12:50

11  not the focus of the class.

12    Q    Okay.  Let's go to 2015.

13         Are there any training courses in 2015 for

14  Deputy Perine that would have involved training on

15  the use of Tasers?                                                 1:13:10

16    A    Again, similar to what I was just talking

17  about.  "Detention and Arrest Procedures," it is on

18  3-24-2015.  That is a -- again, a refresher on

19  overall use of force, handcuffing, detaining people,

20  talk about policy, things like that.                               1:13:38

21    Q    So is it similar to what we discussed

22  before, that Tasers could have come up as a

23  use-of-force option in that context, but the course

24  doesn't appear to be designed specifically to train

25  on Tasers?                                                         1:13:51

1        A    Yes.                                                   1:13:52

2        Q    Okay.  Any others in 2015?

3        A    "Supplemental Core Training."   The easiest

4    way I can explain that is -- do you remember I said

5    how there's people that graduate from the law          1:14:04

6    enforcement academy and detentions academy?

7        Q    Right.

8        A    The ones that graduate from the law

9    enforcement academy, some of them go directly to the

10   jails or courts before they go to patrol.              1:14:14

11          The ones that go to the jails would have to

12   take the Supplemental Core Training, because that is

13   detention-specific training.  So they would go

14   through that.

15          There is an element of, again, use of force    1:14:31

16   in Supplemental Core Training, and it would be

17   similar to what we have previously talked about with

18   the other courses.

19       Q    Similar in the sense that use of Tasers

20   could come up as a use-of-force option, but that the   1:14:48

21   course is not designed specifically to teach about

22   Tasers?

23       A    Yes.

24       Q    Okay.  Any others for 2015?  "Restraint

25   Chair" again perhaps?                                  1:15:00

Atkinson-Baker, Inc.
www.depo.com

```
 1        A     Yes.  So Restraint Chair, because it's the        1:15:01
 2   same --
 3        Q     Right.
 4        A     -- same thing.  To my knowledge, that would
 5   probably be it for 2015.                                     1:15:13
 6        Q     All right.  What about 2016?
 7        A     2016.  And because I don't create this, I'm
 8   just going to -- I can't speak for the department on
 9   this.  This would just be me personally.
10             I'm wondering if the department qual on           1:15:36
11   here on 3-1-2016, if that actually means the actual
12   department qualification or what that means.  I
13   really don't know.
14             But then on page 1661 at the bottom it says
15   3-20-2016, "First Responder, Shots Fired - IFT."            1:16:10
16   That is like an active shooter training where
17   somebody is at the facility and has a weapon and a
18   firearm and is shooting.  So it could -- again,
19   similar to the other courses that we talked about,
20   it would fall under the same category.                      1:16:32
21        Q     Because responding to somebody who is an
22   active shooter would almost by definition include
23   the use of force as an option; right?
24        A     Yes.
25        Q     All right.                                       1:16:44
```

```
 1              But to be fair, though, the use of force    1:16:46
 2     would likely be lethal if we're talking about
 3     somebody who is an active shooter; right?
 4        A    Yes.  The primary response that we're
 5     training there is tactics to get to them and       1:16:57
 6     considering lethal is going to be primary.
 7              Anything less lethal would be secondary
 8     based on what that -- if they gave up, what they
 9     did, that type of stuff.
10        Q    Okay.                                       1:17:10
11              So fair to say that a training designed to
12     respond to an active shooter scenario probably
13     doesn't have Taser as its primary focus?
14        A    Yes.  Correct.
15              Three -- or excuse me.  5-20-2016 where it  1:17:26
16     says, "CPT PSP/Deputy Victim Rescue," that is the
17     training that I talked about, the four-hour block of
18     arrest and control, use of force.  That is that
19     training that I was referring to where there's the
20     four hours and, again, Taser is part of it; however,  1:17:49
21     it's not specifically four hours towards Taser.
22        Q    Okay.
23        A    "Cell Extraction" on 5-28-2016.  That's
24     similar to the prior cell extraction that we talked
25     about.                                               1:18:08
```

1    Q     And then 2017?                              1:18:08

2    A     In 2017 the 5-25-2017 that CPT "Active

3  Shooter Response/CPR," that's -- again, that is the

4  next cycle of that same four-hour use-of-force,

5  arrest-and-control training that we -- that I talked   1:18:28

6  about earlier.  So that -- the one in 2016 is a

7  different cycle than the one in 2017.

8    Q     Is it fair to say, then, that according to

9  this document for Deputy Perine, 2014 was the last

10 time that he received Taser-specific training or a    1:18:52

11 course designed specifically to teach Taser

12 tactics?

13         MR. KISH:  Objection.  Compound.  Assumes

14 facts.

15         THE WITNESS:  So in 2014 that was his         1:19:09

16 Taser-specific course where he was initially taught

17 on Taser and certified along with the other less

18 lethal options.

19         And other than the CPT in 2016 where Taser

20 is a portion of it, that would be the only one that    1:19:27

21 was, let's say, Taser-specific.  But I don't want to

22 leave out the other less lethal options that are in

23 that course as well.

24 BY MR. SCOTT:

25    Q     What if we turn to the POST training         1:19:52

Atkinson-Baker, Inc.
www.depo.com

1    records that begin on page 1664 for Deputy Perine?                    1:19:53

2        A    Okay.

3        Q    Would any of these be specifically designed

4    for Taser training, or do you know?

5        A    None would be specifically designed for                     1:20:31

6    Taser.  Taser would be included as part of some of

7    them but not specifically designed for Taser.

8        Q    Which ones would they -- would Taser be a

9    part of?

10       A    Well, use of force.                                          1:20:43

11       Q    Where are you looking?

12       A    Sorry.  So if you look at 8-7-2014 where it

13   says, "Basic Course - Intensive," so that's the

14   Regional Academy.  So they get overall use of force.

15   They need to know their department's policy.             1:21:01

16           Taser is part of the department policy.  So

17   everybody in the academy has to know their own

18   department policy.  There isn't an academy policy.

19   So Sheriffs have to know theirs, PDs know theirs and

20   so on.                                                    1:21:21

21           So knowing the policy.  And then I think I

22   talked to you earlier about just some of the

23   manipulations that may happen through the course of

24   the academy.

25       Q    Correct me if I'm wrong.                         1:21:31

Atkinson-Baker, Inc.
www.depo.com

```
 1       A     Sure.                                    1:21:31

 2       Q     The academy was where recruits may have a

 3  blue Taser or a dummy Taser, for lack of a better

 4  word, but not actual hands-on with live Tasers?

 5       A     Correct.                                 1:21:43

 6       Q     Okay.  Anything else, aside from the

 7  academy?

 8       A     In the -- so it's -- trying to explain.

 9             Then the next line down says 5-19-2016.

10  Those abbreviations over under course name.  Arrest   1:22:00

11  and control is the first abbreviation.  That is that

12  four-hour block that happens every -- every couple

13  years that we spoke about.

14             Down on the next line 5-20-2016, "Active

15  Shooter Response," that's still part of that same      1:22:25

16  course, because it was a 24-hour course.  So, again,

17  it's still combined in that CPT with use of force.

18             Then when you go down to 5-24-2017, they

19  have it titled -- it's 24 hours -- they have it

20  titled as "Advanced Officer Course."  That is,        1:22:50

21  again, that CPT that we call it, that four-hour

22  block.  It was just the next cycle.

23             I can't say 100 percent, because I didn't

24  teach the class, but at 1-4-2018 there's a "Search

25  Warrant" for patrol in there because search --        1:23:16
```

1   depending on what they did.                          1:23:21

2           If it was just on writing search warrants,

3   then, no.  If it was on executing search warrants,

4   then, yes.  And I honestly don't know because that's

5   not something that our unit teaches.                 1:23:34

6           1-20-2018 where it talks about "Mobile

7   Field Force Training," that is our department's

8   training for civil unrest, protests, mobile field

9   force activations.  And there's the use-of-force

10  training on that where Taser would be part of it but  1:23:53

11  not -- it's not specifically towards Taser.

12       Q    So Taser may come up or be a use-of-force

13  option in the context of those courses you just

14  described, but none of those courses are

15  specifically tailored to teach Taser tactics.  Is     1:24:12

16  that true?

17       A    Correct.

18       Q    Okay.

19       A    And, again, 5-17-2018 it's

20  "Firearms/Tactical Rifle."  That is geared towards    1:24:27

21  getting certified to carry an assault rifle.

22  There's overall Addendum F and use of force talked

23  about, but that is, again, similar.  Like you said,

24  Taser may be a part of it, but it is not geared

25  towards Taser.                                        1:24:46

1    Q    Okay.  Not Taser-specific?                    1:24:47

2    A    Not Taser-specific, yes.

3    Q    All right.

4         Let's now turn to Deputy Vianzon.  So let's

5    start on page 1668, and we'll kind of do the same    1:25:03

6    exercise working in chronological order.

7    A    Okay.

8         Let's see.  So at the bottom there

9    4-10-2018, it says, "74th SD regional academy."

10   Just like I went through with -- is it Perine?        1:25:24

11   Perine?  I don't -- just like I went through with

12   Deputy Perine, the same items in the academy, same

13   type of thing.

14   Q    To the extent that there's hands-on Taser

15   training, it would be with a blue dummy Taser?        1:25:41

16   A    Yeah.  Or an inert Taser.

17   Q    Okay.

18   A    Something that doesn't have live cartridges

19   in them.

20   Q    So just -- why don't we start this way.  As      1:25:52

21   we go through chronologically, can you tell me at

22   what point Deputy Vianzon here would have been

23   qualified to carry a Taser?

24   A    Sure.  Absolutely.

25        So we're going through -- so with the           1:26:10

| | | |
|---|---|---|
| 1 | academy, with the policy and all the same stuff. | 1:26:17 |
| 2 | Then we would go to August 9th of 2008. | |
| 3 | "Multi-Hazard Mobile Field Force."  Again, it's a | |
| 4 | mobile field force type class. | |
| 5 |         So what we talked about, it's not | 1:26:33 |
| 6 | specifically designed for Taser, but Taser is part | |
| 7 | of the overall use of force. | |
| 8 |     Q    I think you might be answering a different | |
| 9 | question right now. | |
| 10 |     A    Sorry. | 1:26:43 |
| 11 |     Q    No.  That's okay. | |
| 12 |         Can you tell based on these training | |
| 13 | records when Deputy Vianzon would have become | |
| 14 | qualified or certified to carry a Taser? | |
| 15 |     A    Okay.  Sorry about that.  It would be on | 1:26:54 |
| 16 | page 1667 towards the bottom, April 23rd, 2009.  It | |
| 17 | says, "PSP:  Taser & Ethics."  So that is the -- | |
| 18 | that's the class where he would have gotten his | |
| 19 | Taser.  And at that time it would be an X26 Taser. | |
| 20 |     Q    So there appears to be a different title | 1:27:41 |
| 21 | between the Taser training that he received versus | |
| 22 | what Deputy Perine received in 2014. | |
| 23 |         Do you know what the difference is between | |
| 24 | "PSP:  Taser & Ethics," which is what Vianzon | |
| 25 | appeared to receive, and the "Less Lethal/Taser | 1:28:02 |

1  Training," which is what it appeared that Perine          1:28:05

2  received?

3      A    I don't know if I'll be able to answer to

4  what you're asking, but I'll do my best.

5           Well, the difference is this "PSP:  Taser &      1:28:15

6  Ethics," that is the -- that class that I talked

7  about.  It's every -- on a two-year cycle.  That's

8  what that title is referring to.

9           So the difference is it's not the separate

10  standalone course that Perine took.  This is part of    1:28:37

11  the every-two-year or the two-year cycle course that

12  I talked about.  That's what that one is from.

13     Q    So I'm clear, the April 23rd, 2009, "PSP:

14  Taser & Ethics" course is part of a broader two-year

15  cycle course?                                            1:29:01

16     A    Yes.  Kind of those ones that I've been

17  explaining.  That's what that course -- or that's

18  what that title, the "PSP: Taser & Ethics" and

19  then --

20     Q    What does PSP stand for?                          1:29:13

21     A    My best guess is perishable skills

22  something.  I don't know.  I really don't know.

23  Perish -- I'm assuming it's perishable skills

24  program, but I couldn't tell you.

25     Q    Do you know whether this "PSP:  Taser &           1:29:31

1  Ethics" class included the Taser PowerPoint slides       1:29:36

2  and the test at the end of the PowerPoints and all

3  of that?

4        A    I couldn't tell you.  I don't know.

5        Q    Do you know how we could get the curriculum   1:29:48

6  for the April 2009 "PSP:  Taser & Ethics" training?

7             MR. KISH:  Objection.  Assumes facts.

8             THE WITNESS:  I don't know.  I don't know

9  where -- because I wasn't in the -- I wasn't in the

10  training unit at that time.  So I don't know if it's   1:30:08

11  stored anywhere or if it's not.

12        My -- this is just my best guess, because

13  it was POST.  POST should have an outline.  So maybe

14  contacting POST, I would think they would have one.

15        At the time this is how they were doing         1:30:29

16  Taser training.  So I -- I don't even know if they

17  stored it.  If they stored it, I couldn't tell you.

18  BY MR. SCOTT:

19        Q    So in 2014 Deputy Perine received the

20  four-day "Less Lethal/Taser Training."  Right?        1:30:46

21        A    Yes.

22        Q    And that was kind of the four-day program

23  that we described this morning that deputies today

24  have to go through before they're permitted to carry

25  a Taser; right?                                        1:31:02

Atkinson-Baker, Inc.
www.depo.com

1   just describing, is it?                                    1:35:22

2       A    Well, I guess for manipulation, that's the

3   largest.

4       Q    Right.

5       A    That's the largest evolution.                     1:35:31

6            But in training you have different case law

7   now than you did in 2009.  So you can't train the

8   same way.  You have to give updated training as case

9   law changes.  So that's another one of the things.

10      Q    And is that change in case law what you           1:35:47

11  were describing in terms of the objectively

12  reasonable use of the Taser, how that has evolved

13  over time?

14      A    It's part of it, yes.

15      Q    What are the other parts of it?                   1:36:01

16      A    Well, it's not necessarily whether it's

17  just objectively reasonable.  But you can go into

18  different tactics have also changed.

19           Certain things were -- like when they first

20  started, depending on who you talk to across the      1:36:19

21  country, there really wasn't an exact standard as to

22  when you can use it or the tactics that would go

23  along with it.

24           So as Taser was still fairly new and wasn't

25  as widely used so you -- people had to just kind of   1:36:33

Atkinson-Baker, Inc.
www.depo.com

1   taught where you have to have assaultive behavior          1:41:37

2   based on the totality of the circumstances in order

3   to use the Taser.

4   BY MR. SCOTT:

5       Q    Not just active resistance?                       1:41:45

6       A    Correct.

7       Q    What is the difference between active

8   resistance and assaultive behavior?

9            MR. KISH:  Objection.  Beyond the scope of

10  this witness' designation.                                 1:41:55

11  BY MR. SCOTT:

12      Q    In terms of how you train at the San Diego

13  Sheriff's Department.

14      A    So --

15           MR. KISH:  Same objections.                        1:42:02

16           THE WITNESS:  The best way that I could

17  describe it is assaultive behavior is what we define

18  in our policy as conduct that suggests the potential

19  for human injury.  So something that you do or that

20  someone else is doing or not doing that suggests          1:42:17

21  potential for human injury.

22           So active resistance is where someone is

23  trying to prevent a deputy's control of them;

24  however, they are not intentionally trying to hurt

25  the deputy.                                                1:42:35

1        I will give some examples sometimes in        1:42:37

2   class.  Active resistance could be walking away.

3   Active resistance could be running away.  They're

4   two different things, but they both can be

5   considered active resistance.        1:42:49

6        Assaultive behavior could be verbally you

7   threatening me without ever physically doing

8   anything, or it could be you saying absolutely

9   nothing but, based on your body language, based on

10  things you're physically doing, that could be        1:43:04

11  assaultive behavior by itself.

12  BY MR. SCOTT:

13     Q    So I want to make sure I understand this.

14        So assaultive behavior is suggesting

15  that -- suggesting that a deputy or someone else in        1:43:14

16  the public is in danger of physical harm?

17     A    Yeah.  The deputy, someone in the public or

18  the subject themselves.  They could be in danger of

19  physical harm based on their conduct.

20     Q    So like self-harm like --        1:43:34

21     A    Sure.

22     Q    -- assaulting themselves?

23     A    Not necessarily just assaulting themselves.

24  That would be part of it.  But things that they're

25  doing are putting themselves in danger.        1:43:43

Atkinson-Baker, Inc.
www.depo.com

1    I'll give you an example of -- so if                    1:43:47

2  somebody is walking on the side of the freeway and

3  they go to walk in front of a car -- okay? -- they

4  may not be trying to hurt themselves, they may not

5  know what they're doing.  But are they putting          1:44:04

6  themselves at harm?  Yes.  Are they putting other

7  people in harm's way?  Yes.

8    So it's not always necessarily the

9  intention.  It's the conduct itself.  Does it

10 suggest that someone is going to get hurt.             1:44:15

11   Q    Is there any kind of time requirement on

12 that?  I mean does it need to be like imminent harm

13 or --

14   A    No.  It's based on totality of the

15 circumstance.                                          1:44:28

16   Q    I assume it can't be, for example, you

17 know, "We believe that the suspect might hurt

18 somebody next week."  I assume it has to have some

19 sort of -- there's got to be some immediacy to it,

20 doesn't there?                                         1:44:44

21   MR. KISH:  Objection.  Incomplete

22 hypothetical.

23   THE WITNESS:  There is no specific time

24 frame or immediacy.  It just has to be when

25 considered in the totality of the circumstances.  It  1:44:53

Atkinson-Baker, Inc.
www.depo.com

1    has to be part of it.                                          1:44:54

2          So one week is part of the circumstances

3    versus in five seconds.  So the -- but we don't

4    teach a specific time frame.  Like it must happen in

5    the next hour, if that's what you're wondering.         1:45:07

6    BY MR. SCOTT:

7        Q    Okay.

8          How else has use of Taser evolved in terms

9    of how you-all teach it, aside from active

10   resistance versus assaultive behavior?                  1:45:24

11       A    Well, again, I can't really speak to the

12   past because, since I've been an instructor, it's

13   been assaultive behavior.  So I don't know if I

14   could really give you an answer on that one.

15       Q    Has the objectively reasonable use of a        1:45:42

16   Taser changed since you've been an instructor?

17       A    You mean different from assaultive

18   behavior?

19       Q    Right.

20       A    No.                                             1:45:53

21       Q    So, other than the change from assaultive

22   behavior to -- excuse me -- from active resistance

23   to assaultive behavior, are you aware of any other

24   changes or evolutions in the objectively reasonable

25   use of a Taser from, say, 2009 to present?              1:46:15

Atkinson-Baker, Inc.
www.depo.com

```
 1          So we try to always train that, try to --        1:58:34
 2    "You're not Superman, you're not going to know
 3    everything, but these are things we'd like you to
 4    look for and, if possible, do."
 5    BY MR. SCOTT:                                           1:58:46
 6         Q    Okay.  I think that we sort of went down a
 7    little bit of a path in terms of the difference of
 8    "PSP:  Taser & Ethics" training versus less
 9    lethal/Taser training as it exists today.
10         A    Yes.                                          1:59:01
11         Q    We were kind of talking about --
12         A    The title and everything?
13         Q    Yes.  So -- which is fine.
14              So let's turn back, though, to Deputy
15    Vianzon's training records.                             1:59:11
16              So the way that you read his training
17    activity here is that it must have been the
18    April 23rd, 2009, course that qualified him or
19    certified him to carry a Taser.
20              Is that right?                                1:59:27
21         A    Correct.
22         Q    But we don't know as we sit here today what
23    that course entailed or what was taught at it.
24         A    I don't specifically know, yeah.
25         Q    Does it appear to you that Deputy Vianzon    1:59:41
```

1    received any Taser-specific training in 2010?          1:59:44

2        A    No.

3        Q    Did Deputy Vianzon receive any

4    Taser-specific training in 2011, based on the

5    training records?                                       2:00:01

6        A    So in 2011 on October 19th, 2011, where it

7    says "Active Shooter Response Based CPT" and then

8    parentheses that "PSP" underneath, that's, again,

9    that two-year block where, just like I said in the

10   other times, Taser would be part of it, but it's not   2:00:21

11   specific to Taser.  That would be that class.

12       Q    Taser certainly isn't specific to an active

13   shooter scenario necessarily; right?

14       A    Taser is not necessarily specific to an

15   active shooter scenario, but that's just the title     2:00:41

16   of what they're calling that two-year block.

17            So they still would do the four hours of

18   arrest and control, use of force in that.  So even

19   when they talk -- say Taser and ethics, when they

20   title these, they're talking about what the focus is   2:00:58

21   and what the department-specific training is going

22   to be.

23       Q    So does it appear that Deputy Vianzon

24   received any Taser-specific training in 2011?

25       A    Again, what do you mean by "specific"?  Was   2:01:21

```
 1  the training just Taser or specific to Taser?      2:01:24
 2      Q    Or geared towards Taser tactics and
 3  procedures specifically.
 4      A    It would be -- it would be part of but not
 5  necessarily -- not specifically geared towards that.  2:01:36
 6      Q    What about 2012?
 7      A    Unless -- unless I'm missing something, I
 8  don't see anything for 2012 or '13 on here.  At
 9  least on this page.
10      Q    Does it appear to you from Deputy Vianzon's  2:02:06
11  individual training record here that there was no
12  in-service training of any kind in 2012 or 2013?
13      A    According to this, yes, that's what it
14  appears, according to this.
15      Q    And what if you also look at the POST        2:02:26
16  training that begins on page 1669?
17      A    According to that, I do not see anything
18  for 2012 or 2013.
19      Q    Does that strike you as at all unusual that
20  a deputy wouldn't receive any in-service training    2:02:45
21  for two separate consecutive calendar years?
22      A    Not necessarily, because what you actually
23  had brought up earlier, how you could attend the
24  beginning of one cycle and then the end of another
25  cycle, so what I'm -- so technically for those two   2:03:04
```

1   years that could be -- that could easily happen.  I        2:03:10

2   don't know if I'm making -- if I'm making sense for

3   '12 and '13.

4       Q    But in 2014 it seems that there were two

5   four-hour classes in October of 2014?                       2:03:30

6       A    Yes.  I see those.

7       Q    One for DNA recognition and one for crime

8   scene evidence?

9       A    Yes.

10      Q    So if we look at 2012, 2013, 2014, does           2:03:45

11  there seem to be any training in those three years

12  that would involve Tasers in any way?

13      A    You said '12, '13 and '14?

14      Q    Right.

15      A    Correct.                                           2:04:04

16      Q    Did -- from what you can see in the

17  records, did Deputy Vianzon receive any

18  Taser-specific training in 2015?

19      A    On 7-10-2015 it's similar to what I've been

20  saying in that two-year cycle.  It's not specific to        2:04:34

21  Taser.  Taser would be a portion of the -- of the

22  training block for that two-year cycle.

23      Q    And what about 2016?

24      A    Well, in 2015 as well where it says,

25  "Introduction to Mental Health/PERT" on 11-5-2015,          2:04:56

Atkinson-Baker, Inc.
www.depo.com

1    in our PERT class there is a portion where we do        2:05:04

2    scenarios, again where there are force options

3    available to them when they're handling the call.

4    But it's not specific to Taser again.  It's just --

5    it's possible.  That's in our PERT class.              2:05:24

6         Q    And that was this 2015?

7         A    I can't -- specifically, I'm not sure on

8    the 2015 because I wasn't teaching that at the time.

9    I can definitely say any of the PERT classes for

10   sure from definitely 2017 and beyond, but I honestly   2:05:45

11   don't know.

12        Q    So as you sit here you don't know whether a

13   PERT class in 2015 would have included anything

14   about Tasers or not?

15        A    I cannot honestly say, yeah.                  2:06:05

16        Q    Did Deputy Vianzon receive any

17   Taser-related training in 2016, to the best of what

18   these records reflect?

19        A    I don't believe so.

20        Q    And then it looks like in June of 2017 he    2:06:21

21   did the transition course to the X2; right?

22        A    Yes.

23        Q    Okay.

24             And then we already talked about the

25   transition course going from an X26 to the X2 and      2:06:32

| | | |
|---|---|---|
| 1 | court decisions, for example, do they? | 2:37:16 |
| 2 | A    The qual would not, no. | |
| 3 | Q    The qual doesn't include any updated | |
| 4 | manufacturer warning or training material, does it? | |
| 5 | A    The -- no, the qual would not. | 2:37:20 |
| 6 | Q    Okay. | |
| 7 | So, aside from the qual, what else does the | |
| 8 | San Diego Sheriff's Department do to ensure that its | |
| 9 | deputies are recertified annually as described in | |
| 10 | slide 10 here? | 2:37:24 |
| 11 | MR. KISH:  Objection.  Assumes facts. | |
| 12 | THE WITNESS:  Well, it would depend.  There | |
| 13 | may not be anything that we would even need to do. | |
| 14 | Ultimately, our job is if there is | |
| 15 | something significant that needs to be sent out | 2:37:27 |
| 16 | then, again, we could send it out through the email | |
| 17 | system that I talked about. | |
| 18 | We could cover it in training, whether it's | |
| 19 | CPT training.  But for our main recertification it's | |
| 20 | the qual. | 2:37:33 |
| 21 | BY MR. SCOTT: | |
| 22 | Q    What do you mean when you say the main | |
| 23 | certification is the qual? | |
| 24 | A    Well, the thing that we're -- definitely we | |
| 25 | know we're going to do regardless every year is | 2:37:35 |

1    Q    And LMS, you can't recall if any Taser        2:38:33

2    training materials were sent out through that system

3    in recent memory?

4    A    Off the top of my head, I can't remember on

5    that.                                               2:38:36

6              With the emails I know for sure training

7    bulletins are sent out.  And like I said, they're in

8    their emails.  They're expected to read them.

9    They're -- we have always been taught, their

10   sergeants, make sure -- "Hey, you guys got an email.  2:38:40

11   Make sure you read it."

12             Some teams will do it during team briefing.

13   So, again, everybody gets it, but some corporals or

14   training officers -- I know I used to do it -- I

15   would just put it up on the team board so I can --    2:38:45

16   "Hey, everybody you got this.  Do you have any

17   questions?"

18             So but as far as tracking, I can't say that

19   we can track it.  Just it's been told to everybody I

20   don't know how many times, "You're responsible for    2:38:49

21   your emails.  If for some reason you choose not to

22   read your emails, that doesn't relieve you of the

23   responsibility that it was sent to you."

24   Q    So it's fair to say that there's no annual

25   test, for example, to stay recertified with Tasers?   2:38:53

Atkinson-Baker, Inc.
www.depo.com

```
1   is an absolute stop at 15 seconds.  Even the term in      2:56:18
2   there is "if possible."
3            So we don't know -- there isn't a specific.
4   Our goal is as soon as you can, that keeps it safe,
5   solves the situation, we want you to do it then.          2:56:34
6   BY MR. SCOTT:
7       Q    And I understand the, you know, if-possible
8   and there's always extenuating circumstances.
9       A    Yeah.
10      Q    In terms of the way you teach it, though,        2:56:46
11  is 15 seconds kind of a benchmark that deputies
12  should be mindful of if they're not certain whether
13  or not the Taser is working?
14           MR. KISH:  Same objections.  Incomplete
15  hypothetical.                                              2:56:57
16           THE WITNESS:  I'm not really disagreeing
17  with you, but I'm not just fully agreeing with the
18  way you're saying it, the benchmark that -- at this
19  point.
20           The way I teach it and the way the               2:57:10
21  department teaches it, if we could, ideally we have
22  them under control and we have their compliance
23  after the first deployment.
24           So it's always up to the subject.
25  Everything we do is a reaction to what they do.           2:57:23
```

1    They resist; we react.  They resist; we react.          2:57:27

2           So we train them, "Hey, if it's possible

3    after that first deployment, we want control of

4    them.  Give them their verbal -- give them the

5    verbal commands.  Give them the option to comply.        2:57:41

6    If you can get in there and make them comply with

7    the Taser, absolutely great."

8           If you can be done and everything is done

9    after the first deployment, we're happy.  That's

10   what we would really want.  But it doesn't mean it's      2:57:58

11   really going to be up to them.

12          So if they can't accomplish that, it's not

13   necessarily because of something they did.  It's 99%

14   of the time something because of the subject or the

15   device -- the device itself.  The device might not       2:58:14

16   work.  They might miss.  There's clothing

17   disconnects.  There's a lot of things that they take

18   into play.  But in an ideal world we would like

19   everything done after the first deployment.

20   BY MR. SCOTT:                                            2:58:30

21      Q    So let me ask a more specific question.

22          Is there any specific training that the San

23   Diego Sheriff provides deputies to prevent them from

24   overexposing a suspect to electricity because the

25   deputies aren't sure if it's working or not?            2:58:49

Atkinson-Baker, Inc.
www.depo.com

1        MR. KISH:  Objection.  Incomplete                    2:58:52

2   hypothetical.  Assumes facts.

3        THE WITNESS:  Yeah, I would say our

4   training that we give is specific training.  We show

5   videos in the class.  We talk about what reactions          2:59:00

6   they should be seeing.

7        So, again, there's -- they would not

8   necessarily know whether or not the person was

9   receiving the charge.  We train them in these are

10  things that you should look for.  These are              2:59:15

11  characteristics.  So --

12  BY MR. SCOTT:

13     Q    Like what kind of things?

14     A    They're stiff as a board.  They're not --

15  they're straight-up stiff.  Their arms, their legs,       2:59:23

16  everything is stiff.  If that's happening, the Taser

17  is doing exactly what it's supposed to be doing.

18        If it's not, then we don't know whether the

19  Taser is -- well, let me rephrase.  If it's not

20  doing that, then it's not the ideal situation for          2:59:43

21  what we're looking for, nor is it ideal for what

22  Taser really designed.  They want that NMI, that

23  lockup.

24        So they have to make a decision, okay,

25  there's different levels of effectiveness.  What         2:59:58

1  level of effectiveness are we on.  And that Taser          3:00:01

2  may be the best way to control somebody at that

3  point.

4          So they have to just always assess and

5  articulate and justify what they're doing.  But,           3:00:14

6  yeah, our training specifically addresses --

7  addresses those things.

8      Q    Okay.  I think that's all I have.  I don't

9  know if your counsel has any questions or not.

10         MR. KISH:  I do not.  Thank you.                    3:00:28

11         MR. SCOTT:  All right.

12 BY MR. SCOTT:

13     Q    Before we sign off here -- and I'm sure

14 your attorney will explain to you -- at some point

15 you'll have an opportunity to look at the transcript       3:00:35

16 that was created today, and you're entitled to make

17 any changes that you want, but I'll just kind of --

18 a friendly warning without overstepping my bounds

19 here that if you -- you know, if the light goes from

20 red to green or day turns to night, you know, it's         3:00:49

21 going to be fair for us to comment on that

22 discrepancy at trial; right?

23         So only in that spirit I'm kind of offering

24 you the opportunity now.  Is there anything that you

25 can think of that you'd like to correct or that you        3:01:02

AD020BD

APRIL 1, 2019

LETTER TO DEPOSITION OFFICER/ERRATA SHEET

DEPOSITION OF:  JOSEPH JARJURA

DATE OF DEPOSITION:   MARCH 7, 2019

CASE: ESTATE OF MARK ROSHAWN ADKINS V. COUNTY OF SAN DIEGO, ET AL.

The following are the corrections which I have made to my transcript:

| PAGE# | LINE# | CORRECTION | REASON FOR CORRECTION |
|-------|-------|------------|----------------------|
| NONE  |       |            |                      |
|       |       |            |                      |
|       |       |            |                      |
|       |       |            |                      |
|       |       |            |                      |
|       |       |            |                      |
|       |       |            |                      |
|       |       |            |                      |

Please sign your name and date it on the below line. As needed, use additional paper to note corrections, dating and signing each page. If you have no corrections, please write the word "None" above and sign, date, and return this page.

EXECUTED this _____17_____ day of ___April___ , 20 _19_ ,

at__San Diego_____.    ___CA___ ,
        (City)                           (State)

_____(Signature)

EXHIBIT K

Atkinson-Baker, Inc.
www.depo.com

1          I, JOSEPH JARJURA, do hereby declare under

2    penalty of perjury that I have read the foregoing

3    transcript; that I have made any corrections as

4    appear noted, in ink, initialed by me; that my

5    testimony as contained herein, as corrected, is true

6    and correct.

7          EXECUTED THIS ___17___ day of __Apr. 1__.

8    20_19_, at __San Diego__ , ____CA____ .
                  (City)              (State)

9

10                            _____

11                            JOSEPH JARJURA

12

13

14

15

16

17

18

19

20

21

22

23

24

25

234

30(b)(6): Joseph Jarjura
March 7, 2019

EXHIBIT K

1                    CERTIFICATE OF

2        CALIFORNIA CERTIFIED SHORTHAND REPORTER

3            I, the undersigned, a Certified Shorthand

4   Reporter of the State of California, do hereby

5   certify:

6            That the foregoing proceedings were taken

7   before me at the time and place herein set forth;

8   that any witnesses in the foregoing proceedings,

9   prior to testifying, were placed under oath; that a

10  verbatim record of the proceedings was made by me

11  using machine shorthand which was thereafter

12  transcribed under my direction; further, that the

13  foregoing is an accurate transcription thereof.

14           The dismantling of this transcript will

15  render the reporter's certificate null and void.

16           I further certify that I am neither

17  financially interested in the action nor a relative

18  or employee of any attorney of any of the parties.

19           IN WITNESS WHEREOF, I have this date

20  subscribed my name.

21           Reading and signing was requested.

22

23

24  Dated: March 25, 2019

                                    KATHLEEN S. McLAUGHLIN
23                                  CSR No. 5845

25

EXHIBIT K

# Exhibit L

Atkinson-Baker, Inc.
www.depo.com

```
 1              UNITED STATES DISTRICT COURT

 2             SOUTHERN DISTRICT OF CALIFORNIA

 3

 4        Civil Action No. 3:18-cv-00371-H-MDD

 5

 6  ESTATE OF MARK ROSHAWN ADKINS,   )
    et al.,                          )
 7                                   )
                        Plaintiffs,  )
 8                                   )
              vs.                    )
 9                                   )
    COUNTY OF SAN DIEGO, et al.,     )
10                                   )
                        Defendants.  )
11  _____)

12

13

14              30(b)(6) DEPOSITION OF

15    DEFENDANT COUNTY OF SAN DIEGO DESIGNATED WITNESS

16        BY AND THROUGH JAMES GOLEMBIEWSKI

17              San Diego, California

18                 April 3, 2019

19

20

21  ATKINSON-BAKER, INC.
    www.depo.com
22  800-288-3376

23  File No. AD02DFD

24  Reported by:  KATHLEEN S. McLAUGHLIN, CSR No. 5845

25
```

**CERTIFIED COPY**

1

Atkinson-Baker, Inc.
www.depo.com

1   light duty status is they're unable to kneel but          10:27:25

2   they're able to participate in the rest of the

3   qualification, then they're supposed to participate

4   in the portions that they wouldn't need to kneel.

5   So it can vary slightly.                                   10:27:35

6       Q    Okay.

7            In terms of Deputy Vianzon's participation

8   or lack thereof in the March 2017 qualification,

9   what's your understanding of what he did in

10  particular?                                                10:27:51

11      A    My understanding is he did the -- he had a

12  full excusal from the Medical Liaison Unit but that

13  he did do the proper paperwork to be -- to

14  participate and count as his A17 at that time.

15      Q    Okay.                                             10:28:04

16           So when you say "participate," that's sort

17  of a term of art, meaning he provided the paperwork

18  to show that he was medically excused?

19      A    Correct.

20      Q    But beyond that, he didn't participate in        10:28:12

21  sort of the normal use of the word participate?

22           MS. HOLMES:   Objection.   Vague.

23  BY MR. SCOTT:

24      Q    Is that correct?

25      A    He did not do the physical aspects of the        10:28:21

22

PMK: James Golembiewski
April 3, 2019
EXHIBIT L

1    qualification, but he did -- I mean, part -- like I    10:28:25

2    said, per our P&P he actually participated.  He is

3    excused -- he is considered finished at that point

4    so it's -- he didn't do the physical aspects of it,

5    but he did the paperwork.                              10:28:38

6        Q    Okay.

7             And, again, the paperwork isn't written

8    training or written tests or anything like that.

9    The paperwork you're referring to is providing a

10   medical excuse, essentially?                           10:28:48

11       A    Correct.

12       Q    Okay.

13            Now, you alluded to a few moments ago the

14   fact that there's supposed to be some sort of

15   paperwork provided when somebody comes off of light    10:29:00

16   duty or when their medical excusal is finished.

17            Is that correct?

18            MS. HOLMES:  Objection.  Misstates prior

19   testimony.

20            THE WITNESS:  So there's a -- for             10:29:10

21   paper-wise, I don't know what it looks like on that

22   end.  We receive an email that an employee has been

23   cleared and needs to be qualified, and that's to

24   the employee, and we are typically cc'd in the

25   email.                                                 10:29:26

23

1   that he missed while he was on light duty?                    10:32:33

2        A    No physical records.

3        Q    Are there other kind of records that aren't

4   physical records that you're thinking of?

5        A    Vianzon's personal account of it.               10:32:45

6        Q    Okay.  And so we'll get into a second --

7   we'll get into in a second what, apparently, Deputy

8   Vianzon told you about what he did.  And you're

9   describing an oral conversation?

10       A    Yes.                                             10:33:00

11       Q    Okay.  So let's -- we'll get to that in a

12  moment.

13            Are there any records reflecting that

14  Deputy Vianzon made up the qualifications that he

15  missed while he was on light duty?                         10:33:10

16            MS. HOLMES:  Objection.  Asked and

17  answered.

18            THE WITNESS:  I couldn't locate any.

19  BY MR. SCOTT:

20       Q    So what did you do then?  You talked to         10:33:21

21  Deputy Vianzon?

22       A    Yes.

23       Q    And what did you ask him?

24       A    I asked him if he had qualified after being

25  cleared from medical leave.  He said he had, and he        10:33:30

27

Atkinson-Baker, Inc.
www.depo.com

1    described the process.                          10:33:37

2         He explained that he had received an email

3    from the Medical Liaison Unit that he was clear and

4    that before returning to work that he had to come

5    qualify with us and to contact us.   He said he did.   10:33:47

6         That he came down to the range, met with a

7    single employee from Weapons Training Unit, which

8    surprised him.   Said it was kind of weird because

9    he's so used to participating in the standard qual,

10   which we can have, you know, a hundred people there   10:34:04

11   at once.

12        He said that he remembers doing the entire

13   qualification.   And he doesn't remember getting an

14   qual card per se, but he remembers completing it

15   before returning to work.   It's a -- his account of   10:34:17

16   it to me was extremely believable because no one

17   would know that process without having been on light

18   duty and being cleared from it.

19        I've been on the Sheriff's Department for

20   12 years prior to working at Weapons Training.   I     10:34:32

21   didn't even know that was part of what we do.   I

22   didn't know that after -- I had never been hurt in a

23   way that I needed to be off and miss qual, so I

24   didn't even know that you had to -- that it was even

25   a Medical Liaison email.   How it proceeded that you   10:34:46

28

PMK: James Golembiewski
April 3, 2019
EXHIBIT L

Atkinson-Baker, Inc.
www.depo.com

1   needed to, you know, have it done.                    10:34:49

2          His account of it to me was so spot on that

3   there was no way he couldn't have participated and

4   had been able to make that process up.

5       Q    Is there anything else that Deputy Vianzon    10:35:04

6   told you about that process?

7       A    Not that I can think of.

8       Q    Did he identify the single person that he

9   met with?

10      A    No.  I asked him, and all he could say was   10:35:12

11  "a white guy."

12      Q    How many people could that white guy have

13  been?  Does that question make sense?

14      A    Yeah.  At that time frame, five to six.

15      Q    Did you then go ask those five or six        10:35:37

16  people if they remember Deputy Vianzon doing this

17  qualification?

18      A    I didn't.  We -- the County reached out to

19  them.  I didn't personally.

20      Q    To your knowledge, were any of those five    10:35:54

21  to six people able to confirm Deputy Vianzon's

22  account?

23      A    No.

24      Q    What is a qualification card in the way

25  that you were just describing it?                      10:36:09

29

1     the semi-annual qualifications?                          11:45:46

2          A     Correct.

3          Q     Okay.

4          A     They have to do it once a year if they want

5     to carry it off duty.                                    11:45:51

6          Q     Okay.  So if we look at page 1780.

7          A     Okay.

8          Q     What are we looking at here on page 1780?

9          A     The spreadsheet version of it.

10         Q     And what does that -- what does that          11:46:07

11    reflect in terms of what Deputy Vianzon passed in

12    qualifications that year?  Or that session I should

13    say.  Excuse me.

14         A     Handgun, shotgun, pepperball, rifle,

15    beanbag, Taser, and 40 "mill."                           11:46:29

16         Q     So in terms of Taser in particular, do you

17    know what the qualifications would have been during

18    that particular session?

19         A     I don't remember off the top of my head.

20    It's a document that we can try and find.                11:46:47

21         Q     All right.

22               Well, why don't you tell me generally.

23    What do you remember just from your own memory in

24    terms of what the qualifications have been over the

25    years?                                                   11:46:57

Atkinson-Baker, Inc.
www.depo.com

1      A      Over the years?                              11:46:59

2      Q      Yeah.

3      A      Gosh.  I mean, they vary.  Anything from

4   spark testing and proper manipulation, making sure

5   they can draw.  You know, they're not using improper    11:47:11

6   technique pulling their Taser out, making sure they

7   know how to manipulate it, making sure that they

8   know to spark test it, to deploying it, to, you

9   know, using inert cartridges to simulate an actual

10  deployment, giving them instructions on whether the    11:47:23

11  subject is still being assaultive, whether it's a

12  clothing disconnect that's not working and have them

13  have an appropriate response to the task they're

14  being given.

15     Q      Can you think of anything else that would    11:47:47

16  be part of the semi-annual qualification for Tasers,

17  other than what you just described?

18     A      We've done mandatory download where we made

19  sure the system was functioning properly.  We've

20  deployed Taser cartridges.  I'm sure there's more,      11:48:06

21  but that's about as much as I'm pulling up right

22  now.

23     Q      So you described doing spark tests?

24     A      Mm-hmm.

25     Q      Is that basically where you manipulate the   11:48:19

80

PMK: James Golembiewski
April 3, 2019
EXHIBIT L

Atkinson-Baker, Inc.
www.depo.com

1    weapon to make the arc between the prongs at the          11:48:22

2    front of the --

3         A    Correct.   Without -- but without deploying

4    the cartridge.   So for the two different platforms,

5    there's a different way to do that.          11:48:31

6         Q    But without shooting the darts, though,

7    essentially?

8         A    Correct.

9         Q    And then you said deploying the Taser?

10   Sometimes you do that?          11:48:40

11        A    Yeah.

12        Q    What does that look like, typically?

13        A    You would give them the command that the

14   subject is presenting assaultive behavior, and they

15   draw properly and aim their Taser at the -- sorry.          11:48:48

16   I'm struggling for the word.   Preferred target

17   locations and actually pull the trigger.   Have the

18   prongs actually go downrange.   Strike a dojo.   We

19   have large rubber dojos with red in the

20   non-targeting areas, and we have them deploy.          11:49:10

21        Q    You say "dojo."   What's a dojo?

22        A    It's literally a rubber cutout of a person,

23   and they're just designed to -- they're soft and

24   they have springs behind them so they're designed to

25   take an impact and not destroy it.          11:49:25

81

Atkinson-Baker, Inc.
www.depo.com

1    Q    I mean, does it look like kind of a --    11:49:28

2    A    It looks like a person standing at you

3    completely facing you straight on.

4    Q    So kind of like a -- it's sort of a rubber

5    dummy of a -- in the shape of a human being?    11:49:36

6    A    It's just a rubber cutout of a human being.

7    Q    Does it have legs, or is it just from the

8    waist up?

9    A    It has legs.

10   Q    Okay.   So sometimes the qualification will    11:49:46

11   include shooting darts at the rubber dojo?

12   A    The probes, yes.

13   Q    Now, you said that you would -- or that the

14   training would include -- strike that.

15        You said the subject is displaying    11:50:09

16   assaultive behavior.   How does that fit into the

17   qualification?

18   A    That's our policy.   So it needs to be

19   assaultive behavior for it to fit into policy as a

20   weapon that they're allowed to deploy.    11:50:26

21   Q    So in the -- in a qualification -- I mean

22   does somebody at the Weapons Training Unit literally

23   say, "The subject is displaying assaultive

24   behavior"?

25   A    So it's not like an, oh, the subject --    11:50:40

82

PMK: James Golembiewski
April 3, 2019
EXHIBIT L

Atkinson-Baker, Inc.
www.depo.com

1    it's -- it's just the -- we need you to -- you         11:50:42

2    know, "We're testing you on your Taser.  The subject

3    is displaying assaultive behavior in a way that

4    you're going to use your Taser to deploy the Taser."

5    It's not like a use-of-force test per se.  It's        11:50:53

6    making sure that they can manipulate it, deploy it

7    the right way.

8        Q    So -- and please correct me if I'm wrong.

9             For purposes of this qualification, you

10   essentially ask the deputy to assume that the          11:51:04

11   subject is displaying assaultive behavior and that

12   the Taser use is justified?

13       A    Yes.  We're just trying to reinforce that

14   it needs to be assaultive behavior.  It's just --

15   instead of just saying, "Hey, shoot at that rubber     11:51:18

16   dojo," we're reinforcing the -- you know, the actual

17   terminology that's used for us and knowing what you

18   need to have to deploy.

19       Q    And what you need to have specifically is

20   assaultive behavior?                                    11:51:31

21       A    Yes.

22       Q    Does the qualification process include

23   testing the deputies on what constitutes assaultive

24   behavior?

25       A    I don't know if that's ever been one of the   11:51:43

83

Atkinson-Baker, Inc.
www.depo.com

```
 1    kind of one-off qualification for his -- for a        11:55:38

 2    personal weapon.

 3             Is that true?

 4       A    Yes.

 5       Q    All right.  See, I'm learning something        11:55:43

 6    this morning.

 7             Now if we look at page 1783, this appears

 8    to be a spreadsheet reflecting the spring

 9    qualification of 2017.

10             Is that accurate?                             11:56:11

11       A    Yes.

12       Q    Specifically, the qualification that took

13    place in March of 2017?

14       A    Yes.

15       Q    And what does that reflect in terms of the    11:56:20

16    qualifications that Deputy Vianzon passed that

17    particular session, March of 2017?

18       A    He had a medical excusal during that one.

19       Q    Where do you see the medical excusal?

20       A    Sorry.  During -- excused and then right      11:56:38

21    below it's MLU.  So Medical Liaison Unit.

22       Q    Got it.

23             And this was the particular medical excusal

24    that at the very beginning of the deposition today

25    you talked about going back and trying to discern if   11:56:54
```

PMK: James Golembiewski
April 3, 2019
EXHIBIT L

Atkinson-Baker, Inc.
www.depo.com

1    there was evidence that he did a make-up; right?    11:56:58

2        A    Correct.

3             MS. HOLMES:   Objection.   Misstates prior

4    testimony.

5    BY MR. SCOTT:    11:57:06

6        Q    Correct?

7        A    Yeah.   This is the one where -- that I had

8    tried to research.

9        Q    If we turn the page to 1784, does page 1784

10   reflect the September 2017 qualifications for Deputy    11:57:24

11   Vianzon?

12       A    Yes.

13       Q    Now, there are three columns.   I'm reading

14   handgun, shotgun, rifle.   Do you see that there?

15       A    Yes.    11:57:43

16       Q    And under each it says "pass"?

17       A    Yes.

18       Q    And then there's a separate box that says

19   "comments"?

20       A    Yes.    11:57:50

21       Q    And under that it says "passed Taser?

22       A    Yes.

23       Q    Can you tell me why it says "passed Taser"

24   in the comment section rather than there being a

25   separate column that just lists Taser?    11:58:03

88

PMK: James Golembiewski
April 3, 2019
EXHIBIT L

Atkinson-Baker, Inc.
www.depo.com

1      A     That would not have been one of the                    11:58:10

2    categories created by admin at that time.

3      Q     What do you mean?

4      A     In the spreadsheet as a possible category.

5    Maybe it's just because the database is used to it            11:58:27

6    being a March thing.

7      Q     Are -- is the Taser qual typically only in

8    March, or do you know?

9      A     Typically, yes, it's just in March.

10     Q     So what does this -- what does page 1784,             11:58:54

11   then, suggest to you in terms of the -- in terms of

12   his Taser qualifications and --

13     A     That he was tested on Taser and he passed.

14     Q     So, apparently, he did do a qual for Tasers

15   in the fall of 2017?  Is that how you read this            11:59:16

16   document?

17     A     Yeah.  I read it as on September 20th,

18   2017, he was tested and passed a Taser

19   qualification.

20     Q     You said you had an oral conversation with           11:59:34

21   Deputy Vianzon about whether or not he did a makeup

22   for the quals that he missed due to medical excuse?

23     A     Yes.

24     Q     Did he indicate the dates that he did that

25   makeup?                                                      11:59:49

89

Atkinson-Baker, Inc.
www.depo.com

```
 1      A    He said he didn't remember the exact date    11:59:53

 2   but that it was a few weeks -- he believed it to be

 3   a few weeks after the March qualifications.

 4      Q    Have you seen any documents to reflect when

 5   his medical leave ended or anything like that?         12:00:11

 6      A    No.

 7      Q    Let's turn to Exhibit 20.

 8           MS. HOLMES:  Do you mind -- do you have a

 9   copy for me?

10           MR. SCOTT:  I'm sorry.  I thought you had      12:00:31

11   that already.

12   BY MR. SCOTT:

13      Q    Do you recognize Exhibit 20?

14      A    Yes.

15      Q    What is it, please?                            12:00:47

16      A    Qual history.

17      Q    A qual history for --

18      A    Yeah.

19      Q    -- Deputy Perine?

20      A    Yeah.                                          12:00:55

21      Q    Are these records -- do we interpret and

22   read these the same way that we discussed with

23   Deputy Vianzon?

24      A    Yes.

25      Q    So if we start at page 1754 --                 12:01:38
```

90

PMK: James Golembiewski
April 3, 2019
EXHIBIT L

1      A    Okay.                                        12:01:45

2      Q    -- does this document reflect a separate

3  Taser qualification in November of 2014?

4      A    Yes.

5      Q    Perhaps as a result of the initial Taser    12:01:58

6  course that he went through or less lethal course

7  that he went through?

8      A    That is possible.  It should be based on

9  the comments of the initial (unintelligible).

10              (Reporter interrupts for               12:02:11

11          clarification of the record.)

12          THE WITNESS:  In the comments it actually

13  says initial.  So I assume it's initial Taser

14  course.

15  BY MR. SCOTT:                                       12:02:19

16     Q    The next page 1755, do you read this to say

17  that Deputy Vianzon passed a Taser qualification in

18  March of 2015?

19     A    Yes.

20     Q    And then page 1756 reflects qualification   12:02:49

21  with the personal firearm?

22     A    Correct.

23     Q    Page 1757 reflects a September 2015 regular

24  qualification session?

25     A    Yes.                                         12:03:11

91

Atkinson-Baker, Inc.
www.depo.com

1        Q    Which evidently was for just handgun and    12:03:12

2    shotgun that particular session?

3        A    Correct.

4        Q    And not any of the less lethals, including

5    Taser?                                               12:03:24

6        A    Correct.

7        Q    The next page 1758, does this reflect a

8    spring of 2016 qualification?

9        A    Yes.

10       Q    And, again, this is a regular -- kind of    12:03:42

11   the regular battery of qualifications as opposed to

12   one of the one-offs we described before?

13       A    Correct.

14       Q    It appears that it perhaps took Deputy

15   Perine two attempts to qualify on handgun?          12:04:00

16       A    Yes.

17       Q    But then passed for the other categories we

18   see here, including shotgun, pepperball, bean bag

19   and Taser?

20       A    Correct.                                    12:04:13

21       Q    If we turn to page 1763 the -- it reflects

22   the fall of 2017 qualification?

23       A    Yes.  September '17.

24       Q    And it appears it was handgun and shotgun

25   but not any of the less lethals?                     12:05:23

92

PMK: James Golembiewski
April 3, 2019
EXHIBIT L

Atkinson-Baker, Inc.
www.depo.com

```
 1              Is there any way to tell which of these    12:11:49
 2    would have been drafted first?
 3         A    No.  I can tell you that this would have
 4    been drafted before the 6th, just based on that
 5    would have needed to be out prior to people showing  12:12:00
 6    up to qualify.  That's my only knowledge of it.
 7         Q    Let's go to page 3201 of Exhibit 24.
 8    That's the A17 qualification document.
 9         A    Okay.  And it's page -- I'm sorry -- what?
10    4?                                                   12:12:28
11         Q    Yeah.  4 of 5 on the document itself.
12         A    Okay.
13         Q    It should have the Bates stamp 3201 at the
14    bottom.
15         A    For qualification?                         12:12:38
16         Q    You have the right document.
17         A    Yeah.  I think you guys gave me another
18    one, though, that has the stamps.
19         Q    Oh, I'm sorry.  You know what?
20         A    It's 4 of 5.  Okay.  Thank you.            12:12:51
21         Q    Okay.  So we're looking at the same page.
22    It says -- there's a bold heading in caps that says
23    "TASER" in kind of the last paragraph of the
24    document.
25         A    Yes.                                       12:13:14
```

96

PMK: James Golembiewski
April 3, 2019
EXHIBIT L

Atkinson-Baker, Inc.
www.depo.com

1      Q      Or there's one sentence and then another       12:13:14

2   full paragraph below that.

3      A      Yes.

4      Q      So does that sentence and then the full

5   paragraph reflect the -- well, what does it reflect?     12:13:24

6   Let me just ask you.

7      A      It reflects what is expected during the

8   Taser portion of qualification.

9      Q      Is this an instruction for the training

10   unit personnel that are putting on the                 12:13:43

11   qualification, or is it an instruction for the

12   person who is participating in the qualification or

13   both?

14      A      Both.

15      Q      So how does it work?  Is this document       12:13:50

16   distributed ahead of time to both parties?

17      A      This is emailed out to the whole department

18   as what is coming.  The range staff for the day,

19   whoever is assigned.  The task of qualifying people

20   on less lethal would go through this with each         12:14:10

21   individual deputy.

22      Q      In the -- so this Taser section kind of

23   lists several tasks that are expected to be

24   performed?

25      A      Correct.                                     12:14:23

97

PMK: James Golembiewski
April 3, 2019
EXHIBIT L

Atkinson-Baker, Inc.
www.depo.com

1    Q    Do I assume that every deputy who qualifies    12:14:23

2    for that session has to perform each of those tasks?

3    A    Yeah.

4    Q    It's uniform among all the deputies?

5    A    Yes.    12:14:31

6    Q    In your experience, are there tasks that

7    are not described in the qualification paperwork

8    that are then -- that then the deputies are asked to

9    do during the qualification?

10   A    No.    12:14:44

11   Q    So the paperwork that we're looking at here

12   in Exhibit 24 would be a pretty complete statement

13   of what the qualification would be, at least for the

14   A session of 2017?

15   A    Correct.  So it -- it might not be as    12:14:55

16   thoroughly described.  But it will say -- you know,

17   Taser qualification might say there will be --

18   you'll being deploying cartridges, and then the

19   person running the task for the day knows you're

20   going to have them fire a cartridge, change the    12:15:07

21   cartridge, fire, however it was, whether it be the

22   old Taser or the new Taser.

23   Q    Okay.

24        So just to make sure I'm clear, the

25   statement of the Taser qualification that's listed    12:15:24

98

PMK: James Golembiewski
April 3, 2019
EXHIBIT L

1   here in Exhibit 24 would be a pretty complete          12:15:27

2   statement of what's performed at the range for

3   the --

4       A    Yeah.  It might --

5       Q    -- qualification section?                      12:15:36

6       A    I'm sorry.

7            MS. HOLMES:  Objection.  Vague.  Misstates

8   prior testimony.

9            THE WITNESS:  So it might -- like I said

10  earlier, it might actually be vague on purpose, but     12:15:43

11  they'll know what they're going to be tasked with,

12  because we may not tell them that we're going to

13  tell you, A, you're having a clothing disconnect,

14  what do you do.  But whatever task they're given,

15  the same instruction is given to every deputy          12:15:58

16  during -- during the qualification.

17  BY MR. SCOTT:

18      Q    When you say you may be vague about certain

19  things --

20      A    It might just say you'll be tested on the      12:16:05

21  ability to work through a Taser malfunction or

22  something like that.  So they know, okay, I'm going

23  to have to show up and I'm going to have work

24  through a Taser malfunction.

25           The proctor, us behind the scenes, know        12:16:16

99

1   it's going to be a clothing disconnect, it's going   12:16:18

2   to be a miss, it's going to be, you know -- it's

3   going to be a faulty Taser, it's going to be this,

4   it's going to be -- what do you do.  You know, those

5   are all possibles.   12:16:29

6        But it will give them the basic task of

7   what they might be challenged with, what to be

8   prepared for, and then we'll have instructions for

9   them.

10       Q    So is it fair to say that the written   12:16:38

11  qualification materials kind of gives the general

12  topics that the deputy will be responsible for but

13  maybe it doesn't forecast or preview the exact

14  factual scenario that they're going to be tested on?

15       MS. HOLMES:  Objection.  Calls for   12:16:54

16  speculation.

17       THE WITNESS:  It's pretty darn close.  It

18  might lack the -- the terminology that we use for

19  why.  But it's going to be very close.  It's a basic

20  road map of what they're going to get that day.   12:17:07

21  BY MR. SCOTT:

22       Q    Okay.

23            So let's look at the March 2017 training

24  bulletin again.  Do you see the first bullet point

25  there where it says,   12:17:39

100

1    record at 12:30 p.m.                                    12:30:32

2          MR. SCOTT:  This is Melissa Holmes for

3    defendants.

4

5                      EXAMINATION                           12:30:39

6    BY MS. HOLMES:

7      Q    I just have a couple follow-up questions.

8          To confirm, Sergeant Golembiewski, usually

9    the Taser qualifications are done once per year in

10   the spring; correct?                                    12:30:52

11     A    Correct.

12         MR. SCOTT:  Object to the form of the

13   question.  It's leading.

14         THE WITNESS:  Correct.

15   BY MS. HOLMES:                                          12:30:57

16     Q    And would -- let me strike that "would."

17         When you spoke to Deputy Vianzon about

18   being qualified after coming back from medical leave

19   in 2017, what did he tell you about the process?

20     A    He was -- he told me that he received his       12:31:33

21   notification from MLU.  That he was cleared for duty

22   and that he needed to qualify before returning to

23   duty.

24         That he contacted Weapons Training,

25   arranged a qualification, ended up qualifying with     12:31:50

107

1   just him and one person from Weapons Training, which     12:31:55

2   he found odd, because he had always been to such

3   busy quals.

4           He completed the qualification.  Does not

5   remember receiving a qualification card.  Remembers     12:32:06

6   doing all of the different weapons platforms from

7   handgun to Taser before returning to work.

8       Q    And in 2017 -- in the spring of 2017 what

9   would you expect to happen to a weapons

10  qualifications card for a deputy who was returning     12:32:30

11  from medical leave?

12          MR. SCOTT:   Object to the form of the

13  question.

14          THE WITNESS:   I would have expected it to

15  have been processed properly.     12:32:38

16  BY MS. HOLMES:

17      Q    And what does that mean, to be processed

18  properly?

19      A    The deputy would have properly filled it

20  out.  The Weapons Training deputy would have     12:32:47

21  completed their part, and then the Weapons Training

22  deputy would have given that card to admin, someone

23  within admin, to have it entered.

24      Q    Entered where?

25      A    Into the database and then filed -- a     12:33:02

108

Atkinson-Baker, Inc.
www.depo.com

1    physical card filed into the file cabinet.          12:33:06

2        Q    And do you have any under -- let me strike

3    that.

4            What do you believe happened to the

5    qualification card for Deputy Vianzon for A17?       12:33:19

6            MR. SCOTT:  Object to the form of the

7    question.

8            THE WITNESS:  I believe it got lost.

9    BY MS. HOLMES:

10       Q    And what's the basis for that belief?       12:33:28

11       A    His story of how it occurred is so specific

12   that it had to have been what occurred.  He would

13   not have known the process.  It was too detailed for

14   me not to believe.

15           I believe that he definitely completed his    12:33:48

16   qualification, and I believe that, unfortunately,

17   that that card was lost by us or Weapons Training.

18       Q    And earlier you testified about Exhibit 19.

19   And if you would go to 1784.

20       A    Okay.  I'm there.                            12:34:19

21       Q    Why would the -- in the comments "passed

22   Taser" be listed there?

23           MR. SCOTT:  Object to the form of the

24   question.

25           THE WITNESS:  He was tested for -- on a       12:34:33

PMK: James Golembiewski
April 3, 2019
EXHIBIT L

Atkinson-Baker, Inc.
www.depo.com

1    Taser and he passed.                          12:34:37

2    BY MS. HOLMES:

3        Q      And during the B17 qualifications were

4    people who had -- was Taser being tested?

5        A      No, it wasn't.                       12:34:52

6            MS. HOLMES:  Okay.  I don't have anything

7    further.

8            MR. SCOTT:  Nothing further from me.  Would

9    you like to receive the --

10           MS. HOLMES:  Are you going to leave the    12:35:09

11   deposition open or are you closing it?

12           MR. SCOTT:  Let's leave it open just for

13   the purpose of getting the card stock qualification

14   cards, to the extent any exist, as well as the

15   department firearm qualification -- how would you    12:35:31

16   describe it?

17           THE WITNESS:  The -- the announcement.

18   Basically describing what's going to occur.

19           MR. SCOTT:  Right.  So the card stock

20   physical qualifications for Deputy Vianzon as well   12:35:43

21   as the department firearm qualification description

22   or notice for years other than A17 that may exist

23   during the time that Deputy Vianzon was --

24           MS. HOLMES:  How long will it take, do you

25   think?                                            12:36:01

110

PMK: James Golembiewski
April 3, 2019
EXHIBIT L

AD02DFD                                        APRIL 19, 2019

LETTER TO DEPOSITION OFFICER/ERRATA SHEET

DEPOSITION OF: JAMES GOLEMBIEWSKI

DATE OF DEPOSITION: APRIL 3, 2019

CASE: ESTATE OF MARK ROSHAWN ADKINS, ET AL., VS. COUNTY OF SAN DIEGO, ET AL.

The following are the corrections which I have made to my transcript:

| PAGE# | LINE# | CORRECTION | REASON FOR CORRECTION |
|-------|-------|------------|------------------------|
| 75 | 14 | GINA LOZANO | IT WAS IN AS "GINA88ANO" |

Please sign your name and date it on the below line. As needed, use additional paper to note corrections, dating and signing each page. If you have no corrections, please write the word "None" above and sign, date, and return this page.

EXECUTED this _____3ᵈ_____ day of ___MAY___, 20 19 ,

at ___SAN DIEGO___, ___CA.___,
     (City)         (State)

_____
(Signature)

EXHIBIT L

Atkinson-Baker, Inc.
www.depo.com

1        I, JAMES GOLEMBIEWSKI, do hereby declare

2  under penalty of perjury that I have read the

3  foregoing transcript; that I have made any

4  corrections as appear noted, in ink, initialed by

5  me; that my testimony as contained herein, as

6  corrected, is true and correct.

7        EXECUTED THIS __3rd__ day of __MAY__.

8  20_19_, at __San Diego__, __CA.__.
           (City)       (State)

9

10

11            JAMES GOLEMBIEWSKI

12

13

14

15

16

17

18

19

20

21

22

23

24

25

113

EXHIBIT L

1                    CERTIFICATE OF

2          CALIFORNIA CERTIFIED SHORTHAND REPORTER

3               I, the undersigned, a Certified Shorthand

4     Reporter of the State of California, do hereby

5     certify:

6               That the foregoing proceedings were taken

7     before me at the time and place herein set forth;

8     that any witnesses in the foregoing proceedings,

9     prior to testifying, were placed under oath; that a

10    verbatim record of the proceedings was made by me

11    using machine shorthand which was thereafter

12    transcribed under my direction; further, that the

13    foregoing is an accurate transcription thereof.

14              The dismantling of this transcript will

15    render the reporter's certificate null and void.

16              I further certify that I am neither

17    financially interested in the action nor a relative

18    or employee of any attorney of any of the parties.

19              IN WITNESS WHEREOF, I have this date

20    subscribed my name.

21              Reading and signing was requested.

22

23

24    Dated: April  15  2019

                    KATHLEEN S. McLAUGHLIN
23                  CSR No. 5845

25

EXHIBIT L

# Exhibit M

# Department Firearms Qualification A-17
## (March 6-25, 2017)

**\*\*Qualifications will be conducted regardless of weather conditions**

## PROCEDURE

Department firearms qualifications are conducted in accordance with Department Policy and Procedure Section 8.7. It is recommended all personnel read and become familiar with this section.

**Department qualifications are testing, not training**. Deputies will have a maximum of two attempts to pass the course of fire for each weapon system. Deputies who fail to qualify within these two attempts will be given training as time allows. If time allows, the training may take place immediately after the second attempt, but must take place before the deputy reports for his/her next assigned duty day. After the training, they will be given two additional attempts to qualify, which may all take place on the same day, if time permits.

All sworn personnel will qualify with their department issued Glock pistol, Remington shotgun (As long as you have completed a basic POST certified academy; law enforcement), and patrol rifle if trained.

Deputies who are currently assigned to specialized or investigative positions, and who have received command approval to carry a secondary/personal weapon as their alternate duty weapon, must qualify with their department issued weapon first. Those deputies who do not pass the qualification with their department issued weapon will not be allowed to qualify with their secondary/personal weapon until they successfully qualify with their department issued weapon.

## REQUIRED EQUIPMENT

- Duty belt, loaded duty weapon with light, if issued, and three fully loaded magazines, magazine pouches, and ballistic vest
- Shotgun/Rifle if issued
- WTU will provide loaner shotguns, rifles, less lethal shotguns, and pepper ball launchers

Loaner vests and gun belts will not be available for use.

Do not remove your weapon from its holster or any duty ammunition from your magazines unless directed to do so by range staff.

Loaner rifles will not be available for those persons who have department issued rifles. Deputies who are patrol rifle trained, but do not currently have an issued department rifle will qualify with a weapon supplied by WTU.

## DETENTIONS/COURT SERVICE DEPUTY SHERIFFS:

If you are a Detentions/Court Service Deputy and have NOT completed a basic POST certified academy, you WILL NOT qualify on the shotgun.

## ALTERNATE DUTY WEAPONS

Alternate duty qualifications will take place only at the Miramar and SDRFTC (Otay) Ranges. Alternate duty qualifications will not take place at the Vista Range. There will be no exceptions, please plan accordingly.

Deputies will qualify first with their regular duty weapon, upon successful completion; they will then qualify with their alternate duty weapon. Deputies, who are documented failures with their regular duty weapon, will not be allowed to qualify with their alternate duty weapon.

CSD003197

EXHIBIT 24

KATHLEEN MCLAUGHLIN, CSR

EXHIBIT M

# SCHEDULE:

**March 6th - 10th at Miramar Range**
0700-1230
1800-2330

-----------------------------------------------

**Saturday March 11th at Miramar Range**
0900-1530

-----------------------------------------------

**March 13th – 17th at Vista Range**
0700-1230
1800-2330

-----------------------------------------------

**Saturday March 18th at Miramar Range**
0900-1530

-----------------------------------------------

**Saturday March 18th at Otay Range**
0900-1230

-----------------------------------------------

**March 20th – 24th at Otay Range**
0700-1230
1800-2330

-----------------------------------------------

**Saturday March 25th at Miramar Range**
0900-1530

CSD003202

EXHIBIT M